**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF
LANDRY, et al.,

PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR. in his official capacity       CIVIL ACTION NO. 1:21-cv-3867-DCJ-JPM
as President of the United States, et al.,

DEFENDANTS.

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................1

    I.   THE FEDERAL CONTRACTING FRAMEWORK ESTABLISHED BY CONGRESS. ...........................1

    II.  THE BIDEN ADMINISTRATION'S VACCINE POLICY..................................................2

    III. THE CHALLENGED ACTIONS COMPRISING THE CONTRACTOR VACCINE MANDATE..............3

    IV. THE IMPACT OF THE CONTRACTOR VACCINE MANDATE ON PLAINTIFF STATES. ..................5

ARGUMENT...............................................................................................................7

    I.   PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS...................7

        A.   The Contractor Mandate Is Beyond the Executive's Authority and Contrary to Law. ....7

        B.   The Contractor Mandate Failed to Employ the Notice-and-Comment Procedures
            Required by the Procurement Policy Act and APA. .........................................................13

        C.   The Contractor Vaccine Mandate Is Arbitrary and Capricious. ........................................15

        D.   The Contractor Vaccine Mandate Violates the Tenth Amendment and Anti-
            Commandeering Doctrine...........................................................................................................17

        E.   The Contractor Mandate Violates the Nondelegation Doctrine. ......................................18

        F.   The Contractor Mandate Violates the Spending Clause. ....................................................19

        G.   No Barriers to Justiciability Prevent Review of the Contractor Mandate. ........................19

            1.   The OMB Rule, FAR Council Guidance, and Task Force Guidance are Final
                 Agency Actions Under the APA. .............................................................................19

            2.   The Contractor Mandate and Executive Order 13990 Are Ultra Vires. ............21

    II.  PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION...............22

    III. AN INJUNCTION WOULD NOT HARM DEFENDANTS OR DISSERVE THE PUBLIC INTEREST. ..25

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Kahn,*
   618 F.2d 784 (D.C. Cir. 1979) ........................................................................8

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
   141 S. Ct. 2485 (2021)............................................................................ 10, 11

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection,*
   801 F. Supp. 2d 383 (D. Md. 2011) ...............................................................21

*Associated Builders & Contractors of Se. Texas v. Rung,*
   2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ................................................21

*BNSF Ry. Co. v. EEOC,*
   385 F. Supp. 3d 512 (N.D. Tex. 2018) ...........................................................20

*Boelens v. Redman Homes, Inc.,*
   748 F.2d 1058 (5th Cir. 1984).......................................................................10

*Bond v. United States,*
   572 U.S. 844 (2014) ......................................................................................10

*BST Holdings, L.L.C. v. OSHA,*
   No. 21-60845, 2021 WL 5166656 (5th Cir. Nov. 6, 2021)..............................10

*Cf. California v. Bernhardt,*
   472 F. Supp. 3d 573 (N.D. Cal. 2020) ...........................................................15

*Chamber of Commerce of the U.S. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) .......................................................................22

*Chrysler Corp. v. Brown,*
   441 U.S. 281, 304 (1979) ................................................................................9

*City of Dallas, Tex. v. Hall,*
   2007 WL 3257188 (N.D. Tex. Oct. 29, 2007).................................................22

*Commc'ns Comm'n v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021)...................................................................................17

*D.C. v. Heller,*
   554 U.S. 570 (2008) ........................................................................................8

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
   710 F.3d 579 (5th Cir. 2013).........................................................................25

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)................................................................................................16

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)................................................................................................15

*Ethyl Corp. v. EPA*,
   51 F.3d 1053 (D.C. Cir. 1995) .....................................................................................8

*Florida v. Becerra*,
   2021 WL 2514138 (M.D. Fla. June 18, 2021).............................................................14

*Gundy v. United States*,
   139 S. Ct. 2116 (2019)................................................................................................18

*Hawkes Co. v. U.S. Army Corps of Engineers*,
   782 F.3d 994 (8th Cir. 2015).......................................................................................21

*Hillsborough Cty., Fla. v. Automated Med. Lab'ys, Inc.*,
   471 U.S. 707 (1985)...............................................................................................10, 17

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
   804 F.2d 1390 (5th Cir. 1986).................................................................................22, 24

*Jacobson v. Commonwealth of Mass.*,
   197 U.S. 11 (1905)......................................................................................................17

*King v. Burwell*,
   576 U.S. 473 (2015)....................................................................................................11

*League of Conservation Voters v. Trump*,
   303 F. Supp. 3d 985 (D. Alaska 2018)........................................................................22

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016).........................................................................................25

*Liberty Mut. Ins. Co. v. Friedman*,
   639 F.2d 164 (4th Cir. 1981).........................................................................................9

*Louisiana v. Biden*,
   2021 WL 2446010 (W.D. La. June 15, 2021) ...........................................16, 19, 20, 24

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)....................................................................................................23

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ..................................................................................20

*Michigan v. EPA,*
   576 U.S. 743 (2015) .......................................................................................................16

*Mountain States Legal Found. v. Bush,*
   306 F.3d 1132 (D.C. Cir. 2002) .............................................................................. 21, 22

*Murphy v. NCAA,*
   138 S. Ct. 1461 (2018) ...................................................................................................17

*Nat'l Gov't Servs., Inc. v. United States,*
   923 F.3d 977 (Fed. Cir. 2019) ........................................................................................13

*Nat'l Women's L. Ctr. v. OMB,*
   358 F. Supp. 3d 66 (D.D.C. 2019) ..................................................................................20

*Nevada v. United States Dep't of Lab.,*
   218 F. Supp. 3d 520 (E.D. Tex. 2016).............................................................................23

*NRDC v. Wheeler,*
   955 F.3d 68 (D.C. Cir. 2020) ..........................................................................................20

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) .............................................................................................7

*Pac. Legal Found. v. Council on Envtl. Quality,*
   636 F.2d 1259 (D.C.Cir.1980) ........................................................................................21

*Paul v. United States,*
   140 S. Ct. 342 (2019).................................................................................................. 8, 18

*Pennhurst State Sch. & Hosp. v. Halderman,*
   451 U.S. 1 (1981) ....................................................................................................... 11, 19

*Printz v. United States,*
   521 U.S. 898 (1997).......................................................................................................17

*Pros. & Patients for Customized Care v. Shalala,*
   56 F.3d 592 (5th Cir. 1995) .............................................................................................14

*Regeneron Pharms. v. HHS,*
   510 F. Supp. 3d 29 (S.D.N.Y. 2020) ...............................................................................14

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) ..........................................................................................................1

*Rosebud Sioux Tribe v. Trump,*
   428 F. Supp. 3d 282 (D. Mont. 2019)..............................................................................22

*S. Bay United Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020) .................................................................................................... 17

*Sackett v. E.P.A.,*
  566 U.S. 120 (2012) ........................................................................................................ 20

*Sierra Club v. Andrus,*
  581 F.2d 895 (D.C. Cir. 1974) ........................................................................................ 20

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engr's,*
  531 U.S. 159 (2001) ........................................................................................................ 11

*Sorenson Commc'ns Inc. v. F.C.C.,*
  755 F.3d 702 (D.C. Cir. 2014) .................................................................................. 14, 15

*Sosa v. Alvarez-Machain,*
  542 U.S. 692 (2004) ........................................................................................................ 12

*Soucie v. David,*
  448 F.2d 1067 (D.C. Cir. 1971) ...................................................................................... 20

*State of Fla. v. Weinberger,*
  492 F.2d 488 (5th Cir. 1974) .......................................................................................... 25

*State v. Becerra,*
  2021 WL 2514138 (M.D. Fla. June 18, 2021) .................................................... 17, 18, 19

*State v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ..................................................................................15, 16, 24

*State v. Biden,*
  2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) ................................................................ 24

*Texas v. Brooks-LaSure,*
  No. 6:21-cv-00191 (E.D. Tex. Aug. 20, 2021) ................................................................ 24

*Texas v. Chiquita Brooks-LaSure,*
  2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ................................................................ 23

*Texas v. Equal Emp. Opportunity Comm'n,*
  933 F.3d 433 (5th Cir. 2019) .............................................................................. 14, 19, 23

*Texas v. United States,*
  2021 WL 2096669 (S.D. Tex. Feb. 23, 2021) ................................................................. 24

*Texas v. United States,*
  2021 WL 3683913 (S.D. Tex. Aug. 19, 2021) ................................................................ 24

*Texas v. United States,*
   2021 WL 723856 (S.D. Tex. Feb. 23, 2021) ................................................................ 23, 25

*Texas v. United States,*
   497 F.3d 491 (5th Cir. 2007) ................................................................................................23

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ............................................................................ 14, 20, 23, 24

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ............................................................................................................24

*Tiger Lily, LLC v. HHS,*
   5 F.4th 666, 672 (6th Cir. 2021) ........................................................................................18

*U.S. Army Corps of Engineers v. Hawkes Co.,*
   136 S. Ct. 1807 (2016) .......................................................................................................20

*United States v. Bass,*
   404 U.S. 336 (1971) ............................................................................................................10

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ..............................................................................................................7

*W. Virginia Univ. Hosps., Inc. v. Casey,*
   499 U.S. 83 (1991) ........................................................................................................10, 13

*W. Watersheds Project v. Bureau of Land Mgmt.,*
   629 F. Supp. 2d 951 (D. Ariz. 2009) .................................................................................22

*Whitman v. Am. Trucking Associations,*
   531 U.S. 457 (2001) ........................................................................................................7, 18

**Statutes**

3 U.S.C. §301 ..............................................................................................................................3

5 U.S.C. §553 ............................................................................................................................14

5 U.S.C. §706(2)(D) ..................................................................................................................14

34 U.S.C. §10102(a)(6).................................................................................................................9

40 U.S.C. §101 ........................................................................................................................1, 8

40 U.S.C. §121(a) ................................................................................................................12, 13

40 U.S.C. §603 ..........................................................................................................................12

41 U.S.C. §1302(a) ...................................................................................................................2

41 U.S.C. §1303(a) .................................................................................................................12

41 U.S.C. §1707(a)(1) .............................................................................................................13

41 U.S.C. §1707(d) .................................................................................................................14

41 U.S.C. §3301(a)(1) .............................................................................................................13

41 U.S.C. §8302(a)(1) ...............................................................................................................9

**Other Authorities**

U.S. Dep't of Justice, Office of Legal Counsel, Centralizing Border Control Policy Under the
    Supervision of the Attorney General, 26 Op. OLC 22, 23 (2002) .......................................12

**Regulations**

86 Fed. Reg. 50,985 (Sept. 14, 2021) .......................................................................................3

86 Fed. Reg. 53,691-692 (Sept. 28, 2021) .................................................................................4

86 Fed. Reg. 50,987 ..................................................................................................................4

## INTRODUCTION

President Biden has forgotten that "even in a pandemic, the Constitution"—which he took an oath to uphold—"cannot be put away." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). At the President's impetus, and without congressional authorization, the Executive Branch has implemented a Contractor Vaccine Mandate that affects one-fifth of the American workforce directly and the entire economy indirectly. This Mandate suffers from a host of fatal flaws. Most fundamentally, it is an action of such economic, social, and political significance that it can be taken only with crystal clear congressional authorization. But Congress has granted the Executive no authority—much less crystal-clear authority—to impose vaccination requirements. Instead, to justify this intrusion into a core area of State sovereignty, the Executive relies upon laws that have nothing to do with public health, provides fragmentary and conflicting explanations, ignores State interests, and disregards constitutional restrictions on federal power. Standing alone, each flaw independently warrants vacating the Contractor Vaccine Mandate; standing together, they require it. And because this Mandate irreparably harms Plaintiff States and their citizens, it must be immediately enjoined.

## BACKGROUND

### I.   THE FEDERAL CONTRACTING FRAMEWORK ESTABLISHED BY CONGRESS.

After World War II, Congress enacted the Federal Property and Administrative Services Act "to provide the Federal Government with an economical and efficient system for … [p]rocuring and supplying property and nonpersonal services, … establish[ing] … pools or systems of transportation of Government personnel, … [and] managing [] public utility services." 40 U.S.C. §101(1) ("Procurement Act"). To achieve those aims, Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out" the Procurement Act. *Id.* §121(a). But Congress did not authorize the President to issue orders with the force or effect of law. Instead, it vested the power to "prescribe regulations" with the GSA Administrator. *Id.* §121(c).

1

In 1988, to remedy perceived flaws in the existing procurement system, Congress established the Federal Acquisition Regulation Council "to assist in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government." Pub. L. No. 100-679, §3, 102 Stat. 4056, codified at 41 U.S.C. §1302(a). Subject to exceptions not relevant here, the FAR Council has exclusive jurisdiction to issue "a single Government-wide procurement regulation." *Id.* §1303(a)(1). No other agency is authorized to issue government-wide procurement regulations. *Id.* §1303(a)(2).

The later-enacted Procurement Policy Act further channels agencies' ability to issue procurement regulations by requiring that any "procurement policy, regulation, procedure, or form"— whether issued by the FAR Council or by an individual agency for that agency—is subject to notice-and-comment procedures that may be waived only if "urgent and compelling circumstances make compliance with the requirements impracticable." Id. §1707(a), (b), (d).

## II.   THE BIDEN ADMINISTRATION'S VACCINE POLICY.

The Biden Administration's initial attempts to address the COVID-19 pandemic focused on measures short of mandating vaccines, and expressly disclaimed an intention to impose a vaccine mandate. See, e.g., Press Briefing by Press Secretary Jen Psaki, July 23, 2021, https://bit.ly/3pWnJVr (mandating vaccines "not the role of the federal government"). But as courts blocked several Administration policies short of a vaccine mandate as beyond the Executive's authority—and as, in his own words, the President's "patience" began "wearing thin" with those "who haven't gotten vaccinated," White House, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://bit.ly/3Ey4Zj6—the Administration decided to take an unprecedented step: issue federal vaccine mandates.

On September 9, 2021, President Biden announced a program aimed at compelling most of the adult population of the United States to be vaccinated. "Remarks by President Biden on Fighting

the COVID-19 Pandemic" (Sept. 9, 2021), https://bit.ly/3oI0pKr. Those requirements are part of the President's broader plan to "increase vaccinations among the unvaccinated with new vaccination requirements." *Id.*; *see also* The White House, Path Out of the Pandemic: President Biden's Covid-19 Action Plan, https://bit.ly/3adkMXx; The White House, Vaccination Requirements Are Helping Vaccinate More People, Protect Americans from COVID-19, and Strengthen the Economy (Oct. 7, 2021), https://bit.ly/3lorbp0.

One leg of those vaccine requirements included the actions at issue here. The President announced that he would issue an Executive Order requiring all federal contractors to be vaccinated stating: "If you want to work with the federal government and do business with us, get vaccinated. If you want to do business with the federal government, vaccinate your workforce." Biden Sept. 9, 2021 Remarks.

### III.   THE CHALLENGED ACTIONS COMPRISING THE CONTRACTOR VACCINE MANDATE.

The challenged actions in this case comprise four discrete actions referred to collectively hereinafter as the "Contractor Vaccine Mandate."

First, on September 9, 2021, President Biden issued Executive Order 14042, which directs agencies to ensure that "contracts and contract-like instruments … include a clause … that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force" when such guidance is approved by the OMB Director. Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50,985, 50,985 (Sept. 14, 2021). The Executive Order directs the Task Force to develop guidance about COVID-19 for federal contractors and subcontractors. Invoking 3 U.S.C. §301, the Executive Order further purports to delegate to the OMB Director the power to exercise the President's authority under the Procurement Act to determine whether the Task Force Guidance will promote economy and efficiency in federal procurement. *Id.* at

3

50,985-986. The Executive Order further instructs the FAR Council to "amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement solicitations and contracts subject to this order" the contract clause relating to COVID-19, and instructs agencies to implement the COVID-19 contract clause in contracts not covered by the FAR. *Id.* at 50,986. The Executive Order exempts contracts with a value below "the simplified acquisition threshold," typically $250,000, 86 Fed. Reg. at 50,986-987; FAR §2.101, and specifies that it applies to contracts entered into, renewed, or with an option to be exercised on or after October 15, 2021, 86 Fed. Reg. at 50,987.

The second challenged action is the Task Force Guidance, issued on September 24, 2021. The Guidance imposes the following requirements on federal contractors and subcontractors: (1) vaccination of covered employees except when an employee is legally entitled to an accommodation; (2) compliance with CDC guidance for masking and physical distancing at workplaces; and (3) designation of a compliance coordinator. COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors (Sept. 24, 2021), https://bit.ly/3jTHSHJ. The Guidance clarifies that prior COVID-19 infection evidenced by an antibody test does not satisfy the vaccination mandate. *Id.* The Guidance also states that even employees who work outdoors are subject to the requirements. *Id.* The compliance deadline for full vaccination is January 4, 2022. The White House, Background Press Call on OSHA and CMS Rules for Vaccination in the Workplace (Nov. 3, 2021), bit.ly/3k1zVAz. The Guidance states that the Task Force will consider updating the Guidance "as warranted by the circumstances of the pandemic and public health conditions." COVID-19 Workplace Safety, *supra*, at 2. Aside from conclusory statements about decreasing the spread of COVID-19 and a reference to the Executive Order, the Guidance contains no substantive justification for its mandates.

The third challenged action is the OMB Director's determination that the Task Force Guidance "will improve economy and efficiency." 86 Fed. Reg. 53,691-692 (Sept. 28, 2021) ("OMB Rule"). The OMB Rule, which occupies less than two pages of the Federal Register, includes as

4

justification only the conclusory statement that the Task Force Guidance will "reduc[e] absenteeism and decreas[e] labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." *Id.* at 53,691.

Fourth, on September 30, 2021, the FAR Council, relying on the Executive Order, issued a guidance document "encourag[ing]" agencies "to make ... deviations" to the FAR to be "effective until the FAR is amended." Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021) ("FAR Guidance"), https://bit.ly/3bvdizB. A deviation is a clause that is inconsistent with the FAR. FAR §1.401. The FAR prescribes procedures for making individual deviations and class deviations. *Id.* §§1.403-04. But the FAR itself prescribes procedures for deviations and makes clear that a deviation is not an appropriate procedure to implement a government-wide procurement policy. It instructs agencies that they "should propose a FAR revision" when they "know[] that it will require a class deviation on a permanent basis." FAR §§1.401, 403-04; 48 C.F.R. §§1.401, 403-04. The FAR Guidance provides no rationale for the deviation and relies only upon Executive Order 14042.

## IV.   THE IMPACT OF THE CONTRACTOR VACCINE MANDATE ON PLAINTIFF STATES.

Because Plaintiff States maintain numerous federal contracts with the federal government and intend on continuing to contract with the federal government, they are directly subject to the Contractor Vaccine Mandate.

Louisiana and its state entities regularly contract with the federal government and have countless federal contracts and partnerships that will be subject to the Contractor Vaccine Mandate. For example, Louisiana routinely oversees contracts implementing federally funded projects for hurricane and flood resiliency and recovery, housing and community development funding, health care funding, education funding, and research through its three university systems. Beyond that, Louisiana has entered into a cooperative agreement with the U.S. Department of Justice through which the Department provides funds to and support the Louisiana Internet Crimes Against Children

("ICAC") Task Force. *See* Ex. A ¶8. The ICAC Task Force relies on this funding and support to protect children by preventing, investigating, and prosecuting child exploitation crimes. *Id.* ¶9-10. Louisiana has already identified several communications sent by federal agencies demanding that Louisiana agencies, boards, commissions, or employees acquiesce in the Mandate, committing the State of Louisiana and exposing it to the loss of funds or clawback of future funds. *Id.* ¶12-14. Louisiana or its state entities currently have contracts subject to renewal or option, both of which Defendants have said they will not exercise unless the State acquiesces in the Contractor Vaccine Mandate. Beyond that, Louisiana or its state entities will continue to pursue government contracts in the future that will be subject to the Contractor Vaccine Mandate.

Similarly, Plaintiff State Indiana and its state entities regularly contract with the federal government and have federal contracts and partnerships that will be subject to the Contractor Vaccine Mandate. For example, Perdue University received $387.3 million in federal awards in 2021. Ex. C ¶5. Instead of a vaccine requirement, Perdue has implemented the Protect Purdue Plan, which focuses on testing and voluntary incentives to be vaccinated. *Id.* ¶9. Defendants have notified Indiana and its state entities such as Perdue that they will be required to amend current contracts to incorporate the Mandate. *Id.* ¶¶13-17. Indiana or its state entities will continue to pursue government contracts in the future that will be subject to the Contractor Vaccine Mandate.

Plaintiff State Mississippi or its state entities regularly contract with the federal government and have countless federal contracts and partnerships that will be subject to the Contractor Vaccine Mandate. Mississippi routinely oversees contracts implementing federally funded projects for, among other things, public safety, health care funding, education funding, and research through its university systems. For example, Mississippi has entered into a cooperative agreement with the U.S. Department of Justice through which the Department provides funds to and support the Mississippi Internet Crimes Against Children ("ICAC") Task Force. *See* Ex. B ¶7. The ICAC Task Force relies on this

funding and support in order to protect children by preventing, investigating, and prosecuting child exploitation crimes. *Id.* ¶9. Mississippi or its state entities also currently have contracts subject to renewal or option, both of which Defendants have said they will not exercise unless Mississippi acquiesces in the Contractor Mandate. And Mississippi or its state entities will continue to pursue government contracts in the future that will be subject to the Mandate. Several State entities such as Mississippi State University and the Mississippi Institute of Higher Learning have made clear that they "really have no choice but to comply due to the research dollars involved and the jobs those dollars create." Keisha Rowe, Two MS universities will not follow Biden's COVID-19 shot rule," Clarion Ledger (Oct. 29, 2021).

## ARGUMENT

To obtain a preliminary injunction, Plaintiff States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Each factor weighs in the Plaintiff States' favor.

## I.   PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   The Contractor Mandate Is Beyond the Executive's Authority and Contrary to Law.

#### 1. The Contractor Vaccine Mandate Is Beyond the Executive's Authority.

The Contractor Vaccine Mandate must be enjoined because it exceeds the Executive's statutory authority. The Supreme Court "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). "In order for an executive or independent agency

to exercise regulatory authority over a major policy question of great economic and political importance, Congress must either: (i) expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce; or (ii) expressly and specifically delegate to the agency the authority both to decide the major policy question and to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari) (collecting cases). The Executive cannot "bring about an enormous and transformative expansion in [its] regulatory authority without clear congressional authorization." *Util. Air Regulatory Grp.*, 573 U.S. at 324; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 (rejecting Executive claim to "jurisdiction to regulate an industry constituting a significant portion of the American economy" absent clear congressional authorization). Yet Defendants identify no clear statutory authority authorizing the Contractor Vaccine Mandate. Instead, they based it on a federal contracting statute that implicates no public health concerns at all.

Defendants point only to the Procurement Act's statement that its purpose is to "provide the Federal Government with an economical and efficient system" for procurement activities. 40 U.S.C. §101. No matter. A prefatory purpose statement like this is not a grant of authority. *See D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause."); *see also Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 n.9 (D.C. Cir. 1995). And the Contractor Vaccine Mandate is an unprecedented use of the President's power under FPASA. Although "there is a first time for everything ... sometimes 'the most telling indication of [a] severe constitutional problem ... is the lack of historical precedent.'" *NFIB*, 567 U.S. at 549. ("Section 361(a) is a wafer-thin reed on which to rest such sweeping power.").

In any event, the term "economical and efficient system" cannot bear the weight Defendants try to place on it. Because the Procurement Act "does not write a blank check for the President to fill in at his will," *AFL-CIO v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979), Defendants must demonstrate a

"nexus" between economy and efficiency and the Mandate, *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 306 (1979). *Chrysler* confirms as much by rejecting the Executive's reliance on the Procurement Act to require disclosure of woman and minority employment statistics because "nowhere in the Act is there a *specific reference to employment discrimination*." *Id.* at 306 n.34. Just as the Act contains no reference to remedying employment discrimination, it never remotely refers to contractor vaccination or public health more generally. *See id.*; *see also Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981) (President lacks Procurement Act authority to impose affirmative action mandate on subcontractors).

Defendants hardly even try to connect the Procurement Act's stated purpose and the Mandate. Instead, they rest on the conclusory statement, unsupported by any citation, that requiring vaccination will reduce "absenteeism and decreas[e] labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. at 53,692. But Defendants have failed to carry their burden of making "findings that suggest what percentage of the total price of federal contracts may be attributed" to the effect of COVID-19 vaccination on reduced absenteeism and labor costs. *Liberty Mut. Ins. Co.*, 639 F.2d at 171. Because "the connection ... is simply too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives," the Mandate is not authorized by the Procurement Act. *Id.*

Defendants' lack of authority to set social policy through the Act's general purpose statement is confirmed by Congress's specific directives setting social policies in procurement. 41 U.S.C. §8302(a)(1) (requiring the procurement of American-made materials unless the "head of the department . . . determines their acquisition to be inconsistent with the public interest or their cost to be unreasonable"); *id.* §6703(1) (requiring contractors to pay employees a minimum wage set by the Secretary of Labor); *see also* 34 U.S.C. §10102(a)(6) (discussing the Department of Justice's authority to "plac[e] special conditions on all grants"). Congress knows how to set social policy through procurement—and it has not authorized the President to use procurement authority to advance the

public-health goal of increasing vaccination. *Cf. W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99 (1991).

The Procurement Act is thus "a wafer-thin reed on which to rest such sweeping power." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). But because of the serious constitutional issues that the Contractor Vaccine Mandate raises, *cf. BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 WL 5166656, at *1 (5th Cir. Nov. 6, 2021) (OSHA EST raises "grave statutory and constitutional issues"), an absolutely clear statement is needed. Indeed, the Mandate triggers three separate clear statement rules.

*First*, Congress will "not be deemed to have significantly changed the federal-state balance" unless it "conveys its purpose clearly." *United States v. Bass*, 404 U.S. 336, 349 (1971); *see also Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir. 1984) ("Absent a clear statement of intention from Congress, there is a presumption against a statutory construction that would significantly affect the federal-state balance."). As discussed below, the Mandate both intrudes upon the States' traditional police power over public health, *see, e.g.*, *Hillsborough Cty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."), and commandeers States to enforce a federal policy, *NFIB*, 567 U.S. at 577 (the federal government cannot "commandeer[] a States' ... administrative apparatus for federal purposes"). Accordingly, nothing short of an unambiguous directive in the Act is sufficient to authorize the Mandate. *See Bond v. United States*, 572 U.S. 844, 857-58 (2014) ("'[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'").

*Second*, because the Executive cannot unilaterally "push the limit of congressional authority," courts require a clear statement before adopting an Executive interpretation that would raise serious constitutional issues. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engr's*, 531 U.S. 159, 172-

73 (2001). As discussed below, the Contractor Vaccine Mandate pushes the federal government's limits under both the Commerce Clause, *see NFIB*, 567 U.S. at 558 ("[T]he Commerce Clause is not a general license to regulate an individual from cradle to grave."), and the Spending Clause, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly"). Because the Executive's "administrative interpretation of [the Act] invokes the outer limits of Congress' power," the Court must demand "a clear indication that Congress intended that result." *Solid Waste Agency of N. Cook Cty.*, 531 U.S. at 172.

*Third*, Congress must clearly delegate power to the Executive to address issues of "deep economic and political significance." *King v. Burwell*, 576 U.S. 473, 486 (2015). Vaccine mandates are the very definition of such an issue. The Contractor Vaccine Mandate affects hundreds of billions of dollars in federal contracts, *see, e.g.*, Federal Government Awards Record-Breaking $145.7 Billion in Contracting to Small Businesses, U.S. Small Business Admin. (July 28, 2021), https://bit.ly/3H0Zqfd, and reaches one-fifth of the entire United States workforce, *see* Dep't of Labor, History of Executive Order 11246, Office of Contract Compliance Programs, https://bit.ly/2ZEmLC8. Accordingly, "the sheer scope of [Defendants'] claimed authority under [the Act] counsel[s] against the Government's interpretation." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).

The term "economical and efficient system" simply cannot run this gauntlet of clear statement rules. If Congress wishes to alter federal-state relations; press its Article I powers; and regulate an area of immense political, social, and economic importance, it must do so clearly. "It is up to Congress," not Defendants, "to decide whether the public interest merits further action here." *Id.* at 2490.

### 2. The Contractor Mandate Is Contrary to Law.

The Contractor Mandate is contrary to several statutes governing the federal procurement system. *First*, the Mandate violates 41 U.S.C. §1303(a), which vests exclusive authority in the FAR

11

Council to "issue and maintain ... a single Government-wide procurement regulation." 41 U.S.C. §1303(a)(1). Section 1303 is clear that "[o]ther regulations relating to procurement issued by an executive agency" must be "limited to" agency-specific regulations. *Id.* §1303(a)(2). By mandating that OMB approve a government-wide procurement regulation, and by approving such a regulation, the Executive Order and OMB Rule violate §1303(a)'s exclusive vesting of such power in the FAR Council. Neither OMB nor the Task Force are the FAR Council and thus they have acted beyond their statutory authority and in conflict with 41 U.S.C. §1303(a) by approving and promulgating a government-wide procurement regulation. The Executive Order's attempt to circumvent §1303(a) by delegating power to the OMB director does not cure this violation; the President himself lacks power to issue government-wide procurement regulations. *See, e.g.*, U.S. Dep't of Justice, Office of Legal Counsel, Centralizing Border Control Policy Under the Supervision of the Attorney General, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.").

*Second*, the Mandate violates the Procurement Act's vesting of authority in the President to issue only "policies and directives" to the Executive Branch (as opposed to regulations binding upon private contractors and subcontractors). 40 U.S.C. §121(a). The Contractor Vaccine Mandate imposes obligations upon private parties and is thus a "regulation" rather than a "policy or directive." The very same statute demonstrates the difference in meaning between the power to issue policies and directives and the power to issue regulations, for Congress has separately vested the GSA Administrator with the power to "prescribe regulations." *Id.* §121(c). And elsewhere in the Procurement Act, Congress specifically vested the President with power to "prescribe regulations" to carry out a provision related to motor vehicle pools, 40 U.S.C. §603, demonstrating both that there is a difference in meaning between the terms "policy or directive" and "prescribe regulation," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and

different language in another, the court assumes different meanings were intended."), and that Congress knows how to vest the President with power to prescribe regulations binding on private parties but declined to do so in §121, *cf. W. Virginia Univ. Hosps., Inc.*, 499 U.S. at 99.

*Third*, the Mandate violates the Competition in Contracting Act, which requires federal agencies to provide for "full and open competition through the use of competitive procedures" in procurement. 41 U.S.C. §3301(a)(1). By categorically excluding entities that do not comply with the Mandate, Defendants ""effectively exclude[] an offeror from winning an award, even if that offeror represents the best value to the government." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 990 (Fed. Cir. 2019). This violates the Competition Act's mandate of full and open competition, which Congress expressly applied to the President's Procurement Act authority. *See* 40 U.S.C. §121(a) (requiring "policies" issued by the President pursuant to FPASA to be "consistent with this subtitle"); *id.* §111 (defining "this subtitle" to include §3301).

### B. The Contractor Mandate Failed to Employ the Notice-and-Comment Procedures Required by the Procurement Policy Act and APA.

#### 1. Defendants Failed to Subject the OMB Rule, FAR Council Guidance, and Task Force Guidance to Notice and Comment in Violation of the Procurement Policy Act.

The Procurement Policy Act requires that procurement policies must be published for public comment in the Federal Register 60 days before taking effect if the policy "relates to the expenditure of appropriate funds" and either "has a significant effect beyond the internal operating procedures of the agency issuing the policy" or "has a significant cost or administrative impact on contractors." 41 U.S.C. § 1707(a)(1). Because they impose a vaccine mandate, the FAR Guidance, OMB Rule, and Task Force Guidance relate to the expenditure of appropriated funds and have a significant effect beyond any agency's internal operating procedures. Beyond that, those actions impose a significant cost and administrative impact on contractors and offerors such as Plaintiff States. And, as discussed below, Defendants cannot hide behind the label "guidance" because agencies have treated the actions as

binding and have attempted to impose it upon contractors. *See* Ex. B ¶11; *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) (guidance is a legislative rule if it is "applied by the agency in a way that indicates it is binding").

To be sure, the Procurement Policy Act contains an exception to notice and comment, but it applies only when "urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. §1707(d). Because neither Guidance invokes this exception, it does not apply here. *Cf. Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014) (good-cause exception requires "invocation" by agency). And even if the Guidance did invoke the exception, Defendants establish no basis for avoiding notice and comment. *See id.* ("Deference to an agency's invocation of good cause—particularly when its reasoning is potentially capacious, as is the case here—would conflict with this court's deliberate and careful treatment of the exception in the past."); *see also Florida v. Becerra*, 2021 WL 2514138, at *45 (M.D. Fla. June 18, 2021) (concluding that the COVID-19 pandemic was insufficient for "good cause"); *Regeneron Pharms. v. HHS*, 510 F. Supp. 3d 29, 48 (S.D.N.Y. 2020) (similar). Accordingly, the FAR Guidance, OMB Rule, and Task Force Guidance must be vacated for failing to comply with "procedure required by law." 5 U.S.C. §706(2)(D).

### 2. Defendants Failed to Subject the Task Force Guidance and OMB Rule to Notice and Comment in Violation of the APA.

Agency legislative rules must go through the APA's notice-and-comment procedures. 5 U.S.C. §553; *see also Texas v. United States*, 2021 WL 723856, at *43 (S.D. Tex. Feb. 23, 2021). That includes rules that alter "rights and obligations" or do not leave agency decisionmakers free to exercise discretion. *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"); *Texas v. United States*, 809 F.3d at 171 ("'If a statement denies the decisionmaker discretion in the area of its coverage ... then the statement is binding, and creates rights or obligations.'"). In deciding whether a

rule is legislative, courts must be "mindful but suspicious of the agency's own characterization" of the rule. *Id.*

To the extent the FAR Council Guidance, OMB Rule, and Task Force Guidance do not involve procurement and contracting, they would be subject to the APA's notice-and-comment procedures. For the reasons stated, Defendants have treated them as binding, and they alter private parties' and States' rights and obligations. Nor do they qualify for the APA good-cause exception to notice and comment (much less try to invoke that exception). *See Sorenson*, 755 F.3d at 706. Accordingly, these actions are legislative rules that were required to undergo notice and comment. *See Texas*, 933 F.3d at 441.

### C.   The Contractor Vaccine Mandate Is Arbitrary and Capricious.

The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Texas v. United States*, 2021 WL 723856, at *39. Though "the Executive branch holds the power to issue executive orders, an agency cannot flip-flop regulations on the whims of each new administration." *California v. Bernhardt*, 472 F. Supp. 3d 573, 600-01 (N.D. Cal. 2020). The Contractor Vaccine Mandate is arbitrary and capricious for several independently sufficient reasons.

*First*, Defendants have provided no reasons for the Mandate. The OMB Rule's single conclusory sentence parroting the statutory factors is not the type of serious analysis of statutory factors that agencies must provide. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) ("[C]onclusory statements do not suffice to explain [an agency's] decision."). OMB's Rule contains no reasoning or explanation to support its conclusion that the Contractor Vaccine Mandate would further economy and efficiency in federal procurement. *State v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) ("'Stating that a factor was considered ... is not a substitute for considering it.'"). And the Task Force

Guidance upon which OMB passed did not itself provide any justification. Nor did the Executive Order. Because neither the OMB Rule nor any of the actions underlying the Contractor Vaccine Mandate contain any reasoning for imposing it—much less reasoning grounded in the statutory factors—the OMB Rule is arbitrary and capricious. *See Louisiana v. Biden*, 2021 WL 2446010, at \*18 (W.D. La. June 15, 2021) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decisionmaking requirement.").

*Second*, the Mandate is arbitrary and capricious because it ignores a "centrally relevant factor"— costs to the States. *Michigan v. EPA*, 576 U.S. 743, 752-53 (2015). As discussed *infra*, Plaintiff States have overwhelming reliance interests in their existing federal contracts and ability to compete for future contracts. The OMB Rule is arbitrary and capricious because it utterly ignores those reliance interests. *See State v. Biden*, 10 F.4th at 553 ("In its seven-page June 1 Memorandum, DHS does not directly mention any reliance interests, especially those of the States.").

*Third*, the Mandate is arbitrary and capricious because its rationales are pretextual. As recounted above, the President has stated several times that the Contractor Vaccine Mandate is part of a broader program aimed at increasing vaccination rates. The OMB Rule, however, eschews this rationale and tries to pigeonhole the Mandate into the Procurement Act's statutory factors. The presence of such blatant pretext is enough to render the Contractor Vaccine Mandate arbitrary and capricious. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

*Fourth*, given its total lack of explanatory support, the OMB Rule fails to consider several important aspects of the problem, including the effect of large-scale resignations; the impact on State budgets, pension funds, and bond obligations; other State reliance interests; natural immunity; contractors who work from home or outside; or whether a religious exemption would ease compliance and displace less State law.

16

For all those reasons, the Contractor Vaccine Mandate is neither "reasonable" nor "reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Accordingly, it is arbitrary and capricious.

### D.  The Contractor Vaccine Mandate Violates the Tenth Amendment and Anti-Commandeering Doctrine.

"The powers not delegated by the Constitution to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. No clause of the Constitution authorizes the federal government to impose the Contractor Vaccine Mandate. Public health—and vaccinations in particular—have long been recognized as an aspect of police power reserved to the States, not the Federal Government. *See, e.g., Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 24 (1905); *see also Hillsborough Cty.*, 471 U.S. at 719 ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring in the denial of application for injunctive relief) ("[O]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect'"); *State v. Becerra*, 2021 WL 2514138, at *15 (M.D. Fla. June 18, 2021) ("The history shows ... that the public health power ... was traditionally understood — and still is understood — as a function of state police power."). By encroaching upon the States' traditional police power, particularly without clear authorization from Congress, Defendants have exceeded their authority and violated the Tenth Amendment.

The Contractor Mandate also violates the Tenth Amendment's Anti-Commandeering Doctrine. The Tenth Amendment and the structure of the Constitution deprive Congress of "the power to issue direct orders to the governments of the States," *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018), and forbid the federal government to commandeer State officers "into administering federal law," *Printz v. United States*, 521 U.S. 898, 928 (1997). The Contractor Vaccine Mandate violates

this doctrine by requiring Plaintiff States to enforce the Mandate against State employees, including employees with no connection to federal contracts and those who work outside and remotely, and against the States' subcontractors. The Mandate directly compels States and state entities to implement a federal vaccination policy with no nexus to contracting and to State employees who do not work on federal contracts. By "conscript[ing] state [agencies] into the national bureaucratic army," the Mandate violates the Anti-Commandeering Doctrine. *NFIB*, 567 U.S. at 585

### E.    The Contractor Mandate Violates the Nondelegation Doctrine.

If the Procurement Act is read to authorize the Executive to issue the Contractor Vaccine Mandate, it contains no limiting principle and thus violates the nondelegation doctrine. "The Constitution confers on Congress certain 'legislative [p]owers,' Art. I, § 1, and does not permit Congress to delegate them to another branch of the Government." *Gundy v. United States*, 139 S. Ct. 2116, 2130 (2019) (Alito, J., concurring in the judgment). When Congress vests decision-making authority in an agency, "Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman*, 531 U.S. at 472.

Defendants' reading of the Procurement Act renders the statute standardless. Both "the degree of agency discretion" and "the scope of the power congressionally conferred" must be limitless for Defendants to claim authority to use a federal procurement standard to mandate a personal health choice. *Id.* at 475. Congress lacks authority to delegate "unfettered power" over the American economy to an executive agency. *Tiger Lily, LLC v. HHS*, 5 F.4th 666, 672 (6th Cir. 2021); *see also State v. Becerra*, 2021 WL 2514138, at \*20, \*37. Accordingly, Congress's "delegation ... of authority to decide major policy questions" violates the nondelegation doctrine. *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Justice Kavanaugh respecting the denial of certiorari).

To avoid this serious constitutional issue, the Court must not adopt Defendants' expansive reading of the Procurement Act. *See Tiger Lily*, 5 F.4th at 672 ("[T]o put 'extra icing on a cake already

frosted,' the government's interpretation of § 264(a) could raise a nondelegation problem."); *State v. Becerra*, 2021 WL 2514138, at *37. For if the Court agrees with Defendants that the text of the Procurement Act does grant them unbounded discretion to impose a Contractor Vaccine Mandate, the Procurement Act is unconstitutional under the nondelegation doctrine.

### F.     The Contractor Mandate Violates the Spending Clause.

The Contractor Vaccine Mandate is an unconstitutional condition on Plaintiff States' receipt of federal funds.  "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly," *Pennhurst*, 451 U.S. at 17. Federal contracts are an exercise of powers under the Spending Clause. Yet the Contractor Vaccine Mandate purports to force the States to comply with the Task Force Guidance, which the Task Force itself purports to retain discretion to change at any time—the very definition of an ambiguous contract term. And the Procurement Act provides no notice to the States that the Contractor Vaccine Mandate would be a condition of their federal contracts. Accordingly, the Contractor Vaccine Mandate violates the Spending Clause. Additionally, the Contractor Vaccine Mandate violates the Spending Clause because it is not necessary to preventing the spread of COVID-19 or rationally related to any federal interest in a particular project or program subject to a federal contract. *See NFIB*, 567 U.S. at 579.

### G.     No Barriers to Justiciability Prevent Review of the Contractor Mandate.

#### 1.     The OMB Rule, FAR Council Guidance, and Task Force Guidance Are Final Agency Actions Under the APA.

Because the non-executive order parts of the Mandate are legislative rules, *supra* §I.B, it necessarily follows that they are final agency action subject to APA review, *Texas*, 933 F.3d at 441 (a legislative rule is "by definition, a final agency action"). In any event, the actions also easily meet the APA test for final agency action because (1) they "mark the consummation of the agency's decision-making process" and (2) have "legal consequences" and determine "rights and obligations." *Louisiana*, 2021 WL 2446010, at *12 (citing *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813

(2016)); *see also Sackett v. E.P.A.,* 566 U.S. 120, 130 (2012) ("The APA's presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all."); *BNSF Ry. Co. v. EEOC,* 385 F. Supp. 3d 512, 522 (N.D. Tex. 2018) ("Buoying this pragmatic framework is an increasing hesitance by the Supreme Court and lower courts alike to shelter agencies from judicial enforcement of congressional mandates.").

The Mandate marks the consummation of the Executive's decisionmaking process—its requirements are in force right now and agencies are using them in their relations with the States and other federal contractors. Because there are no further steps in the process, the Mandate satisfies the first prong of the finality test. *See Louisiana,* 2021 WL 2446010, at *12 ("As long as an agency has completed its decisionmaking on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test.") (citing *NRDC v. Wheeler,* 955 F.3d 68, 80 (D.C. Cir. 2020)).

Turning to the second prong, "[w]here agency action withdraws an entity's previously held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." *Texas v. EEOC,* 933 F.3d 433, 442 (5th Cir. 2019). That's exactly what the Mandate does here—it binds the entire Executive Branch and federal contractors to a vaccine requirement. Because the Mandate both "denies the decisionmaker discretion in the area of its coverage" and creates obligations on private and State parties, it is final agency action. *Texas,* 809 F.3d at 171.

OMB and the FAR Council are "agencies" for purposes of the APA because they are "administrative unit[s] with substantial independent authority in the exercise of specific functions." *Soucie v. David,* 448 F.2d 1067, 1073 (D.C. Cir. 1971). Courts have long recognized that OMB is an agency under the APA. *See, e.g., Sierra Club v. Andrus,* 581 F.2d 895, 902 (D.C. Cir. 1974), *rev'd on other grounds,* 442 U.S. 347 (1979); *see also Meyer v. Bush,* 981 F.2d 1288, 1294 (D.C. Cir. 1993); *cf. Hyatt v. OMB,* 908 F.3d 1165, 1170-74 (9th Cir. 2018) (entertaining an APA challenge to an OMB action); *Nat'l Women's L. Ctr. v. OMB,* 358 F. Supp. 66, 84-87 (D.D.C. 2019) (same). The FAR Council also

easily fits the APA's definition of "agency" because it is tasked by law to promulgate government-wide regulations and oversee other agencies' procurement activities. This power to "issue guidelines to federal agencies for the preparation of" regulatory review is a hallmark of an APA agency. *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980). The Council's ongoing oversight authority only confirms the point. *Soucie*, 60 F.3d at 854 ("By virtue of its independent function of evaluating federal programs, the OST must be regarded as an agency.").

Finally, Plaintiff States lack any adequate alternative remedy to challenge this final agency action because alternatives to judicial review of the Contractor Vaccine Mandate would impose "prohibitive costs, risk, and delay" upon Plaintiff States. *Hawkes Co. v. U.S. Army Corps of Engineers*, 782 F.3d 994, 1001 (8th Cir. 2015). Challenges to "regulation[s] governing a procurement" are appropriately brought as APA challenges in federal district courts. *See Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021); *see also Alphapointe v. Dep't of Dep't of Veterans Affairs*, 416 F. Supp. 3d 1, 7 (D.D.C. 2019).

Accordingly, the Mandate is final agency action reviewable under the APA.

### 2.    The Contractor Mandate and Executive Order 13990 Are Ultra Vires.

Plaintiff States also have a cause of action to obtain review of the President's illegal Executive Order. *Ultra vires* review is available to review "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002)); *see also Assoc. Builders & Contractors of Se. Tex. v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The DOL, a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and

non-statutory grounds.") (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)).

As explained in §I.A above, the Contractor Mandate is not authorized by any statute and directly conflicts with the Procurement Act and the Competition in Contracting Act. Such *ultra vires* presidential action is subject to judicial review—particularly when it concerns matters of major national importance. *See Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 291 (D. Mont. 2019) ("A court's power to enjoin the President extends to enjoining portions of an executive order where the order 'exceeds the statutory authority delegated by Congress and constitutional boundaries.'"); *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 995 (D. Alaska 2018); *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 960 (D. Ariz. 2009); *City of Dallas, Tex. v. Hall*, 2007 WL 3257188, at *15 (N.D. Tex. Oct. 29, 2007).

Plaintiff States thus have an *ultra vires* cause of action to challenge the Executive Order.

***

To sum up: because Plaintiff States have demonstrated multiple independently sufficient grounds to vacate the Contractor Vaccine Mandate, they have shown a strong likelihood of success on the merits.

## II.    PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, Plaintiff States "need only show it 'cannot be undone through monetary remedies'" and that they are "'*likely* to suffer irreparable harm in the absence of preliminary relief.'" *Texas v. United States*, 2021 WL 723856, at *48. Plaintiff States have standing to challenge the Contractor Vaccine Mandate and are entitled to an injunction because the Mandate irreparably harms Plaintiff

States' sovereign, quasi-sovereign, and *parens patriae* interests. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518-520 (2007); *see also Texas v. United States*, 809 F.3d 134, 151-55 (5th Cir. 2015); *Texas*, 2021 WL 723856, at \*10-21. Though Plaintiff States have standing under the traditional analysis, they also receive "special solicitude" on this issue. *Massachusetts*, 549 U.S. at 518-20. Plaintiff States will suffer several irreparable harms as a direct result of the Contractor Vaccine Mandate.

*First*, the Mandate puts Plaintiff States to an untenable choice: suffer widespread economic harm through lost contracts or violate State law or change state laws and policies. *See Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir. 2015) ("Texas's interest in not being pressured to change its law is more directly related to its sovereignty than was Massachusetts's interest in preventing the erosion of its shoreline."); *Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007). As discussed above, each Plaintiff State regularly contracts with the federal government. And each Plaintiff State would have to change its laws and policies to require vaccination. The immediate pressure that the Mandate places on Plaintiff States—indeed, is *intended* to place on them—to "abandon [their] laws and policies" by requiring vaccination is a quintessential irreparable harm to Plaintiff States' sovereign interests. *Texas*, 933 F.3d at 447. And Fifth Circuit courts have held that injuries to Plaintiff States' sovereign power are "necessarily" irreparable. *See, e.g., Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Texas*, 2021 WL 3683913, at \*59; *Nevada v. United States Dep't of Lab.*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016). Beyond that, Plaintiff States have an irreparable procedural harm because they were denied the ability to defend this concrete interest through submitting comments. *See, e.g., id.*; *see also Texas v. Chiquita Brooks-LaSure*, 2021 WL 5154219, at \*10 (E.D. Tex. Aug. 20, 2021).

*Second*, the Mandate will inflict financial injury upon Plaintiff States by depriving them of the ability to compete for contracts on an even playing field and by placing a strain on State agencies to produce proof of vaccination documentation. Such compliance costs are immediate and irreparable.

*See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring) ("[A] regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."). Additionally, the Mandate will naturally and predictably lead to increased unemployment, which will place a greater burden on Plaintiff States' unemployment insurance funds. *See State v. Biden*, 10 F.4th at 548. Plaintiff States do not need to show that these "harm[s] [are] inevitable and irreparable." *Humana*, 804 F.2d at 1394. Instead, Plaintiff States "need only show" harm that "'cannot be undone through monetary remedies.'" *Louisiana*, 2021 WL 2446010, at *21. Fifth Circuit courts have uniformly held that the very types of economic and fiscal harms Plaintiff States will suffer are irreparable because States cannot recover money damages from the federal government. *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015) (financial injury from federal government irreparable); *Louisiana*, 2021 WL 2446010, at *21 (financial and *parens patriae* injury irreparable); *Texas*, 2021 WL 5154219, at *12 (resource reallocation and harm to industry irreparable); *Texas v. United States*, 2021 WL 3683913, at *58 (S.D. Tex. Aug. 19, 2021) (financial and *parens patriae* harm irreparable); *State v. Biden*, 2021 WL 3603341, at *26 (N.D. Tex. Aug. 13, 2021) (financial injuries irreparable); *Texas v. United States*, 2021 WL 2096669, at *47 (S.D. Tex. Feb. 23, 2021) (same).

*Third*, the imminent loss of federal funds for Louisiana's and Mississippi's ICAC Task Forces will lead to an increase in sex crimes against children in those States. In Louisiana alone, the ICAC Task Force received 6,731 CyberTips this, leading to 116 arrests. *See* Ex. A ¶31. The Louisiana Task Force's ability to investigate those tips and arrest perpetrators will be undermined if the Task Force loses federal funds and thus cannot continue paying its employees—or if its employees resign in lieu of complying with the Mandate.

*Fourth*, Plaintiff States have standing as *parens patriae* to vindicate their citizens' economic interests. *Texas*, 2021 WL 3683913, at *15. A natural and predictable consequence of the vaccine mandate is that numerous employees may be fired, retire, or quit their jobs, including employees of

businesses within the Plaintiff States. For example, federal contractors at John C. Stennis Space Center in Hancock County, Mississippi have said they would choose unemployment over being forced to take a vaccination shot. Plaintiffs States have standing to seek relief from these irreparable harms to their citizens. *See, e.g., State of Fla. v. Weinberger*, 492 F.2d 488, 492 (5th Cir. 1974) ("The calamitous prospect of such a loss of funding, even for a short period, to the state and to the disadvantaged citizens for whom it stands parens patriae is so grave as to suffice for such hardship as may be required.").

### III.   AN INJUNCTION WOULD NOT HARM DEFENDANTS OR DISSERVE THE PUBLIC INTEREST.

Finally, the public interest and balance of equities weigh in favor of granting a preliminary injunction. Simply put, Defendants "have no legitimate interest in the implementation of [the] unlawful" Contractor Mandate. *Texas*, 2021 WL 723856, at *49. Instead, "the public is served when the law is followed." *Id.* at *51 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). The public has an overriding interest in ensuring that vast regulatory programs are implemented lawfully, in compliance with the constitutional separation of powers and APA. And while Plaintiff States would be irreparably harmed by the implementation of the Mandate, the only harm to the Defendants from an injunction would be to wait for an actual grant of authority from Congress. Accordingly, the public interest and balance of harms weigh heavily in Plaintiff States' favor.

### CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' Motion for a Preliminary Injunction.

Respectfully submitted,

Dated: November 12, 2021

TYLER R. GREEN*
DANIEL SHAPIRO*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423


*Counsel for Plaintiff State of Louisiana*


OTHER COUNSEL:

THEODORE M. ROKITA
  Indiana Attorney General
Thomas M. Fisher*
  Solicitor General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Tom.fisher@atg.in.gov
*Counsel for the State of Indiana*

LYNN FITCH
  Attorney General of Mississippi
John V. Coghlan*
  Deputy Solicitor General
State of Mississippi
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
*Counsel for the State of Mississippi*


*\*Pro Hac Vice admission application forthcoming*

 */s/ Elizabeth B. Murrill*

ELIZABETH B. MURRILL
  Solicitor General
J. SCOTT ST. JOHN
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov

26