**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION**

THE STATE OF LOUISIANA et al.,

               Plaintiffs,

    v.

JOSEPH R. BIDEN et al.,

               Defendants.

No. 1:21-cv-3867

Judge Dee D. Drell

Magistrate Judge Joseph H. L. Perez-Montes

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director

MADELINE M. McMAHON
KEVIN WYNOSKY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    I.      The COVID-19 Pandemic.......................................................................... 2

    II.     Executive Order 14042 ............................................................................. 3

    III.    The Task Force Guidance and the OMB Director's Economy & Efficiency
              Determination ........................................................................................... 5

    IV.    The FAR Council's Interim Guidance ....................................................... 6

ARGUMENT ...................................................................................................... 7

    I.      The states fail to establish this Court's subject-matter jurisdiction. ....... 7

          A.    The states lack standing. ................................................................. 7

          B.    Even if the states did have standing, the Court of Federal Claims
               would have jurisdiction over any claim relating to existing
               contracts. ...................................................................................... 11

    II.     The states cannot succeed on the merits. ............................................. 12

          A.    The President has authority as the CEO of the Executive Branch to
               direct government procurement policy. ...................................... 12

          B.    Requiring contractor vaccination does not violate the Competition
               in Contracting Act........................................................................ 17

          C.    The states' APA and § 1707 notice-and-comment claims are
               meritless. ..................................................................................... 18

               1.    The OMB determination did not require notice and
                       comment........................................................................... 18

               2.    The FAR Memo and Task Force guidance do not require
                       notice and comment. ...................................................... 22

          D.    The OMB determination is neither arbitrary nor capricious.................... 24

          E.    Requiring contractor vaccination is constitutional. .................. 27

    III.    The states do not face irreparable harm. .............................................. 31

i

IV.     The equities and the public interest weigh against injunctive relief. .................... 32

V.      In all events, this court should not enter relief extending beyond federal
        contracts with Louisiana, Indiana, and Mississippi, and should only enjoin
        enforcement of the challenged provisions. .......................................................... 34

# TABLE OF AUTHORITIES

## CASES

*AFGE v. Carmen,*
   669 F.2d 815 (D.C. Cir. 1981) ............................................................ 13, 28

*AFL-CIO v. Kahn,*
   618 F.2d 784 (D.C. Cir. 1979) ........................................................... *passim*

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
   141 S. Ct. 2485 (2021) ............................................................................ 18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982) ................................................................................ 11

*Am. Fed'n of Gov't Emps., AFL-CIO v. Block,*
   655 F.2d 1153 (D.C. Cir. 1981) ............................................................. 21

*Am.'s Frontline Drs. v. Wilcox,*
   No. EDCV 21-1243, 2021 WL 4546923 (C.D. Cal. July 30, 2021) ........................................ 35

*Anselma Crossing, L.P. v. U.S. Postal Serv.,*
   637 F.3d 238 (3d Cir. 2011) ................................................................... 12

*Arbitraje Casa de Cambio, S.A. de CV. v. United States,*
   79 Fed. Cl. 235 (2007) ........................................................................... 16

*Barber v. Bryant,*
   860 F.3d 345 (5th Cir. 2017) .................................................................... 8

*Bennett v. Ky. Dep't of Educ.,*
   470 U.S. 656 (1985) ........................................................................... 32, 33

*Benning v. Georgia,*
   391 F.3d 1299 (11th Cir. 2004) ............................................................... 32

*Boeing Co. v. Movassaghi,*
   768 F.3d 832 (9th Cir. 2014) .................................................................. 29

*Bostock v. Clayton Cty.,*
   140 S. Ct. 1731 (2020) ........................................................................... 17

*Brackeen v. Haaland,*
   994 F.3d 249 (5th Cir. 2021), *docketing petition for cert.,*
   No. 21-380 (S. Ct. Sept. 8, 2021) .................................................... 11, 27, 28

*Brown v. Gilmore*,
    533 U.S. 1301 (2001) ........................................................................... 36

*BST Holdings, L.L.C. v. OSHA*,
    No. 21-60845, 2021 WL 5166656 (5th Cir. Nov. 6 2021) ...................... 18

*Cecile Indus., Inc. v. Cheney*,
    995 F.2d 1052 (Fed. Cir. 1993) ............................................................ 12

*Chacon v. Granata*,
    515 F.2d 922 (5th Cir. 1975) ............................................................... 34

*Chamber of Com. of U.S. v. Napolitano*,
    648 F. Supp. 2d 726 (D. Md. 2009) ................................................. 14, 30

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ..................................................... 16, 17, 18

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984) ............................................................................. 17

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................................. 16

*City of Albuquerque v. U.S. Dep't of Interior*,
    379 F.3d 901 (10th Cir. 2004) ................................................. 13, 14, 26, 30

*Council of the S. Mountains, Inc. v. Donovan*,
    653 F.2d 573 (D.C. Cir. 1981) .............................................................. 21

*Dalton v. Sherwood Van Lines, Inc.*,
    50 F.3d 1014 (Fed. Cir. 1995) .............................................................. 12

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ............................................................................. 15

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
    710 F.3d 579 (5th Cir. 2013) ............................................................... 33

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ......................................................................... 28

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017),
    *and aff'd*, 883 F.3d 895 (D.C. Cir. 2018) ..................................... 20, 21, 25

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .......................................................................... 27

*Farkas v. Tex. Instrument, Inc.*,
  375 F.2d 629 (5th Cir. 1967) ........................................................... 13, 14

*Farmer v. Phila Elec. Co.*,
  329 F.2d 3 (3d Cir. 1964) ..................................................................... 14

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) .......................................................................... 27

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .............................................................................. 17

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .......................................................................... 20, 24

*The GEO Grp., Inc. v. City of Tacoma*,
  No. 3:18-cv-5233, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019),
  *appeal dismissed*, 2020 WL 1249388 (9th Cir. Jan. 21, 2020) ................ 29

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) .......................................................................... 37

*Gundy v. United States*,
  139 S. Ct. 2116 (2019), *reh'g denied*, 140 S. Ct. 579 (2019) ................... 31

*Harris v. Univ. of Mass., Lowell*,
  --- F. Supp. 3d ---, No. 21-cv-11244, 2021 WL 3848012 (D. Mass. Aug. 27, 2021),
  *appeal filed*, No. 21-1770 (1st Cir. Sept. 28, 2021) .............................. 35

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981) ......................................................................... 28, 29

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ................................................................ 33

*Hollis v. Biden*,
  No. 1:21-cv-163, 2021 WL 5500500 (N.D. Miss. Nov. 23, 2021) ..................... 9, 37

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) .............................................................................. 30

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ............................................................. 21

*Johnson v. Brown*,
   --- F. Supp. 3d ---, No. 3:21-cv-1494, 2021 WL 4846060 (D. Or. Oct. 18, 2021) .................. 35

*Kentucky v. Biden*,
   No. 3:21-55, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) ............................................ *passim*

*Kentucky v. Donovan*,
   704 F.2d 288 (6th Cir. 1983) ...................................................................................... 33

*Liberty Mut. Ins. Co. v. Friedman*,
   639 F.2d 164 (4th Cir. 1981) ......................................................................... 13, 25, 30

*Lockheed Martin Corp. v. Def. Cont. Audit Agency*,
   397 F. Supp. 2d 659 (D. Md. 2005) .............................................................................. 12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................................... 9

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ..................................................................................................... 9

*Maryland v. Wirtz*,
   392 U.S. 183 (1968) ................................................................................................... 29

*Mass. Corr. Officers Federated Union v. Baker*,
   --- F. Supp. 3d ---, No. 21-cv-11599, 2021 WL 4822154 (D. Mass. Oct. 15, 2021) ............... 35

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................................... 11

*Mayweathers v. Newland*,
   314 F.3d 1062 (9th Cir. 2002) .................................................................................... 33

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ..................................................................................................... 7

*M'Culloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) .................................................................................... 29

*McDonald v. Longley*,
   4 F.4th 229, 255 (5th Cir. 2021) ................................................................................... 7

*Mistretta v. United States*,
   488 U.S. 361 (1989) .............................................................................................. 30, 31

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ......................................................................................... 8

*Murphy v. NCAA,*
   138 S.Ct. 1461, 1478 (2018) ......................................................................... 28

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
   551 U.S. 644 (2007) ....................................................................................... 26

*Nat'l Collegiate Athletic Ass'n v. Christie,*
   926 F. Supp. 2d 551 (D.N.J. 2013), *aff'd, Nat'l Collegiate Athletic Ass'n v. Governor*
   *of N.J.,* 730 F.3d 208 (3d Cir. 2013) ............................................................. 29

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ....................................................................................... 32

*Nat'l Gov't Servs., Inc. v. United States,*
   923 F.3d 977 (Fed. Cir. 2019) ................................................................. 18, 19

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State,*
   658 F. Supp. 2d 105 (D.D.C. 2009) ..................................................... 20, 21, 25

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................. 34, 36

*Oracle Am., Inc. v. United States,*
   975 F.3d 1279 (Fed Cir. 2020) ...................................................................... 18

*Pennhurst State School & Hospital v. Halderman,*
   451 U.S. 1 (1981) ..................................................................................... 32, 33

*Perkins v. Lukens Steel Co.,*
   310 U.S. 113 (1940) ............................................................................. 2, 18, 33

*Printz v. United States,*
   521 U.S. 898 (1997) ....................................................................................... 30

*Raines v. Byrd,*
   521 U.S. 811 (1997) ......................................................................................... 8

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) ................................................................................. 22, 35

*Smith v. Biden,*
   No. 1:21-cv-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021), *appeal filed,*
   No. 21-3091 (3d Cir. Nov. 10, 2021) ............................................................. 37

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ........................................................ 24

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ........................................................................... 11

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................................... 32

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) ........................................................... 8, 9

*Talleywhacker, Inc. v. Cooper*,
    465 F. Supp. 3d 523 (E.D.N.C. 2020) ............................................... 36

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................................. 3

*Tesfamichael v. Gonzales*,
    411 F.3d 169 (5th Cir. 2005) .............................................................. 12

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015) ........................................................................... 15

*Tex. Health Choice, L.C. v. Off. of Pers. Mgmt.*,
    400 F.3d 895 (Fed. Cir. 2005) ........................................................... 12

*Tigges v. Northam*,
    473 F. Supp. 3d 559 (E.D. Va. 2020) ................................................ 35

*TJM 64, Inc. v. Harris*,
    475 F. Supp. 3d 828 (W.D. Tenn. 2020) ...................................... 35, 36

*Touby v. United States*,
    500 U.S. 160 (1991) ........................................................................... 31

*Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*,
    492 F.3d 471 (D.C. Cir. 2007) ........................................................... 10

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ....................................................................... 37

*UAW-Labor Emp. & Training Corp. v. Chao*,
    325 F.3d 360 (D.C. Cir. 2003) ............................................... 13, 14, 26

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020) ........................................... 29

*United States v. Hatch*,
  722 F.3d 1193 (10th Cir. 2013) ...................................................................................... 29

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915) ...................................................................................................... 15

*Valdez v. Grisham*,
  --- F. Supp. 3d ---, No. 21-cv-783, 2021 WL 4145746 (D.N.M. Sept. 13, 2021),
  *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021) ................................................... 35

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ....................................................................................... 33

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...................................................................................................... 31

*Williams v. Brown*,
  --- F. Supp. 3d ---, No. 6:21-cv-1332, 2021 WL 4894264 (D. Or. Oct. 19, 2021) ................... 35

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................................... 7, 36

*Wise v. Inslee*,
  No. 2:21-cv-0288, 2021 WL 4951571 (E.D. Wash. Oct. 25, 2021) ........................................ 35

*Yakus v. United States*,
  321 U.S. 414 (1944) ...................................................................................................... 31

**STATUTES**

3 U.S.C. § 301 .................................................................................................... 4, 20

5 U.S.C. § 553 ................................................................................................. 19, 21, 24

5 U.S.C. § 704 ................................................................................................. 23, 24

28 U.S.C. § 1491(a)(2) ............................................................................................ 12

40 U.S.C. § 101 ....................................................................................................... 31

40 U.S.C. § 121(a) .......................................................................................... 13, 18, 31

41 U.S.C. § 133 ....................................................................................................... 20

41 U.S.C. § 1303 ..................................................................................... 10, 17, 25

41 U.S.C. § 1707 .............................................................................................. *passim*

41 U.S.C. § 3301(a)(1) ............................................................................... 18

41 U.S.C. § 6701–6707 ................................................................................ 4

Pub. L. No. 99-500,
    100 Stat. 1783-345 (1986) ..................................................... 15

Pub. L. No. 99-591,
    100 Stat. 3341-345 (1986) ..................................................... 15

Pub. L. No. 104-208,
    110 Stat. 3009-355 (1996) ..................................................... 15

Pub. L. No. 107-217,
    116 Stat. 1062 (2002) ............................................................ 15

## REGULATIONS

29 C.F.R. § 4.133(b) ................................................................................... 4

48 C.F.R. § 1.402 ....................................................................................... 10

48 C.F.R. § 2.101 ......................................................................................... 5

Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19)
    Outbreak, Proclamation No. 9994,
    85 Fed. Reg. 15,337 (Mar. 18, 2020) ................................... 3

Determination of the Acting OMB Director Regarding the Revised Safer Federal
    Workforce Task Force Guidance for Federal Contractors and the Revised Economy
    & Efficiency Analysis,
    86 Fed. Reg. 63, 418 (Nov. 16, 2021) ........................................... *passim*

Determination of the Promotion of Economy and Efficiency in Federal Contracting
    Pursuant to Executive Order No. 14042,
    86 Fed. Reg. 53,691 (Sept. 28, 2021) ........................................ 5, 6, 23

Executive Order 8802,
    6 Fed. Reg. 3109 (June 27, 1941) .......................................... 14

Executive Order 13950,
    85 Fed. Reg. 60,683 (Sept. 28, 2020) ................................... 14

Executive Order 14042,
   86 Fed. Reg. 50,985 (Sept. 14, 2021) .................................................................... *passim*

Federal Acquisition Regulation; Contractor Responsibility, Labor Relations Costs, and Costs
   Relating to Legal and Other Proceedings,
   66 Fed. Reg. 17,754 (Apr. 3, 2001) ............................................................................ 22

Federal Acquisition Regulation: Non-Retaliation for Disclosure of Compensation
   Information,
   81 Fed. Reg. 67,732 (Sept. 30 2016) ......................................................................... 22

## OTHER AUTHORITIES

Alex M. Azar, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020),
   https://perma.cc/VZ5X-CT5R ....................................................................................... 3

CDC COVID Data Tracker (as of Nov. 30, 2021),
   https://perma.cc/UGE3-XZ7Q ....................................................................................... 3

Centers for Disease Control and Prevention (CDC), *Delta Variant: What We Know
   About the Science* (updated Aug. 26, 2021),
   https://perma.cc/4RW6-7SGB ....................................................................................... 3

FAR Case No. 2021-021, Ensuring Adequate COVID-19 Safety Protocols for Federal
   Contractors,
   https://perma.cc/ZQ4Y-8Y9W...................................................................................... 7

Memorandum from Lesley A. Field et al.,
   https://perma.cc/77L7-8TM8 ........................................................................................ 7

Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies
   (June 2020),
   https://perma.cc/GGF4-F4FV ..................................................................................... 34

Safer Federal Workforce, Federal Contractor FAQs,
   https://perma.cc/RGR9-ZTES...................................................................................... 38

Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and
   Subcontractors,
   https://perma.cc/H2MY-K8RT ...................................................................................... 5

**INTRODUCTION**

Louisiana, Indiana, and Mississippi have sued the President, the United States, and two dozen federal officials and entities. The states challenge Executive Order 14042, which is not a regulation but rather an exercise of the President's authority to direct federal contracting in his capacity as Chief Executive Officer of the Executive Branch as a market participant. With respect to certain kinds of government contracts, Executive Order 14042 directs federal agencies to include a clause requiring certain COVID-19 safety protocols in any "new contract," "new solicitation for a contract," "extension or renewal of an existing contract," and "exercise of an option on an existing contract." Executive Order 14042, 86 Fed. Reg. 50,985 (Sept. 14, 2021) [Executive Order or EO]. Those safety protocols are dynamic: they can be updated to account for the best available science and to reflect on-the-ground conditions. Currently, they require federal contractor employees to be vaccinated unless granted a medical or religious exemption.

The plaintiff states ask this Court to exercise its extraordinary emergency powers to enjoin this EO—even, apparently, outside the boundaries of Louisiana, Indiana, and Mississippi. *See* Pls.' Mem. Prelim. Inj. 2, ECF No. 10 [Pls.' Mem.]; Proposed Order, ECF No. 10-5. But the states fail to show how they will be imminently harmed, much less irreparably: other than one contract that Indiana has already agreed to modify, the states provide no evidence that they are parties to federal contracts that already have the COVID-19 safety clause, or parties to existing covered contracts that are soon up for an option, extension, or renewal that must include the clause. Nor do they identify any specific solicitations that they plan to bid on or contracts that they plan to enter in the immediate future. For these reasons alone, the states' motion should be denied.

Even if this Court reaches the merits, it should reject the states' argument that the President has no power to direct federal contracting—an argument that conflicts with more than 50 years of

1

precedent. EO 14042 is not an action taken in the President's regulatory capacity but rather an action by the CEO of the Executive Branch as a market participant. Moreover, the President's delegation of certain authority to the Director of the Office of Management and Budget (OMB) is consistent with applicable statutes. Even assuming that the Administrative Procedure Act (APA) or 41 U.S.C. § 1707 apply to the OMB Director's action pursuant to the delegation (they do not), the states' procedural arguments lack merit because the Acting OMB Director thoroughly explained her economy-and-efficiency determination and opened a period for comments. And the states' constitutional claims have been considered and rejected by many courts many times over.

When COVID-19 first emerged in the United States, it ravaged the economy and severely compromised the federal government's operations. Just like private entities, the federal government suffered when its contractors' employees became sick and died. The federal government has therefore made a decision—in its capacity as a market participant—to require those with whom it contracts to take precautions to prevent the spread of this virulent, contagious disease. "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). "Those wishing to do business with the Government must meet the Government's terms; others need not." *AFL-CIO v. Kahn*, 618 F.2d 784, 794 (D.C. Cir. 1979) (en banc). The Court should reject the states' novel and wooden view of the federal government's ability to set the terms of its own contracts, especially in the midst of unprecedented economic upheaval.

## BACKGROUND

### I.    The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services declared a public health

emergency because of COVID-19. *See* Alex M. Azar, *Determination that a Public Health Emergency Exists*, https://perma.cc/VZ5X-CT5R (Jan. 31, 2020). On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. *See* Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020). In July 2021, the United States began experiencing "a rapid and alarming rise in . . . COVID-19 case and hospitalization rates" driven by an especially contagious strain known as the Delta variant. *See* Centers for Disease Control and Prevention (CDC), *Delta Variant: What We Know About the Science* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[1] To date, more than 48 million Americans have been infected with COVID-19 and nearly 780,000 have died from COVID-19—including nearly 2.3 million infections and 26,000 deaths since these states filed suit. CDC COVID Data Tracker (as of Nov. 30, 2021), https://perma.cc/4PCN-9XMB.

## II.    Executive Order 14042

On September 9, 2021, the President issued EO 14042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument." EO 14042 § 1. The EO explained that new safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id.* Those safeguards would be set forth in guidance issued by the Safer Federal Workforce Task Force, *id.* § 2(a), and become binding when the OMB Director,

---

[1] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).

pursuant to a delegation of the President's statutory authority, determines that they would "promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." *Id.* § 2(c) (citing 3 U.S.C. § 301).

Pursuant to the EO, the President, as the ultimate manager of federal procurement, directed federal executive departments and agencies to incorporate a COVID-19 safety clause implementing the Task Force's guidance into certain contracts. Specifically, federal executive departments and agencies, "to the extent permitted by law," must incorporate the clause into new contracts and new solicitations, extensions or renewals of an existing contract, and exercises of an option on an existing contract, but only if they also fall into one of the following categories:

- a procurement contract for services, construction, or a leasehold interest in real property;

- a contract for services covered by the Service Contract Act, 41 U.S.C. § 6701–6707;

- a contract for concessions, including any concessions contract excluded by Department of Labor regulations at 29 C.F.R. § 4.133(b); or

- a contract in connection with federal property or lands and related to offering services for federal employees, their dependents, or the general public.

EO 14042 § 5(a) (collectively, "covered contracts"). The COVID-19 safety clause must specify compliance by the contractor or subcontractor with the Task Force's published guidance for workplace locations, provided that guidance is approved by the OMB Director. *Id.* at § 2(a).

The EO, however, is targeted and has exceptions. Its mandate does not apply to grants, or to most contracts for procurement of goods (as opposed to services). *See id.* § 5(a)(i), (b)(i), (b)(v). Nor does its mandate apply to "contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold," which is essentially $250,000. *Id.* at § 5(a)(iii); *see also* 48 C.F.R. § 2.101. And, although "agencies are strongly encouraged, to the extent permitted by law,

to ensure that the safety protocols required under [existing] contracts . . . are consistent with" the Task Force guidance, the EO does not itself require (or even give authority for) agencies to insert the COVID-19 safety clause into existing contracts. EO 14042 § 6(c).

To implement this directive, the EO directs the Federal Acquisition Regulatory Council to make corresponding amendments to the Federal Acquisition Regulation (FAR) to include the COVID-19 safety clause in future covered contracts. *See id.* § 3(a). Because that amendment process takes time, the EO directs agencies to exercise their authority to deviate from the FAR to incorporate COVID-19 safety clauses until the amendment can take effect. *See id.* § 3(b). To that end, the EO asks the FAR Council to issue interim guidance helping agencies do so. *See id.* § 3(a).

## III.    The Task Force Guidance and the OMB Director's Economy & Efficiency Determination

The Task Force issued initial guidance under EO 14042 on September 24, 2021. *See* Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, https://perma.cc/H2MY-K8RT. That guidance required federal contractors party to a covered contract to ensure that all covered contractor employees are fully vaccinated for COVID-19 by December 8, 2021. *See id.* Exercising the authority delegated to her by the President, Acting OMB Director Shalanda Young made the statutorily required determination that the Task Force guidance would promote economy and efficiency in federal contracting. *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 Fed. Reg. 53,691, 53,691-92 (Sept. 28, 2021).

On November 10, 2021, the Task Force issued updated guidance and Acting OMB Director Young made a new economy-and-efficiency determination. *See* 86 Fed. Reg. 63,418, 63,418-21 (Nov. 16, 2021). Acting Director Young's new determination rescinded and superseded her September 24 determination and re-exercised the authority delegated to her by the President to

determine that the revised Task Force guidance would promote economy and efficiency in federal contracting. *See id.* The new determination included the full text of the revised guidance and a detailed economic analysis spelling out how the revised guidelines promote economy and efficiency in federal procurement. *See id.* Finally, although the determination explained why neither the APA nor the Office of Federal Procurement Policy (OFPP) Act's notice-and-comment requirements applied, the determination nevertheless complied with both, opening a public comment period through December 16, 2021. *Id.*

The revised Task Force guidance requires federal contractors that are a party to a covered contract to "ensure that all covered contractor employees are fully vaccinated for COVID-19" by January 18, 2022. *Id.* at 63,420. "Covered contractor employees means any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace." *Id.* at 63,419 (emphasis removed). A covered contractor workplace is "a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." *Id.* Covered contractor employers oversee compliance with the guidance. Federal law may require covered contractor employers to provide accommodations to employees "who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." *Id.* at 63,420.

## IV.   The FAR Council's Interim Guidance

As previously noted, EO 14042 asked the FAR Council to issue interim guidance to federal agencies on how to incorporate COVID-19 safety clauses into new covered contracts until the FAR can be amended. *See* EO 14042 § 3(a). On September 30, 2021, the FAR Council issued a memo

"provid[ing] agencies . . . with initial direction" on implementing "all guidance" the Task Force may issue and on "meeting the applicability requirements and deadlines set forth in" EO 14042. *See* Memorandum from Lesley A. Field et al. 1-2, https://perma.cc/77L7-8TM8 [FAR Memo]. The memo "encourage[s]" agencies to use their independent authority to temporarily deviate from the FAR and "support[s]" those efforts by offering a sample COVID-19 safety clause that agencies might use, subject to agency- and contract-specific deviations. *Id.* at 2-5.

Separately, the FAR Council has begun the rulemaking process to amend the FAR in order to implement EO 14042. *See* FAR Case No. 2021-021, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors, https://perma.cc/ZQ4Y-8Y9W.

## ARGUMENT

To justify the "drastic remedy" of a preliminary injunction, the states must "*by a clear showing*" establish (1) that they have a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm without an injunction; (3) that the balance of equities tips in their favor; and (4) that preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). The plaintiff states fail to meet their burden on each front.

## I.     The states fail to establish this Court's subject-matter jurisdiction.

### A.     The states lack standing.

To establish standing, plaintiffs must show an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

The states have failed to carry their "especially rigorous" burden. *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). General claims about the potential loss of contracts or "widespread economic harm" do not even begin to establish a concrete, particularized, and imminent injury traceable to

the EO or its implementing guidance that would be redressable by a favorable decision. Pls.' Mem. 22; *see Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Nor do the states demonstrate standing by identifying specific "contracts": all but one are cooperative agreements with the U.S. Department of Justice (DOJ) that are akin to grants—and therefore fall outside the scope of the EO's mandatory provisions. As for the one actual contract the states identify—a contract between Purdue University and the Department of Defense (DOD)—Purdue has already voluntarily agreed to insert the COVID safety clause. All the states' remaining attempts to establish standing similarly fail: the states' claims with respect to the Task Force guidance and FAR Memo do not identify any injury and are not redressable in any event. Further, any procedural injury alleged by the states is moot, and the states lack *parens patriae* standing against the federal government.

   *Economic harm*. The states' generalized fear of economic injury arising from its dealings with the federal government is too conjectural and hypothetical to confer standing. A plaintiff's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)). In other words, a plaintiff seeking a preliminary injunction cannot rest on "mere allegations," but rather must "set forth by affidavit or other evidence specific facts" establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The states fail to do so here. Besides merely identifying the DOJ cooperative agreements and the Purdue–DOD contract discussed below, the states provide no specific information on whether those or other entities are unwilling to comply with the EO, whether individual employees have applied for medical or religious exemptions, or how many employees would leave their positions if their employer incorporated the COVID-19 safety clause into relevant contracts. Vague assertions about potential economic

harm do not suffice to establish "concrete and particularized" injury in fact. *Id*. at 560. Although the states claim that they will lose future contracts without the requested relief, that piles speculation upon speculation: future contracts may be below the simplified acquisition threshold or otherwise not covered by the express terms of the EO, and a state's agreement or refusal to bilaterally modify an existing contract has no effect on its future procurement opportunities. As another court in this Circuit recently held, institutions who merely allege that they are "likely to be recipients of" future federal contracts lack standing to challenge EO 14042. *See Hollis v. Biden*, No. 1:21-cv-163, 2021 WL 5500500, at *4 (N.D. Miss. Nov. 23, 2021).

*DOJ cooperative agreements*. The Louisiana and Mississippi Justice Departments' cooperative agreements with DOJ do not give those states standing to enjoin EO 14042 or its implementing guidance. Pls.' Mem. 6-7, Exs. A & B. These cooperative agreements do not fall under any of the applicable conditions in § 5(a) of the EO; they are treated as grants awarded to fund the states' efforts in an area where the federal government also has an interest. *See* Ex. A, Declaration of Ralph Martin ¶¶ 7–9. Grants are excluded from the terms of EO 14042. *See* EO 14042 § 5(b)(i). Because the terms of the EO are inapplicable to grants, there can be no injury arising from the EO, and any effort to include a COVID-19 safety clause in these agreements is not fairly traceable to the EO. In all events, the Department of Justice has no intention to apply a COVID-19 safety clause to these agreements. *See* Martin Decl. ¶ 10.

*Purdue University's DOD contract*. Purdue is currently in the second year of a nearly five-year contract with DOD. *See* Ex. B, Declaration of Katelyn Coon ¶ 6. On November 19, Purdue agreed to bilaterally modify this contract to insert DOD's proposed COVID-19 safety clause. *See id*. ¶ 10. So Indiana cannot claim that the EO caused any injury relating to this contract—let alone one that would be redressed by vacating the EO or its implementing guidance.

*The Task Force guidance & FAR Memo*. The states also lack standing to challenge the Task Force guidance and the FAR Memo specifically, both because the guidance and the memo cause no harm by themselves, and because enjoining the guidance or the memo would not redress any injury. Neither the guidance nor the memo on its own has any standalone legal force. The Task Force guidance only becomes operative once the OMB Director makes an economy-and-efficiency determination. Likewise, the FAR Memo merely suggests a sample clause that agencies might use to implement the EO; it has no bearing on whether agencies are required to include a COVID-19 safety clause in their contracts. *See* 41 U.S.C. § 1303(a)(2)(A) (agencies are authorized to implement regulations outside the FAR "to implement Government-wide policies"); FAR § 1.402 ("[D]eviations from the FAR may be granted . . . when necessary to meet the specific needs and requirements of each agency."). Neither the Task Force guidance nor the FAR Memo independently injures these states. *See Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 477 (D.C. Cir. 2007) (no injury from guidance that "cause[s] nothing" to happen to the plaintiff).

*Procedural injury*. Any procedural injury the states complain of is nonexistent: the Acting OMB Director's operative economy-and-efficiency determination provides for a public comment period through December 16, 2021. *See* 86 Fed. Reg. 63,418. Because the states currently have the ability to submit comments, they have not suffered any procedural injury giving them standing to sue (to the extent a comment period is required at all—*see infra* section II.C).

*Parens Patriae*. The states also invoke *parens patriae* standing "to vindicate their citizens' economic interests." Pls.' Mem. 24. But "a state does not have standing as *parens patriae* to bring an action against the federal government to vindicate the rights of its citizens." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982). Although a state may have standing to

10

vindicate its own injuries, *see Massachusetts v. EPA*, 549 U.S. 497, 519, 520 n.17 (2007) (injury to state's interest as a coastal property owner), the states here are asserting an injury on behalf of a certain subset of their citizens: federal contractors who do not wish to be vaccinated. Whatever injuries these citizens may claim because they are employed by a contractor that profits from the federal government, the states are not in a position to bring suit on their behalf.  S*ee Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) ("[A] State [does not] have standing as the parent of its citizens . . . against the Federal Government, the ultimate parens patriae of every American citizen." (alterations in original) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966))), *docketing petition for cert.*, No. 21-380 (S.Ct. Sept. 8, 2021). So the states lack standing to proceed on that basis as well.[2]

> **B.      Even if the states did have standing, the Court of Federal Claims would have jurisdiction over any claim relating to existing contracts.**

This Court lacks jurisdiction to entertain claims about inserting COVID-19 safety clauses in procurement contracts outside the scope of EO 14042. Put differently, even if the states could identify an existing procurement contract giving them standing, any dispute about the legality of including a COVID-19 safety clause in that particular contract could not be brought in the district courts, but rather must be brought in the Court of Federal Claims under the Contract Disputes Act (CDA), which "applies to any express or implied contract entered into by an executive agency for the procurement of property, services, construction, repair, or the disposal of personal property." *Anselma Crossing, L.P. v. U.S. Postal Serv.*, 637 F.3d 238, 240 (3d Cir. 2011); *see* 28 U.S.C. § 1491(a)(2); *Lockheed Martin Corp. v. Def. Cont. Audit Agency*, 397 F.Supp.2d 659, 664 (D. Md.

---

[2] This Court should thus decline to follow the standing analysis in *Kentucky v. Biden*, because it is based on the incorrect premise that "States are permitted 'to litigate as *parens patriae*' in suits against the federal government." No. 3:21-55, 2021 WL 5587446, at *3 (E.D. Ky. Nov. 30, 2021) (quoting *Massachusetts*, 549 U.S. at 520 n.17).

2005). As the Federal Circuit has explained, "[t]he CDA exclusively governs Government contracts and Government contract disputes," and, "[w]hen the [CDA] applies, it provides the exclusive mechanism for dispute resolution." *Tex. Health Choice, L.C. v. Off. of Pers. Mgmt.*, 400 F.3d 895, 898-99 (Fed. Cir. 2005) (quoting *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993) and *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995)).

## II.   The states cannot succeed on the merits.

Even assuming this Court reaches the merits, none of the states' various theories establishes a substantial likelihood of success, "arguably the most important" factor when considering requests for preliminary relief. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

### A.   The President has authority as the CEO of the Executive Branch to direct government procurement policy.

The states characterize the federal contractor vaccination requirement as "an unprecedented use of the President's power" and argue that the President lacks "clear statutory authority" to impose it. Pls.' Mem. 9. They are wrong on both scores. FPASA specifically authorizes the President to manage federal procurement, and its text, judicial construction, and history amply support the federal contractor vaccination requirement.

FPASA expressly empowers the President to "prescribe policies and directives that the President considers necessary to carry out" the Act's provisions if the policies and directives are "consistent" with the Act. 40 U.S.C. § 121(a). Presidential policies and directives are "consistent" with FPASA if they "reasonably relate[] to . . . ensuring efficiency and economy in government procurement." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981); *accord Kahn*, 618 F.2d at 793 & n.49.

"Economy" and "efficiency" are "not narrow terms." *Kahn*, 618 F.2d at 789. In fact, a half-century of case law confirms that FPASA confers upon the President both "necessary flexibility

12

and 'broad-ranging authority.'" *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (quoting *Kahn*, 618 F.2d at 789). Courts have concluded, for example, that FPASA authorizes the President

- to impose wage and price controls on government contractors, *Kahn*, 618 F.2d 784;

- to require employers to hang posters informing employees that they cannot be forced to join a union or to pay mandatory dues for costs unrelated to representational activities, *Chao*, 325 F.3d 360 (D.C. Cir. 2003);

- to promote urban renewal by requiring federal entities to look for office space in a city's downtown, *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004);

- to phase out free parking for government officials in order to discourage their gasoline consumption, *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981);

- to impose anti-discrimination requirements for Government contractors, *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967); and

- to require contractors to confirm employees' immigration status through e-Verify, *Chamber of Com. of U.S. v. Napolitano*, 648 F.Supp.2d 726, 729 (D. Md. 2009).

Presidents have consistently used their FPASA authority in this manner for even longer. *See, e.g.*, *Kahn*, 618 F.2d at 790 (explaining how President Lyndon Johnson used FPASA to impose anti-age-discrimination requirements for government contractors and how President Nixon used FPASA to exclude state prisoners from working on federal contracts); *Farmer v. Phila Elec. Co.*, 329 F.2d 3, 5-9 (3d Cir. 1964) (describing how Presidents Truman, Eisenhower, and Kennedy used FPASA to impose anti-race-discrimination requirements for government contractors); *see also* Executive Order 13950, 85 Fed. Reg. 60,683, 60,685 (Sept. 28, 2020) (President Trump invoking FPASA authority "to promote economy and efficiency in Federal contracting" to prohibit federal

contractors from "promot[ing] race or sex stereotyping").

Presidents need not publish detailed findings to support their FPASA authority. In *Chao*, the D.C. Circuit deemed a one-sentence analysis sufficient to support a procurement rule requiring posters about employee labor rights. *See* 325 F.3d at 366 (upholding explanation that "When workers are better informed of their rights, including their rights under Federal labor laws, their productivity is enhanced."). In *City of Albuquerque*, the Tenth Circuit upheld an economy-and-efficiency determination providing even less exposition. *See* 379 F.3d at 914.

Against this backdrop of presidential action and judicial affirmation, Congress has effectively endorsed this expansive view of the President's FPASA power. "Past [presidential] practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (second and third alterations in original) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)). "[T]he President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting Congressional reversal, it is entitled to great respect." *Kahn*, 618 F.2d at 790 (footnote omitted). Although Congress has revised FPASA since 1949, including a complete recodification in 2002, no amendment modified or restricted this presidential power. "If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536-37 (2015) (quoting Scalia & Garner, *Reading Law* 322 (2012)).

EO 14042 fits comfortably within these decades of precedent from all three branches of our constitutional system. As many American employers have found, the self-evident nexus

between slowing COVID-19's spread among the federal contractor workforce and promoting efficient and economic government procurement requires no extended explication. Although FPASA says nothing specific about vaccination or disease prevention, it also does not specifically authorize promoting urban renewal, protecting collective bargaining rights, conserving gasoline, combating discrimination, verifying contractors' immigration status, or the other presidential directives that have passed FPASA muster. Indeed, even cases relied on by the states confirm that FPASA "does vest broad discretion in the President." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330-33 (D.C. Cir. 1996) (observing that "[t]he President's authority to pursue 'efficient and economic' procurement . . . certainly reach[es] beyond any narrow concept of efficiency and economy in procurement" and collecting examples).

Against this considered line of cases from courts across the country, the states offer dicta from a four-decade-old footnote in *Chrysler Corp. v. Brown*, a case expressly refusing "to decide whether" an Executive Order "[wa]s authorized by" FPASA. 441 U.S. 281, 304 (1979). That dicta does not undo what multiple courts before and after have held: FPASA "emphasiz[es] the leadership role of the President in setting Government-wide procurement policy on matters common to all agencies" and expects "the President [to] play a direct and active part in supervising the Government's management functions." *Kahn*, 618 F.2d at 788.[3]

The states' invocation of various clear-statement rules from different contexts does not justify radically departing from the way that FPASA has always been interpreted. For starters, EO 14042 is not an "elephant" that changes the balance of federal–state authority or that pushes the

---

[3] The recent merits conclusion in *Kentucky* cannot be squared with these longstanding interpretations. Indeed, the *Kentucky* court's conclusion is difficult to reconcile with its own holding that the "OMB Determination provided ample support for the premise that a vaccine mandate will improve procurement efficiency." 2021 WL 5587446, at *13.

constitutional envelope. Rather than directly regulating anyone, EO 14042 merely sets conditions on who the government will business with—something private-sector business leaders do all the time. *Cf. Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 240-41 (2007) (noting that when contracting with other parties, the government engages "as private parties, individuals or corporations also engage in among themselves"). Here, the government has chosen to do business with companies and entities that are requiring their employees to be vaccinated, because doing so will ensure that those companies and entities can provide contracted-for services in a safe and efficient manner to the government. Nor does EO 14042 run afoul of the "major questions" doctrine, a proviso to ordinary *Chevron* deference presuming that Congress does not *sub silentio* give unelected agency heads power to regulate on questions of major public significance. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 147 (2000) (discussing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). By contrast, EO 14042 is an exercise of presidential authority to manage the workplace, not to regulate private parties who do not choose to contract with the government, and the federal government is not asking this Court for *Chevron* deference. Finally, FPASA is no "mousehole": as discussed, it "vest[s]" the President with "broad discretion" to manage federal procurement. *Reich*, 74 F.3d at 1330; *see also Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1753 (2020) (recognizing that the canon "has no relevance" when a statute "is written in starkly broad terms").

Nor can the states duck this precedent by arguing that the federal contractor vaccination requirement is a procurement "regulation" that must come from the FAR Council. 41 U.S.C. § 1303 neither states nor implies that that the FAR Council's authority to issue regulations regarding procurement is exclusive. Indeed, § 1303(a)(1)(A) also permits agencies to prescribe "regulations essential to implement Government-wide policies and procedures."

16

Relatedly, the President's request for the FAR Council to amend the FAR does not usurp the FAR Council's authority to prescribe regulations. Put simply, the President has in no way prescribed the amendments himself: his EO merely directs the Task Force to develop COVID-19 safety protocols, tasks the OMB Director with ascertaining whether those protocols will promote economy and efficiency, and if the Director makes that determination, asks the FAR Council to incorporate the protocols into the FAR in the long run and to help agencies incorporate them into agency-specific regulations in the short run. That is perfectly consistent with 40 U.S.C. § 121(a), which empowers the President to "prescribe [procurement] policies and directives."

Finally, invoking *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S.Ct. 2485 (2021), and *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 WL 5166656 (5th Cir. Nov. 6 2021), gets the states nowhere. Those cases involve different standards from different statutes. Neither concerns FPASA, which gives the President "broad-ranging authority," *Kahn*, 618 F.2d at 789, that "certainly reach[es] beyond any narrow concept of efficiency and economy in procurement," *Reich*, 74 F.3d at 1333. Unlike the regulatory actions challenged in those cases, EO 14042 concerns the government's role as a player in the commercial marketplace, where the government enjoys "unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins*, 310 U.S. at 127. In the end, the Executive Branch's right to contract, and its relationship to those with whom it contracts, places this case on vastly different footing.

**B.    Requiring contractor vaccination does not violate the Competition in Contracting Act.**

The states are also unlikely to show that the contractor vaccination requirement conflicts with the Competition in Contracting Act, which requires "full and open competition" and "competitive procedures." 41 U.S.C. § 3301(a)(1) (CICA). The states argue that requiring

compliance with the Task Force guidance violates CICA "[b]y categorically excluding entities." Pls.' Mem. 13. But the only case they cite, *National Government Services, Inc. v. United States*, upholds "the unremarkable proposition that a solicitation requirement . . . is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors who cannot satisfy that requirement." 923 F.3d 977, 985-86 (Fed. Cir. 2019). If anything, *National Government Services* teaches that solicitation requirements excluding officers do not violate CICA as long as the agency has a reason for establishing the requirement, which might be because the requirement will "likely result in reduced overall cost for the procurement." *Id.* at 986; *see also Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1293 (Fed Cir. 2020). So for the same reasons that EO 14042 and its implementing guidance are likely to promote economy and efficiency in federal procurement, EO 14042 and its implementing guidance are unlikely to violate CICA.

**C.    The states' APA and § 1707 notice-and-comment claims are meritless.**

The states fault the OMB determination, the Task Force guidance, and the FAR Memo for not complying with the notice-and-comment requirements of the APA or 41 U.S.C. § 1707. But neither the APA nor § 1707 applies to exercises of presidential authority like the OMB determination, and in any event the determination contains findings waiving those statutes' notice-and-comment provisions. Nor do the APA or § 1707 apply to nonbinding guidance like the Task Force guidelines or the FAR Memo. *See generally Kentucky v. Biden*, No. 3:21-55, 2021 WL 5587446, at *10 (E.D. Ky. Nov. 30, 2021) (rejecting similar arguments and concluding that EO 14042 and its implementing guidance "followed the procedures required by statute").

**1.    The OMB determination did not require notice and comment.**

*The APA.* The OMB determination is doubly exempt from the APA's notice-and-comment requirement. *First*, the APA's notice-and-comment requirement simply does not apply to

"matter[s] relating to . . . contracts." 5 U.S.C. § 553(a)(2).

 *Second*, the APA does not apply to actions taken pursuant to delegated presidential authority. The Acting OMB Director's economy-and-efficiency determination was carried out with presidential authority delegated to her under 3 U.S.C. § 301. *See* EO 14042 § 2(c). When the President delegates his authority under § 301, the APA does not authorize judicial review of the action taken pursuant to that delegation. Officers exercising presidential authority delegated to them through § 301 "stand[] in the President's shoes" and "exercis[e] purely presidential prerogatives." *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F.Supp.2d 105, 109 & n.5, 111 (D.D.C. 2009). So just as the President cannot be sued under the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992), the Acting OMB Director's actions "cannot be subject to judicial review under the APA," either. *Nat. Res. Def. Council*, 658 F.Supp.2d at 109; *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F.Supp.3d 85, 100 (D.D.C. 2016) (collecting cases "conclud[ing] that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA").

 *Section 1707*. Section 1707 requires agency heads to publish a proposed "procurement policy, regulation, procedure, or form" in the Federal Register if the proposal "relates to the expenditure of appropriated funds" and either "has a significant effect beyond the internal operating procedures of the [issuing] agency" or "has a significant cost or administrative impact on contractors." 41 U.S.C. § 1707(a)(1), (b). Section 1707 applies only to an "executive agency," a defined term in the statute. 41 U.S.C. § 133. That definition does not include the President. *See id.* Here too, because the OMB Director acted pursuant to a § 301 delegation from the President, § 1707's procedural requirements do not apply to the Acting OMB Director's determination. *See Detroit Int'l Bridge Co.*, 189 F.Supp.3d at 100; *Nat. Res. Def. Council*, 658 F.Supp.2d at 109.

*Good cause.* Even if either notice-and-comment requirement applied, the OMB Director properly invoked the APA's exception for good-cause and § 1707's exception for urgent-and-compelling circumstances. The APA allows agencies to forgo its notice-and-comment requirement when the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Likewise, although ordinarily a proposed procurement policy, procedure, regulation, or form "may not take effect until 60 days after" its Federal Register publication, § 1707 allows a proposal to take effect immediately on a temporary basis (subject to a concurrent comment period) "if urgent and compelling circumstances" require. 41 U.S.C. § 1707(a), (d)–(e).

Courts have held that notice and comment is impracticable when the issue is of "life-saving importance," *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981), in "emergency situations," *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004), and when "delay could result in serious harm," *id.* Although the general importance of notice and comment means that "courts will examine closely proffered rationales justifying the elimination of public procedures," courts are more willing to allow agencies to bypass notice and comment for "temporary" regulations enacted "pending public notice-and-comment procedures." *Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1157-58 & n.6 (D.C. Cir. 1981).

Here, each point supports allowing the OMB determination to take effect without notice and comment here. For § 1707 purposes, waiting sixty days before the revised Task Force guidance could take effect would mean that its revised January 18 deadline would be illusory; the original guidance's December deadline would take effect before the revised guidance could kick in. Relatedly, waiting sixty days under § 1707 would have precipitated regulatory uncertainty. Contractors would not know whether, at the conclusion of the sixty days, they would be facing a

fairly imminent vaccination deadline or, as a result of the comment process, a delayed deadline. Despite that uncertainty, given the many weeks required to meet a vaccination deadline, many contractors would have struggled significantly with how to protect themselves from being found out of compliance. Issuing a temporary but immediately effective rule avoided that regulatory uncertainty. *See also* 81 Fed. Reg. 67,732, 67,733 (Sept. 30 2016) (a FAR amendment invoking § 1707's urgent-and-compelling-circumstances waiver in order to harmonize deadlines across regulatory actions and to clarify compliance obligations); 66 Fed. Reg. 17,754, 17,755 (Apr. 3, 2001) (the FAR council invoking § 1707's urgent-and-compelling-circumstances waiver to immediate stay a FAR rule because "otherwise the rule imposes burdens that the Government and contractors are not prepared to meet"). Moreover the OMB determination is only "temporary," to be finalized after a thirty-day comment period. 86 Fed. Reg. at 63,424. So contrary to what the states say, the Acting OMB Director is not attempting to "avoid[] transparency and public input" on her determination—she has invited comments, and her determination will take permanent effect only after she considers any comments received. Pls.' Mem. 16.

The states contend that any emergency posed by COVID-19 dissipated by the time the President issued EO 14042 in September 2021. In fact, the President acted swiftly to require federal contractor vaccination once vaccines became both especially necessary and available. Vaccines became especially necessary in summer 2021 due to the "emergence of the B.1.617.2 (Delta) variant, which . . . spreads more easily than previously discovered variants" and thus represented a new "imminent threat to the health and safety of the American people." *Id.* at 63,423 ("The CDC has determined that the best way to slow the spread of COVID-19, including preventing infection by the Delta variant, is for individuals to get vaccinated."). And around the same time, vaccines became widely available to all adults. Waiting until vaccines became both especially necessary

and widely available ensured that requiring federal contractor vaccination would have a meaningful effect on economy and efficiency. In all events, it is hard to overlook the irony in the states' argument that EO 14042 came too late to be truly necessary yet too early to promote economy and efficiency with certainty.

The states further contend that any good cause evaporated during the weeks between the EO's release and OMB's economy and efficiency determinations. But thousands of people are still dying each week. *See supra* p. 3. And in all events, OMB proceeded in lockstep with the timeframe laid out by § 2(b) of the EO: the Task Force issued its initial guidance expeditiously—only two weeks after the EO's release—and Acting OMB Director Young made her original economy-and-efficiency determination that very same day. *See* 86 Fed. Reg. 53,691. When the Task Force issued updated guidance a few weeks later, Acting OMB Director Young included her new determination for simultaneous publication in the Federal Register. *See* 86 Fed. Reg. at 63,418.

### 2.    The FAR Memo and Task Force guidance do not require notice and comment.

*The APA.* The states' APA notice-and-comment challenge to the FAR Memo and the Task Force guidance fails because the APA provides review only of final agency action. *See* 5 U.S.C. § 704. So besides § 553(a)(2)'s exception for rules "relating to . . . contracts," the notice-and-comment requirement also does not apply to the Task Force guidance or to the FAR Memo because the Task Force is not an agency, and neither its guidance nor the FAR Memo is final action.

The Task Force is not an agency. "[T]he APA . . . confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971). But the Task Force is an entity within the Executive Office of the President that exists solely to advise and assist the President.

In addition, the Task Force guidance and the FAR Memo are "not final agency action."

*Kentucky*, 2021 WL 5587446, at *3. Agency action becomes final only after "the agency has completed its decisionmaking process" and "the result of that process . . . will directly affect the parties." *Franklin*, 505 U.S. at 797. Yet as mentioned, the Task Force guidance has no standalone legal force; it becomes binding only following the OMB Director's economy-and-efficiency determination. Likewise, the FAR Memo binds no one absent subsequent agency action. The memo has no direct effect on anyone unless and until an agency incorporates it into a procurement contract. The memo is not the FAR Council's final word on COVID-19 safety clauses, either: it only "provide[s] agencies that award contracts under the [FAR] with *initial* direction" to incorporate COVID-19 safety clauses into new contracts. FAR Memo 1 (emphasis added). The completion of the FAR Council's decisionmaking process—the forthcoming FAR Amendment including a COVID-19 safety clause "in Federal procurement solicitations and contracts" subject to the EO—has yet to occur. EO 14042 § 3(a); *see* FAR Memo 3.

*Section 1707.* Section 1707 does not apply to the Task Force guidance either. For the reasons explained above, the states do not—and could not—contend that the Task Force guidance was a binding "policy, regulation, procedure, or form" by itself, *i.e.*, without the accompanying OMB economy-and-efficiency determination. *Cf.* 41 U.S.C. § 1707(a). So the states could not argue that the guidance itself needed to run § 1707's procedural gauntlet.

Nor does § 1707 apply to the FAR Memo, "because it constitutes nonbinding guidance that does not rise to the level of a 'procurement policy, regulation, procedure, or form.'" *Kentucky*, 2021 WL 5587446, at *11 (quoting § 1707(a)). The FAR Memo does not direct an agency to take any specific action; it merely points contracting officers to "the direction[s] . . . issued by their respective agencies" for how to utilize the memo's guidance. FAR Memo 2. So the FAR Memo has no independent effect; none of its guidance is operational unless an agency independently

23

chooses to incorporate it into a procurement contract. *Cf.* 41 U.S.C. § 1303(a)(2)(A).[4]

> **D.    The OMB determination is neither arbitrary nor capricious.**

The states ask this Court to flyspeck the OMB determination's economy-and-efficiency analysis and deem it arbitrary and capricious in violation of the APA. This argument fails for at least three reasons. *First*, as subsection II.C.1 notes, the APA does not apply to the OMB determination.

*Second*, FPASA economy-and-efficiency determinations can pass judicial muster with just a single sentence explaining how a policy "reasonably relate[s]" to promoting economy and efficiency in federal contracting. *Liberty Mut.*, 639 F.2d at 170; *accord Kahn*, 618 F.2d at 793 n.49; *see City of Albuquerque*, 379 F.3d at 914; *Chao*, 325 F.3d at 366; *see also supra* Section II.A. Courts must uphold economy-and-efficiency determinations even when "[t]he link may seem attenuated" and even if one can "advance an argument claiming opposite effects or no effects [on economy or efficiency] at all." *Chao*, 325 F.3d at 366-67.

The OMB determination clears this "lenient" standard with plenty of room to spare. *Id.* at 367. COVID-19 hobbled the economy for months and continues to disrupt American life. Federal procurement is no exception. The President, as the head of federal procurement operations, determined that workplace safeguards aimed at preventing COVID-19's spread will "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." EO 14042 § 1. To anyone who has lived through the last two years of the pandemic and resulting economic turmoil, the

---

[4] The states contend that "agencies have treated" the FAR Memo "as binding" based on a declaration attached to their brief. *See* Pls.' Mem. 13-14 (citing Ex. B ¶ 11). But the cited paragraph does not support that contention: the declarant merely states that "[b]ased on communications . . . received from the federal government," she "reasonably believe[s]" that a particular state entity is party to a covered contract. Pls.' Mem. Ex. B. ¶ 11.

nexus between reducing the spread of COVID-19 and promoting economy and efficiency in federal contracting is self-evident. Slowing COVID-19's spread promotes economy and efficiency because federal procurement—like any business endeavor—suffers when people contracting with the federal government get sick and miss work. Although the states may disagree with the federal contractor vaccination requirement, the OMB determination's explanation is sufficient to show the required nexus between the policy and promoting economy and efficiency.

*Third*, even if the APA applied, and even if it displaced FPASA's lenient standard, the OMB determination's painstaking analysis would plainly satisfy "deferential" arbitrary-and-capricious review. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). Under that standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).

As another court recently held, the OMB determination includes a "thorough and robust economy-and-efficiency analysis" that "provide[s] ample support for the premise that" requiring federal contractor vaccination "will improve procurement efficiency." *Kentucky*, 2021 WL 5587446, at *12-13. Indeed, the determination spends 1750 words reviewing scientific studies and parsing economic data before concluding that requiring contractors to comply with the Task Force guidance would promote economy and efficiency in federal contracting. The determination specifically takes on the states' concern that implementing the guidance would cause a labor shortage and comes to the opposite conclusion. *See, e.g.*, 86 Fed. Reg. at 63,422 (concluding that "few employees [will] quit because of the vaccine mandate" and "even if some non-negligible number of workers were to quit rather than comply with a vaccine mandate," the short-term cost of replacing those workers is outweighed by "long-lasting" benefits of vaccination). The

determination repeatedly considers costs to employers and contractors, too. *See id.* at 63,421-23 (determining that "[b]ecause vaccines are widely available for free, the cost of implementing a vaccine mandate is largely limited to administrative costs associated with distributing information about the mandate and tracking employees' vaccination status," and that "[s]uch costs are likely to be small"). It also explains why it requires masking "in certain outdoor settings." *Id.* at 63,420. And it already excludes a teleworker's home office from the definition of a "covered contractor workplace" and includes a religious exemption. *See, e.g.*, *id.* at 63,419-20 & 63,422.

Although the determination does not specifically address reliance interests, there was no need to do so here: OMB was not changing a longstanding position. *Cf. Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125-26 (2016). To the extent there were any reliance interests, the EO protects them by exempting existing contracts from its scope.

*Finally*, the OMB determination is not "pretextual." Pls.' Mem. 16. To be sure, it complements the Administration's overarching goal of "getting more people vaccinated and decreas[ing] the spread of COVID-19." FAR Memo 3. But that makes sense—given the way COVID-19 spreads from person to person, to adequately protect those working on federal contracts, the Task Force guidance also protects others with whom they come into contact. Simply put, any synergy is a feature, not a bug. Decreasing the spread of COVID-19 among federal contractors is not an impermissible objective merely because it will redound to the benefit of the economy generally as well as federal procurement specifically. *See Carmen*, 669 F.2d at 821 (presidential exercise of FPASA authority does not "become[] illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissible, ends as well"). The OMB determination "provided ample support" for its economy-and-efficiency rationale, and "'a court may not reject an agency's stated reasons for

acting simply because the agency might also have had other unstated reasons.'" *Kentucky*, 2021

WL 5587446, at *13 (quoting *Dep't of Com. v. New York*, 139 S.Ct. 2551, 2575-76 (2019))

### E.   Requiring contractor vaccination is constitutional.

The states conclude their merits analysis with arguments about the Tenth Amendment, the

nondelegation doctrine, and the Spending Clause. None withstands scrutiny.

*Tenth Amendment*. The federal contractor vaccination requirement does not violate the

Tenth Amendment. True, "[p]ublic health—and vaccinations in particular—have long been

recognized as an aspect of police power reserved to the states." Pls.' Mem. 17. But the Supreme

Court "long ago rejected the suggestion" that the federal government "invades areas reserved to

the States by the Tenth Amendment simply because it exercises its authority . . . in a manner that

displaces the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation

Ass'n*, 452 U.S. 264, 291 (1981). As as a plurality of the Fifth Circuit recently put it, "the Federal

Government, when acting within a delegated power, may override countervailing state interests."

*Brackeen*, 994 F.3d at 310 (quoting *Maryland v. Wirtz*, 392 U.S. 183, 195 (1968)). Here, the federal

contractor vaccination requirement stems from the President's FPASA authority.

The doctrine of intergovernmental immunity further supports the federal government's

ability to set the terms of federal contracts regardless of the states' police power. *See generally

M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819) (barring state regulations that "retard,

impede, burden, or in any manner control the operations of the constitutional laws enacted by

[C]ongress to carry into effect the powers vested in the national government"); *see also United

States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019) ("For purposes of intergovernmental

immunity, federal contractors are treated the same as the federal government itself."). Courts

regularly conclude that government contractors are immune from conflicting state laws, even when

those laws are based on state power to regulate health and safety. *See Boeing Co. v. Movassaghi*,

768 F.3d 832, 840 (9th Cir. 2014); *The GEO Grp., Inc. v. City of Tacoma*, No. 3:18-cv-5233, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019). As relevant here, the doctrine of intergovernmental immunity means that the federal government may contract with whom it likes under whatever terms it pleases without interference from states.

Finally, the anti-commandeering doctrine is beside the point. If anything, the states' primary authority—*Printz v. United States*, 521 U.S. 898 (1997)—supports the federal government, not the states. In *Printz*, Congress conscripted state officials to perform certain duties related to firearm background checks. *See* 521 U.S. at 903-04. Although the Court concluded that conscription violated the Tenth Amendment, in the same breath it noted that had Congress *contracted* with state officials, there would have been no constitutional concern. *See id.* at 916; *see also id.* at 936 (O'Connor, J., concurring) ("Congress is also free to amend the interim program to provide for its continuance on a contractual basis with the States if it wishes, as it does with a number of other federal programs."). Indeed, when (as here) "Congress evenhandedly [manages] an activity in which both States and private actors engage" "the anticommandeering doctrine does not apply." *Murphy v. NCAA*, 138 S.Ct. 1461, 1478 (2018); *Brackeen*, 994 F.3d at 322-25 ("That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." (quoting *Baker v. South Carolina*, 485 U.S. 505, 514-15 (1988)).

*Nondelegation Doctrine*. Next, the states take on the uphill argument that the President's FPASA authority is an unconstitutional delegation of legislative power. But they identify no cases suggesting that FPASA violates this exceedingly deferential doctrine—perhaps because every court to consider the question has held that the Congressional grant of contracting authority to the President passes constitutional muster. *See City of Albuquerque*, 379 F.3d at 914; *Liberty Mut.*,

639 F.2d at 166; *Kahn*, 618 F.2d at 793 n.51; *Napolitano*, 648 F.Supp.2d at 739.

To the contrary, FPASA's delegation of authority lands comfortably within constitutional bounds. Congress may lawfully delegate decisionmaking authority so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

The intelligible-principle standard is so deferential that the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001) (quoting *Mistretta*, 488 U.S at 416 (Scalia, J., dissenting)). In fact, the Supreme Court has struck down delegations only twice in United States history—both in 1935—and only because "Congress had failed to articulate *any* policy or standard." *Gundy v. United States*, 139 S.Ct. 2116, 2129 (2019) (plurality op.) (quoting *Mistretta*, 488 U.S. at 373 n.7). Since then, the Supreme Court "has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards." *Id.* at 2130-31 (Alito, J., concurring in the judgment).

FPASA is not the once-in-eighty-six-year exception that the states make it out to be. Rather, FPASA sets forth a general policy—the promotion of economy and efficiency in the federal government's procurement of property and services, *see* 40 U.S.C. § 101—and authorizes the President to issue orders designed to further those specific statutory goals in that specific context, *see id.* § 121(a). Because this Court could not "say that there is an absence of standards for the guidance of the [President's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed," this Court cannot "overrid[e]" FPASA's delegation of power to the President. *Yakus v. United States*, 321 U.S. 414, 426 (1944);

29

*see also Touby v. United States*, 500 U.S. 160, 165 (1991) ("Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors.").

*Spending Clause*. The states' Spending Clause argument fares no better. As an initial matter, the states cite no case subjecting a federal procurement policy or contract to the Spending Clause's requirement to "unambiguously" impose any "condition[s on] the States' receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). Indeed, their sole Spending Clause authority is *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981). But no court has ever applied *Pennhurst* to government contracts. *See also Kentucky*, 2021 WL 5587446 at *7 n.9 (rejecting a similar Spending Clause argument on this basis). That's for good reason: doing so would make simple imprecisions in federal procurement contracts matters of constitutional magnitude. *But cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998) (explaining that "the consequences of imprecision" in spending legislation "are not constitutionally severe" when the government "is acting as patron rather than as sovereign").

At any rate, inclusion of a COVID-19 safety clause unambiguously puts covered contractors on notice that compliance with OMB-approved Task Force guidance is an obligation under a covered contract. The Spending Clause requires nothing more. Unlike the federal grant program struck down in *Pennhurst* because it "was unclear as to whether the states incurred any obligations at all by accepting federal funds," *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004), these states will be capable of making "an informed," voluntary decision whether to accept the attendant obligations of contracting with the federal government. *Pennhurst*, 451 U.S. at 25; *see also id.* at 17 (holding the Spending Clause is not violated as long as a state is "[]aware of the conditions" and "[]able to ascertain what is expected of [them]").

To be sure, the Task Force retains discretion to update its guidance to reflect new science and on-the-ground conditions. But that poses no Spending Clause dilemma. The Spending Clause does not require the federal government to "prospectively resolve every possible ambiguity concerning particular applications of [a spending program's] requirements." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). Funding conditions may be "largely indeterminate," and yet constitutionally permissible, if they "provid[e] clear notice to the States that they, by accepting funds . . . would indeed be obligated to comply with [the conditions]." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (alterations in original) (quoting *Pennhurst*, 451 U.S. at 24-25). All that matters is that "the state voluntarily accepts the [federal government]'s power to alter the program and require compliance." *Kentucky v. Donovan*, 704 F.2d 288, 299 (6th Cir. 1983).

## III.   The states do not face irreparable harm.

The states must show that, in the absence of an injunction, they are "likely to suffer irreparable harm." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (citation omitted). "Speculative injury is not sufficient." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). The states have not carried their burden here.

Although the states frame their injury in terms of their sovereign prerogative, nothing in EO 14042 purports to prevent the states from enforcing their laws. Rather, EO 14042 merely directs federal-contracting policy to promote safe and effective performance in the midst of a global health emergency, something "the Government enjoys the unrestricted power to" do. *Perkins*, 310 U.S. at 127. If the states disagree with EO 14042, they are free to decline to contract with the United States. But these states—or any others—may not turn our federal system on its

31

head by compelling the United States to contract with them on terms of their choosing.

The states also argue that they face "widespread economic harm through lost contracts" to the extent that federal contractors in their states will refuse to enter into contracts with COVID-19 safety clauses. Pls.' Mem. 23. But EO 14042 is not self-executing. To meet their burden to show imminent harm, the states would have to demonstrate that the United States has indicated that for a contract expiring soon, or for a contract to be awarded imminently, renewal or award would be contingent on incorporation of a COVID-19 safety clause. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). The states fail to do so; as discussed in Section I.A, none of the specific agreements Louisiana and Mississippi mention need imminently (if ever) include a COVID-19 safety clause, and Purdue has already voluntarily agreed to insert the clause into its contract with DOD.

## IV.   The equities and the public interest weigh against injunctive relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the [federal] Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these considerations tilt decisively in the federal government's favor for three reasons.

*First*, enjoining EO 14042 would harm the public interest by hampering the efficiency of the contractors on which the federal government relies. The COVID-19 pandemic has interfered with numerous aspects of the government's work: forcing office closures; interfering with employees' access to paper-based or sensitive records; limiting official travel; and causing staffing shortages. *See generally* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/GGF4-F4FV. These disruptions have affected the work of federal employees and federal contractors alike. Requiring federal covered contractor employees to become fully vaccinated against COVID-19, with exceptions only as required by

law, reduces disruptions caused by worker absences associated with illness or exposure to the virus, generating meaningful gains in contracting efficiency. Enjoining EO 14042 would prevent these gains and interfere with the government's ability to resume normal, pre-pandemic operations.

*Second*, enjoining EO 14042 would harm the public interest in slowing the spread of COVID-19 among millions of federal contractors and the members of the public with whom they interact. As the Supreme Court has recognized, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020). Accordingly, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction. *Tigges v. Northam*, 473 F.Supp.3d 559, 573-74 (E.D. Va. 2020); *see also Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243, 2021 WL 4546923, at *8 (C.D. Cal. 2021); *Valdez v. Grisham*, No. 21-cv-783, 2021 WL 4145746, at *13 (D.N.M. 2021); *Harris v. Univ. of Mass., Lowell*, No. 21-cv-11244, 2021 WL 3848012, at *8 (D. Mass. 2021); *Williams v. Brown*, No. 6:21-cv-1332, 2021 WL 4894264, at *10-11 (D. Or. 2021); *Wise v. Inslee*, No. 2:21-cv-0288, 2021 WL 4951571, at *6-7 (E.D. Wash. 2021); *Mass. Corr. Officers Federated Union v. Baker*, No. 21-cv-11599, 2021 WL 4822154, at *7-8 (D. Mass. 2021); *Johnson v. Brown*, No. 3:21-cv-1494, 2021 WL 4846060, at *26-27 (D. Or. 2021); *TJM 64, Inc. v. Harris*, 475 F.Supp.3d 828, 840-41 (W.D. Tenn. 2020); *Talleywhacker, Inc. v. Cooper*, 465 F.Supp.3d 523, 543 (E.D.N.C. 2020).

*Third*, granting the requested injunction against the federal government would not preserve the relative positions of the parties. In contrast, entering the requested relief would upend the status quo by (1) preventing further implementation of EO 14042, which has been in effect for over two months; and (2) interfering with the federal government's ability to determine the terms on which

33

it will enter into contracts. *See, e.g.*, *Nken*, 556 U.S. at 428-29 (explaining that enjoining a government policy is an act of "judicial intervention" that "*alter[s]* the legal status quo") (citations omitted). Further, granting the relief sought against the federal government would generate the absurd result of allowing challengers to obtain a preliminary injunction against *any* new government policy, in order to maintain the prior "status quo" until a decision on the merits. *But see Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers).

Against these weighty and substantial federal interests, the states have presented what is largely a mirage of impending economic calamity. Although the states would have this Court believe that EO 14042 portends an across-the-board invalidation of numerous federal contracts worth tens of millions of dollars, the reality bears no resemblance to their characterization. The states may disagree with the policy determinations that undergird EO 14042, but the harm from allowing these (or any) states to dictate federal contract policy far outstrips any harm from allowing the United States to supervise and direct the terms on which it will enter contracts.

**V.     In all events, this court should not enter relief extending beyond federal contracts with Louisiana, Indiana, and Mississippi, and should only enjoin enforcement of the challenged provisions.**

Although relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress these states' alleged injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," any " remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S.Ct. 1916, 1933-34 (2018). Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency." *Trump v. Hawaii*, 138 S.Ct. 2392, 2425 (2018) (Thomas, J., concurring). EO 14042 and its implementing guidance have been challenged in numerous other cases—

including two in this Circuit—underscoring why this Court should not attempt to decide its legality for all parties. *E.g.*, *Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021) (denying preliminary injunction regarding government contractor vaccine mandate); *Brnovich v. Biden,* 2:21-cv-01568 (D. Ariz.) (same); *Hollis v. Biden*, 1:21-cv-163 (N.D. Miss.) (same); *Texas v. Biden,* 3:21-cv-309 (S.D. Tex.); *Georgia v. Biden*, 1:21-cv-163 (S.D. Ga.); *Missouri v. Biden*, 4:21-cv-1300 (E.D. Mo.); *Oklahoma v. Biden*, 5:21-cv-1069 (W.D. Okla.); *Florida v. Nelson*, 8:21-cv-2524 (M.D. Fla.); *Navy Seal 1 v. Biden*, No. 21-2429 (M.D. Fla.); *see Kentucky*, 2021 WL 5587446, at *14 (any injunction "is properly limited to the [states] before the Court").

Even assuming the states identify a contract sufficient to confer standing to challenge (and this Court jurisdiction to consider) the EO, any relief should be tailored to that contract. Moreover, any relief should merely block enforcement—not inclusion—of a COVID-19 safety clause. Allowing COVID-19 safety clauses to be included but not enforced during the pendency of this litigation would mean that contractors within its scope would not have to require their employees to be vaccinated. But if EO 14042 and its implementing guidance are ultimately upheld, the policy can be put into effect without further delay.[5]

## CONCLUSION

For the foregoing reasons, the states' motion for a preliminary injunction should be denied.

---

[5] Allowing COVID-19 safety clauses to be included but not enforced will not precipitate layoffs or a rush to vaccination if the injunction is dissolved. Covered contractor employers have flexibility to "determine the appropriate means of enforcement" and to craft "polic[ies] that encourage[] compliance." Safer Federal Workforce, Federal Contractor FAQs, https://perma.cc/ RGR9-ZTES (choose Compliance). In other words, covered contractors would not need to immediately discharge unvaccinated employees once the injunction is dissolved. Rather, covered contractors should provide for a "period of counseling and education, followed by additional disciplinary measures if necessary," before terminating employees or putting them on leave. *Id.*

Dated:  December 2, 2021                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General

                                            ALEXANDER C. VAN HOOK
                                            Acting U.S. Attorney

                                            BRAD P. ROSENBERG
                                            Assistant Branch Director

                                            */s/ Kevin Wynosky*
                                            MADELINE M. McMAHON
                                            KEVIN WYNOSKY (PA Bar # 326087)
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street N.W., Rm. 12400
                                            Washington, DC 20005
                                            (202) 616-8267
                                            Kevin.J.Wynosky@usdoj.gov

                                            */s/ Jerry Edwards, Jr.*
                                            JERRY EDWARDS, JR. (LA Bar # 30242)
                                            Assistant United States Attorney
                                            300 Fannin Street, Suite 3201
                                            Shreveport, Louisiana 71101
                                            (318) 676-3600
                                            jerry.edwards@usdoj.gov

                                            *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On December 2, 2021, I electronically submitted this document to the clerk of court of the U.S. District Court for the Western District of Louisiana using the court's electronic case filing system. I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Kevin Wynosky*
Kevin Wynosky
Trial Attorney
U.S. Department of Justice