UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| STATE OF LOUISIANA ET AL | CASE NO. 21-cv-3867 |
| -vs- | JUDGE DRELL |
| JOSEPH R BIDEN JR ET AL | MAGISTRATE JUDGE PEREZ-MONTES |

## RULING AND ORDER ON MOTIONS
## FOR PRELIMINARY INJUNCTION AND TO STAY

As we near the end of 2021, COVID-19 still presents a threat. Seeking to minimize that threat within the United States, the President is flexing the delegated authority of his Office and of the agencies within his control to impose vaccinations. Through the Occupational Safety and Health Administration ("OSHA") under the Department of Labor, the President imposed employee vaccinations on employers with one hundred or more employees. See 86 Fed. Reg. 61,402-01. Through the Centers for Medicare and Medicaid Services ("CMS") under the Department of Health and Human Services, the President imposed employee vaccinations on health care facilities participating in Medicare and Medicaid programs. See 86 Fed. Reg. 61555-01. Through the Department of Defense, the President imposed vaccinations on active-duty service members. See memorandum "Mandatory Coronavirus Disease 2019 Vaccination of Defense Service Members" issued by Secretary of Defense Lloyd J. Austin III on August 25, 2021. Last but not least, directly through his own authority, the President issued Executive Orders 14042 ("EO 14042") imposing employee vaccinations on federal contractors, 86 Fed. Reg. 50985, and Executive

1

Order 14043 imposing the same on federal employees, 86 Fed. Reg. 50989.  Each of these exercises of authority is being challenged across the country.

In the case at bar, the Plaintiff States of Louisiana, Mississippi, and Indiana seek to enjoin EO 14042.  Quoting from Judge Van Tatenhoven of the Eastern District of Kentucky, "[T]his is not a case about whether the vaccines are effective.  They are. Nor is this case about whether the government, at some level, and in some circumstances, can require citizens to obtain vaccines.  It can." Kentucky v. Biden, No. 3:21-CV-00055-GFVT, 2021 WL 5587446, at *1 (E.D. Ky. Nov. 30, 2021). Nonetheless, EO 14042 presents concern over the President's delegated authority only under the Federal Property and Administrative Services Act (40 U.S.C. § 101 *et seq,* "FPASA") and the limits of the execution of that authority to impose COVID vaccinations.  Generally speaking, FPASA is the principal procurement statute which provides for the means and methods through which the U.S. contracts with other entities for goods and services.  Plaintiff's claim EO 14042 is beyond the President's authority delegated through FPASA and that is implementation furthers those issues and presents new ones.

For the reasons explained below, the pending motion for preliminary injunction will be **GRANTED**.  However, the grant is limited to contracts, grants, or any other like agreement by any other name between the Plaintiff States and the national government.  Plaintiff States' motion for preliminary injunction is **DENIED**, without prejudice, to the extent that it seeks to enjoin the application of EO 14042 against contracts between private contractors and the national government.  At this

time, there is not a single plaintiff representative of private contractors nor has there been any presentation of evidence of EO 14042's effect on private contractors for this court to enjoin the national government from enforcing EO 14042 on private contractors. Further, this distinction is presently not considered because of the national injunction imposed against EO 14042 by Judge Baker in the US District Court for the Southern District of Georgia. <u>Georgia v. Biden</u>, No. 1:21-CV-163, 2021 WL 5779939, at *12 (S.D. Ga. Dec. 7, 2021). Lastly, we rule that the injunction imposed against EO 14042 applies only to the Plaintiff States as opposed to non-plaintiff states.

1. FACTS

We begin by noting that most of the underlying factual backdrop necessary for decision here is found in a stipulation of the parties, with accompanying attachments. Doc. 26. What follows is a summary of relevant portion of the stipulations and further facts adduced herein.

The Safer Federal Workforce Task Force was established by President Biden to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. 7045-48, 7046, Executive Order 13991 (Jan. 20, 2021). Seeking ostensibly to increase the COVID-19 vaccination rate, the President issued on September 9, 2021, EO 14042 charging the Safer Federal Workforce Task Force with determining "adequate COVID-19 safeguards" applicable to all federal contractors and subcontracts by September 24, 2021. §§ 1, 2(b). The

order further specified that the "safeguards" would be mandatory if the Office of Management and Budget ("OMB") approved the guidance and determined that it would promote economy and efficiency in contracting.  Id.  And finally, EO 14042 charged the Federal Acquisition Regulatory Council ("FAR Council") with taking initial step to implement the guidance by amending the Federal Acquisition Regulations to incorporate the Task Force Guidance once approved by the OMB.  Id. at § 3.

On September 24, 2021, the Task Force issued Guidance containing "safeguards" which required all employees of federal contractors and subcontractors to be fully vaccinated[1] by December 8, 2021, unless entitled to an accommodation. Doc. 26-3, "Safer Federal Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors" issued Sept. 24, 2021.  On September 28, 2021, again pursuant to the mandate the OMB approved the Task Force Guidance. According to the OMB, the guidance would promote economy and efficiency in contracting, thereby making the Task Force Guidance mandatory.  Doc. 26-4, "Determination of Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order 14042" published Sept. 28, 2021.  On September 30, 2021, the FAR Council issued preliminary guidance ("FAR Memo") to include an implementation clause that incorporated the Task Force Guidance commonly

---

[1] Task Force Guidance defines "fully vaccinated" as two weeks after the second dose from a two dose vaccine regimen or two weeks after a single does from a single dose vaccine regimen.

referred to as the deviation clause.  Doc. 26-5, "Issuance of Agency Deviations to Implement Executive Order 14042".

There are, however, some bizarre coverage differences between EO 14042 and the FAR Memo.  EO 14042 applies to new contracts, new solicitations, extensions or renewals, and exercised options if a contract is either (i) "for services, construction, or a leasehold interest in real property", (ii) "for services covered by the Services Agreement Act, (iii) for "concessions", (iii) "for concessions", and (iv) "in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public." § 5(a).  EO 14042 does not apply to existing or current contracts.  Id.  Nor does it apply to (i) grants, (ii) contracts with Indian Tribes, (iii) contracts equal to or under $250,000, (iv) work performed outside the United States, and, particularly oddly, (v) contracts for products. Id. § 5(b).

The application and exclusion sections of the FAR Memo reads quite differently. Doc. 26-5.  The "Applicability and Effective Dates" section first provides effective dates for including the clause in new contracts and solicitations.  Id. Immediately following that, the Memo includes a directive "[t]o maximize the goal of getting more people vaccinated" by "strongly encourage[ing] agencies to apply the requirements of [the] guidance broadly... by including the clause in" any contract regardless of when awarded or solicited, and "contracts that are not covered or directly addressed by [EO 14042] because the contract ... is under [$250,000] or is a contract... for the manufacturing of products."  Id.  Following this direction, the "Exclusions" section of the FAR Memo precludes application of the Task Force

5

Guidance to contracts with Indian Tribes and contracts performed outside the United States.   Notably missing from the directive of broad application and from the exclusion section is any guidance regarding grants.

Plaintiff States filed their Complaint on November 4, 2021, raising, among other claims, a rule-making procedural defects by the OMB Council issuing the OMB determination and by the FAR Council issuing the FAR Memo. Doc. 1. On November 10, 2021, the OMB rescinded its prior statement and again approved the Task Force Guidance.   Doc. 26-6, "Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis" published Nov. 16, 2021.   This time, however, the OMB provided a more detailed explanation of its determinations on economy and efficiency in contracting and pushed the fully vaccinated date of December 8, 2021 to January 18, 2022. See Id.  The new statement also provided a comment and response period to pacify the complaint of the existence of a procedural defect.[2]

On November 12, the Plaintiff States sought this preliminary injunction against EO 14042 and its implementation. Doc. 10. The motion maintained the rule-making procedural defect claims. Once the case was assigned to this judge, a telephone conference was held on November 18, 2021, to set a deadline for the

---

[2] As is discussed *infra* Part 3.A(2) , the included comment period does not pacify these complaints because calling January 18, 2022 the "effective date" is arbitrary to those individuals compelled to comply weeks before January 18, 2022, and thus, inconsistent with the purpose of the Administrative Procedures Act.

Defendants' response in opposition to the motion for preliminary injunction, to set a hearing for December 6, 2021, and to inform counsel for both parties of the briefing schedule.   Thereafter, with the court's approval, the preliminary injunction was amended and restated.  Doc. 22.  Defendants filed their opposition on December 2, 2021 and the hearing was held December 6, 2021.

During the hearing, two witnesses for the Plaintiff States testified.   Dr. Henderson, President and CEO of the University of Louisiana system including the University of Louisiana at Lafayette ("ULL"), testified that the National Inititute of Health ("NIH") contacted ULL and requested compliance with the Task Force Guidance through the inclusion of a deviation clause in an existing grant.  Although EO 14042 explicitly did not apply to any grants regardless of when entered or existing contracts, the NIH pushed the deviation clause onto ULL.  Dr. Henderson testified to the university's lack of bargaining power and to a lack of any guarantee by the NIH that the grant would continue if ULL didn't comply or that future contracts wouldn't be impacted if ULL chose to not modify the existing grant.  The Defendants provide no explanation as to why the NIH sought inclusion of the deviation clause in its grant with ULL when EO 14042 clearly excludes grants.

Megan Breaux, the Director of Operational Review for ULL, testified to having been required by operation of EO 14042 to obtain a fully vaccinated status by January 18, 2022 or be fired from her position.  Ms. Breaux claimed a religious exemption and had always complied with ULL's masking and testing requirements before EO 14042. Again, although EO 14042 supposedly would have allowed for a well founded

religious exemption, hers was denied. As Ms. Breaux testified, there is uncertainty as to whether any accommodation for a religious exemption is sufficient to comply with the Task Force Guidance and FAR Memo as imposed upon ULL. As a result, Ms. Breaux was informed that such exemptions, regardless of the legitimacy of her religious views, would not be allowed, and her previous compliance with ULL's accommodation standard of masking and testing would be inadequate. In short, if she refused she would be terminated.

## 2. STANDING

Before we can address the merits of Plaintiff States' motion for a preliminary injunction, we must determine whether the plaintiffs have standing. Town of Chester, NY v. Laroe Estates, Inc., 137 S.Ct. 1645 (2017). Supreme Court precedent is clear, and the parties do not dispute, that where multiple parties petition for injunctive relief only one of the plaintiffs must establish it possesses standing. Massachusetts v. EPA, 579 U.S. 497, 498 (2007); Town of Chester, 137 S.Ct. at 1651. Plaintiff States claim they possess both *parens patriae* standing and Article III standing and in support they rely heavily on the contract between the State of Louisiana and the United States. We first address whether the Plaintiff States have *parens patriae* standing.

### A. *Parens Patriae*

*Parens patriae* standing originated in English common law where the crown undertook to protect and act for minors and incompetents. The doctrine was adopted by United States courts and has expanded to allow for suits by a state against private

defendants or other states to protect quasi-sovereign interests in the health and economy of the plaintiff state. At issue here is whether or not the Plaintiff States have *parens patriae* standing to sue the national government regarding EO 14042.

Defendants argue Supreme Court precedential cases, namely <u>Commonwealth of Massachusetts v. Mellon</u>, 262 U.S. 447 (1923) and <u>Alfred L. Snapp & Son v. Puerto Rico, ex rel., Barez</u>, 458 U.S. 592 (1982), clearly establish states do not have *parens patriae* standing to sue the national government. This denial of standing is commonly referred to as the <u>Mellon</u> bar. Plaintiff States contend the most recent case from the Supreme Court on the issue, <u>Massachusetts v. EPA</u>, 549 U.S. 497 (2007), creates an exception to the <u>Mellon</u> bar and that exception applies to this matter.

As we noted, whether a state has *parens patriae* standing to sue the national government on behalf of its citizens was first addressed in <u>Commonwealth of Massachusetts v. Mellon</u>, 262 U.S. 447 (1923). Therein, our Supreme Court held:

> It cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the state, under some circumstances, may sue in that capacity for the protection of its citizens (<u>Missouri v. Illinois and Chicago District</u>, 180 U. S. 208, 241, 21 Sup. Ct. 331, 45 L. Ed. 497), it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

<u>Id.</u> at 485–86.

While the <u>Mellon</u> decision clearly established the bar, it did not say that there were or were not exceptions to the bar. It also was decided in a much simpler time.

However, in Snapp, albeit in a footnote by Chief Justice Roberts, the Supreme Court more equivocally suggested that no exceptions applied. In Snapp, the Commonwealth of Puerto Rico sought declaratory relief against East Coast apple growers who were violating federal laws which preferred domestic laborers over foreign temporary laborers. The federal district court in Harrisonburg, Virginia dismissed the case for lack of standing; the Fourth Circuit Court of Appeals reversed and remanded; and the Supreme Court granted writs to determine whether Puerto Rico had standing to pursue the claims on behalf of its citizens pursuant to *parens patriae*.

The Supreme Court found that Puerto Rico did have standing to pursue the claims against the individuals and companies of Virginia pursuant to *parens patriae*. However, in a footnote immediately after reasons for its holding, the Court distinguished the case as one where the state was "seeking to secure the federally created interests of its residents against private defendants" not one against the United States. Snapp 458 U.S. at 610, n. 16. It reiterated approvingly its decision in Mellon stating "[a] State does not have *parens patriea* to bring an action against the Federal Government" and quoted Mellon: "While the State under some circumstances, may sue in that capacity for the protection of its citizens it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field, it is the United States, and not the State, which represents them as *parens patriae*." Id.

Based upon Mellon and Snapp, it seemed clear that states could not assert *parens patriae* standing to bring suit against the United States. In 2007, the

Supreme Court examined whether the Commonwealth of Massachusetts could file suit against the Environmental Protection Agency to regulate carbon dioxide emissions under the Clean Air Act. In a majority opinion, the Court found that the state of Massachusetts had "special solicitude" and thus standing to bring the case. Yet, the Court ultimately found that *parens patriae* standing was not necessary to case determination as the plaintiffs met the traditional standing requirements under Article III.

Many courts and scholars have debated whether <u>Massachusetts v. EPA</u> really did create an exception to <u>Mellon</u>. It is important to note, in the context of COVID vaccinations, that, without state *parens patriae* standing, individuals who believe they cannot or should not be compelled to be vaccinated are relegated to the cost prohibitive remedy of filing individual suits against the national government, yea the President, to assert their rights. Neither <u>Mellon</u>, <u>Snapp</u> nor <u>EPA</u> involve constitutional issues, and it seems wrong to assume that the <u>Mellon</u> bar has such a broad umbrella to preclude states from protecting their citizen from a perceived unconstitutional exercise of national government power or from the overreach of national government power into constitutionally and historically reserved state police powers, as is the case here.

Regardless of whether <u>Mellon</u> did or does bar *parens patriae* in this suit, we do not find that to be necessary to a decision because Plaintiffs States may proceed as they possess Article III standing.

11

B. Article III

"Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies.  As we have explained, '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation on federal-court jurisdiction to actual cases or controversies.'"  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013) citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (internal quotation marks omitted).  To establish standing, a plaintiff must show it: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo v. Robins, 578 U.S. 330, 338 (2016).

Defendants argue that Plaintiff States lack Article III standing because the contracts upon which Plaintiff States rely, particularly research contracts between ULL and NIH with a contract term of 2019 through 2022, are not the type of contract contemplated by EO 14042.  The Defendants observe that only new contracts with the national government are covered, and further NIH grants are excluded under § 5(b).  We agree with our sister court in Kentucky that this claim is disingenuous. Kentucky, 2021 WL 5587446 at *4.  "When a claim involves a challenge to a future contracting opportunity, the pertinent question is whether Plaintiffs ha[ve] made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract." Adarand Contractors, Inc. v. Pena, 515 U.S. 200, 211 (1995).

It is undisputed that the national government has nearly $100 million dollars in contracts with the States of Louisiana, Mississippi, and Indiana. It is also undisputed that these states intend to continue to bid on new contracting opportunities. That this is true was made abundantly clear by the exemplar testimony of Dr. Henderson. If the Plaintiff States or their agencies had to wait to see if they were in mandate compliance until they secured a new contract, it would reasonably and likely result in even more harm than they face now. The various agencies of the states would have to make a choice whether or not to comply with EO 14042. If they did, they would risk losing their workforce because of many situations like or similar to that of Megan Breaux. If they didn't, they would be ineligible to bid on those contracts. It is indeed a "Hobson's choice." *Accord* Kentucky, 2021 WL 5587446 at *4.

Defendants' argument that modifications to current contracts, such as the one between ULL and NIH, are not covered by EO 14042 because the contractor has a choice to comply with deviation clause is completely disingenuous. Defendants argue inclusion of the deviation clause is a bilateral decision, but it was clear from testimony at our hearing that Plaintiffs have no bargaining power in the matter. In this instance, the NIH submitted the deviation clause to ULL with a short deadline within which ULL was to sign and return the modification. There was no provision that the contract would continue through the term if ULL didn't assent. There was no guarantee that ULL's position to bid on future contracts wouldn't be impacted if it

13

chose not to modify its existing contract. It was simply a heavy handed sign and return proposition, even though EO 14042 by its terms should not apply to any grant.

If indeed EO 140042 applied to only new contracts and excluded grants, no such deviation would need to have been included in ULL's NIH grants. But again, Dr. Henderson testified the NIH imposed upon ULL the deviation clause for an existing grant. As outlined above, the FAR Memo "strongly encourages" the inclusion of the requirement in current contracts and does not explicitly exclude grants. Thus, even if EO 14042 supposedly excludes either existing contracts or any grants, the FAR Memo does not. During oral argument, the Defendants posited that any interpretation of EO 14042 to apply to current contracts and grants did not come from EO 14042, and they simultaneously claimed the FAR Memo was non-final agency action not subject to review. The Defendants hope that this strategic arrangement will simultaneously shield both an Executive order and "initial" agency action forcefully imposed beyond the order's scope. Dr. Henderson testified to feeling powerless against the NIH's "request" and afraid of losing funding; thus he and ULL felt compelled to sign. The FAR Memo is in no way only a sample of what contracting officers might use to implement the Executive Order, and it clearly extends far beyond the reach of EO 14024 by encouraging the strong-arming of contractors to include deviation clauses into existing contracts and grants.

In light of the foregoing, we find that the Plaintiffs have sufficiently demonstrated they have suffered injury in fact and will most likely continue to do so. They face a Hobson's choice in that they must decide whether to maintain current

contracts and whether they want to be a bid on future contracts. That injury is more than fairly traceable to the FAR Memo and EO 14024 as the FAR Memo would not exist but for the executive order. We further find that providing injunctive relief will redress the Plaintiffs' injuries. Accordingly, Plaintiffs have standing to pursue their claims on behalf of the States of Louisiana, Mississippi, and Indiana.

3. PRELIMINARY INJUNCTION STANDARD OF REVIEW

"Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985).

> "To be entitled to a preliminary injunction, a movant must establish (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest."

Ladd v. Livingston, 777 F.3d 286, 288 (5th Cir.2015) (quoting Trottie v. Livingston, 766 F.3d 450, 451 (5th Cir.2014)).

A. Likelihood of Success

(1) FPASA

The FPASA is a procurement statute, plain and simple. It was enacted with the "purpose... to provide the Federal government with an economical and efficient system for the following activities: (1) [p]rocuring and supplying property and nonpersonal services, and performing related function ...[,] (2) [u]sing available property[,] (3) [d]isposing of surplus property[, or] (4) [r]ecord management." 40 USC

§101. "'Economy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn, 618 F.2d 784, 789 (D.C. Cir. 1979).

Generally, an obligation imposing a secondary policy will survive attacks so long as there is a close nexus between the obligation and the Government's primary policy under FPASA to procure and manage properties and services in an economical and efficient manner. Kahn, 618 F.2d at 792. Indeed, the Executive branch pursuant to the FPASA, or its predecessors, has imposed several secondary policies that survived judicial scrutiny. See, e.g., Id. at 790 (discussing the historical uses of the Executive power to push anti-discriminatory employment practices); Id. at 792 (Executive Order 12092: "to encourage noninflationary pay and price behavior"); Am. Fed'n of Gov't Emp., AFL-CIO v. Carmen, 669 F.2d 815 (D.C. Cir. 1981) (President Carter's April 5, 1979 national address: "Steps will be taken to eliminate free parking for Government employees in order to reduce the waste of energy, particularly gasoline, in commuting to and from work"); UAW-Lab. Emp. & Training Corp. v. Chao, 325 F.3d 360 (D.C. Cir. 2003) (Executive Order 13201: "When workers are better informed of their [federal labor] rights, their productivity is enhanced."); City Of Albuquerque v. U.S. Dep't Of Interior, 379 F.3d 901 (10th Cir. 2004) (Executive Order 12072: federal "use of space in urban areas" to "encourage the development and redevelopment of cities"); Chamber of Com. of U.S. v. Napolitano, 648 F. Supp. 2d 726

(D. Md. 2009) (Executive Order 12989: increasing stability of federal contractor by discouraging the employment of illegal immigrants).

However, in those cases, there was no palpable conflict with any other federal statute or the Constitution. *Accord* Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1333 (D.C. Cir. 1996) (distinguishing Kahn); Kahn, 618 F.2d at 796 ("Although the Executive Order represents an important external factor in the economic environment surrounding collective bargaining, it does not subvert the integrity of that process."); Chao, 325 f.3d at 363 (reversing district court's finding that a federal labor law preempted Executive order only because the district court's analysis of the preemption was misguided).   When conflict does exist, and that conflict is "unacceptable," the Executive's action may be enjoined. See Reich, 74 f.3d at 1333, 1337 ("No state or federal official or government entity can alter the delicate balance of bargaining and economic power that the [National Labor Relations Act] establishes, whatever his or its purpose may be.").

We agree with the argument that a reasonably sufficient nexus can exist between EO14042 and the government's policy under FPASA to procure and manage properties and services in an economical and efficient manner.  It is not unreasonable to assume that a vaccinated labor pool will be more reliable during surges of viral transmission than an unvaccinated labor pool.  Nonetheless, the court is convinced that EO 14042 conflicts with the Tenth Amendment.[3]

---

[3] Our limited concern is not to be read as an opinion regarding any other challenge against EO 14042.

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (citing Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905). Against this constitutional reservation of delegated authority, the President has on more than one occasion publicly announced his disappointment regarding the country's supposedly low COVID-19 vaccination rate and expressed his intent to increase the vaccination rate by using Executive authority.   Thus, EO 14042, although supported upon a nexus of economy and efficiency, was clearly and unequivocally motivated by public health policy first and foremost.  See Reich, 74 F.3d at 1337 ("The President has, of course, acted to set procurement policy rather than labor policy. But the former is quite explicitly based—and would have to be based—on his views of the latter."). "Whatever one's views on the [vaccine mandate's ability to increase economy and efficiency in procurement], [EO 14042] surely goes to the heart of [the Tenth Amendment]." Id.  See Kentucky, 2021 WL 5587446, at *10 ("The Court is also concerned that the vaccine mandate intrudes on an area that is traditionally reserved to the States."); Cf. BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab., 17 F.4th 604, 617 (5th Cir. 2021) ("[T]he [OSHA] Mandate likely exceeds the federal government's authority under the

Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power.").

(2) Administrative Procedures Act

Procedural compliance by the rule making agency is an indispensable component of the Administrative Procedures Act ("APA").   5 USC § 706(2)(D). Plaintiff States argue that 41 U.S.C. § 1707(a) requires the FAR Memo and the OMB determination to be published in the Federal Register for sixty days before it can take effect.

Regarding the FAR Memo, Defendants claim is it not final agency action subject to review under § 1707 because EO 14042 instructed the FAR council to "take initial steps to implement" the contract clause.   However, this comment is not dispositive, but merely a factor.   When considering whether agency action is ripe for review, the Fifth Circuit considers "(1) whether the issues presented are purely legal; (2) whether the agency's pronouncement is a "final agency action" within the meaning of 5 U.S.C. §§ 551(13) & 704; (3) whether the impact on the petitioners is direct and immediate; and (4) whether resolution of the issues will foster effective administration of the statute."   Merchants Fast Motor Lines, Inc. v. I.C.C., 5 F.3d 911, 920 (5th Cir. 1993).

Here, the issue is purely legal because Plaintiff States challenge EO 14042, the FAR Memo and the OMB determination as beyond the reach of Executive authority; Plaintiff States have demonstrated that Executive Department agencies are pushing for the inclusion of the contract clause into existing agreements making the impact

direct and immediate; and resolution of executive reach under FPASA will foster effective administration of FPASA. These factors clearly outweigh, and effectively pierce the shield created by, EO 14042's instruction to take only "initial steps." As such, we find the FAR Memo does constitute agency action ripe for review and subject to the rule-making procedural requirements of § 1707, which absent "urgent and compelling circumstances [that] make compliance with the [comment period] impracticable" requires a sufficient comment period. Id. at (d). Defendants argue that the pandemic presents urgent and compelling circumstances. However, we doubt that the pandemic makes compliance with a relatively short comment period impracticable[4] two years into the pandemic, given that we have much greater scientific knowledge and that the medical community has a much better handle on treatment modalities.

Even if the FAR Memo complied with § 1707, its applicability and exclusions sections clearly and unequivocally apply beyond EO 14042's authorized scope provided in § 5 of the order. The FAR Memo "strongly encourages agencies apply the requirements of its guidance broadly... by including the clause in" all contracts regardless when entered or solicited, except for those performed outside the United States and those with Indian Tribes. Further, there is no exclusion of grants. Given the directive to apply the requirement broadly, we read the FAR Memo to also encourage the application of the requirement in grants. From the testimony of Dr.

---

[4] Impracticable - 1) impassable; 2) not practicable: incapable of being performed or accomplished by means employed or at command. https://www.merriam-webster.com/dictionary/impracticable; last viewed Dec. 9, 2021.

Henderson, the NIH would appear to agree. EO 14042 does not authorize such an expansive application. Thus, even assuming that EO 14042 could be construed as constitutional, the FAR Memo is an unacceptable deviation form the limitation on existing contracts in EO 14042 making the FAR Memo "an abuse of discretion ... not in accordance" with EO 14042, "contrary to constitutional ... power" conferred upon the FAR Council by EO 14042 and "in excess of ... authority" granted in EO 14042. 5 U.S.C. § 706 (A)-(C).

Regarding the OMB determination, Defendants claim the determination is shielded because it issued on November 10 implementing a comment period terminating December 16 and extended the compliance date to January 18 in accordance with §1707. Indeed, this does adhere to the text of 41 U.S.C. § 1707, but, it only does so textually. Compliance requires action by employees weeks before the effective date to obtain a fully vaccinated status. Thus, labeling January 18, 2022 the effective date is disingenuous and arbitrary to those who would have to take steps to comply before January 18, and as a result circumvents the APA's purpose.

Among other reasons, Congress enacted the APA

"to provide suitable arrangements through which Federal agencies, assisted by outside experts, may cooperatively study mutual problems, exchange information, and develop recommendations for action by proper authorities *to the end that private rights may be fully protected* and regulatory activities and other Federal responsibilities may be carried out expeditiously *in the public interest,* [and] to promote more effective *public participation* and efficiency in the rulemaking process[.]"

5 U.S.C. § 591 (1), (2) (emphasis added). A regulation's comment period is critical for affected citizens to assert their rights and for the cooperative development of regulations that balance the needs of the government and the rights of the public.

21

Because compliance requires significant action on the part of employees well before the effective date, these purposes were not preserved by the OMB's calendaring of the comment period. While we do not like to rely on the spirit of the law when the letter is clear, the actions of the OMB circumvent the protections envisioned under the APA by manipulating the letter.

Defendants again rely on § 1707(d)'s waiver for "urgent and compelling circumstances," but as already discussed above, we do not find compliance with a relatively short comment period to be impracticable two years into this pandemic.

B. Irreparable Harm

"[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." Texas v. EPA, 829 F.3d 405, 433 (5th Cir. 2016) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment). "When determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts....'" Texas, 829 F.3d at 433–34 (citing Enter. Int'l Inc. v. Corp. Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472–73 (5th Cir. 1985)). At a minimum, compliance by contractors requires the diversion of resources necessary to identify covered employees and manage their vaccination status. If a covered employee, such as the one who testified at the hearing, refuses to receive a vaccination, the Plaintiff States and their agencies must decide between releasing the employee and all accompanying efficiency, institutional memory, and operational know-how or foregoing federal contracts. Compliance by an employee requires vaccination, which

22

cannot be undone.   Further, Plaintiff States "have an interest in seeing their constitutionally reserved over public health policy defended from federal overreach." Texas, 829 F.3d at 433. Clearly, there is a substantial threat of irreparable harm.

### C. Balance of Harms

Defendants claim the risk of the pandemic outweighs enjoining EO 14042.  We disagree.  We are now nearly two years into the COVID-19 pandemic that comes and goes in waves and the economy is recovering.  Without denying the existence of the pandemic or the potential risk it imposes, we find that EO 14042, the OMB determination and the FAR Memo present a greater risk to the rights of covered employees and contractors and to the interests of the Plaintiff States to defend constitutionally reserved police powers from federal overreach.

### D. Public Interest

We agree with and adopt the Fifth Circuit's finding of public interest in its recent decision to enjoin the OSHA vaccine mandate.

> [A] stay is firmly in the public interest. From economic uncertainty to workplace strife, the mere specter of [EO 14042] has contributed to untold economic upheaval in recent months. Of course, the principles at stake when it comes to the [EO 14042] are not reducible to dollars and cents. The public interest is also served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions—even, or perhaps particularly, when those decisions frustrate government officials.

BST Holdings, 17 F.4th at 618–19 (5th Cir. 2021).  Therefore, Plaintiff States have established each element necessary to obtain a preliminary injunction.

4. SCOPE OF THE INJUNCTION

Lastly, we consider the scope of the injunction. As explained *supra* Part II.A, under current Supreme Court precedent the Plaintiff States may not have *parens patriae* to defend their citizens from EO 14042, although we suggest and believe it should be otherwise when the issue involves perceived unconstitutional or overreaching actions by the national government. Additionally, there are no named private entity plaintiffs other than the states of Louisiana, Mississippi, and Indiana. Therefore, it appears that private contractor seeking to evade EO 14042 and its implementation must file suit to enjoin the national government from enforcing EO 14042, See, e.g., Liberty Mut. Ins. Co. v. Friedman, 639 F.2d 164, 172 (4th Cir. 1981) (enjoining EO 11246 from applying to plaintiffs only), even if that jurisprudence conflicts with notions of judicial economy.

Thus, at this time the preliminary injunction will be limited to all contracts, grants, or any other like agreement by any other name between the Plaintiff States and the national government. Moreover, we find no reason at this time to extend the injunction nationally, whether or not we have authority to do so, because the record before us is limited to evidence of contracts and grants between the Plaintiff States and national government and there was presented no evidence in this record of any significant spill-over into non-plaintiff states.

5. MOTION TO STAY

On December 11, 2021, after the hearing in this case, Defendants filed a Motion to Stay these proceedings, largely relying on the supposition that a stay would

somehow preserve resources and foster judicial efficiency. But, "stay" means "delay." That a delay would be appropriate at this time, especially when a cardinal point of EO 14042 was the supposed need for rapid action for vaccination in incongruous. However, we think, to the extent it can be avoided, a delay in issuance of this injunction only prolongs the inherent uncertainty in litigation.

From our conversations with counsel for both sides at the hearing, we believe it obvious that the issues in many or all of the injunction cases related to Presidential vaccine mandates will most likely be litigated in the appellate courts around the country. That being the case, it is better for us to have as many matters determined in the district courts in advance of those likely appeals. For those reasons, we decline to stay the issuance of this ruling on preliminary injunction.

Nevertheless, we will and do stay further proceedings leading to any trial on a permanent injunction pending further appellate action on this case. Either party may, however, by motion request a lifting of the stay. Upon any grant of that relief, we will issue appropriate case management orders.

6. CONCLUSION

For the reasons explained above, it is **ORDERED** that the Motion for Preliminary Injunction, Doc. 22, is **GRANTED** to enjoin the national government from enforcing the Task Force Guidance and FAR Memo in any contract, grant, or any other like agreement by any other name, whether for services or product and whether existing or new, between the Plaintiff States or their agencies and the national government.

**THUS DONE AND SIGNED** in Alexandria, Louisiana this ⟋5ᵗ day of December, 2021.

_____
DEE D. DRELL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

26