# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 10, 2023

Mr. Tony R. Moore
Western District of Louisiana, Alexandria
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

No. 22-30019   State of Louisiana v. Biden
USDC No. 1:21-CV-3867

Dear Mr. Moore,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Whitney M. Jett, Deputy Clerk
504-310-7772

cc:
    Mr. Jerry Edwards Jr.
    Mr. Scott A. Keller
    Ms. Anna O. Mohan
    Ms. Elizabeth Baker Murrill
    Mr. David Peters
    Mr. Henry Charles Whitaker

# United States Court of Appeals
# for the Fifth Circuit

--------

No. 22-30019

--------

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2022

Lyle W. Cayce
Clerk

STATE OF LOUISIANA; STATE OF INDIANA; STATE OF
MISSISSIPPI,

*Plaintiffs—Appellees*,

*versus*

JOSEPH R. BIDEN, JR., *in his official capacity as President of the United States*; UNITED STATES OF AMERICA; FEDERAL ACQUISITION REGULATORY COUNCIL; GENERAL SERVICES ADMINISTRATION; ROBIN CARNAHAN, IN HER OFFICIAL CAPACITY AS ADMINISTRATOR OF GENERAL SERVICES, ET AL.,

*Defendants—Appellants*.

--------

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:21-CV-3867

--------

Before GRAVES, WILLETT, and ENGELHARDT, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

No. 22-30019

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

James E. Graves, Jr., *Circuit Judge*, dissenting.



**Certified as a true copy and issued
as the mandate on Feb 10, 2023**

**Attest:**

*Jyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2022

Lyle W. Cayce
Clerk

No. 22-30019

STATE OF LOUISIANA; STATE OF INDIANA; STATE OF
MISSISSIPPI,

*Plaintiffs—Appellees*,

*versus*

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES; UNITED STATES OF
AMERICA; FEDERAL ACQUISITION REGULATORY COUNCIL;
GENERAL SERVICES ADMINISTRATION; ROBIN CARNAHAN, IN
HER OFFICIAL CAPACITY AS ADMINISTRATOR OF GENERAL
SERVICES, ET AL

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:21-CV-3867

Before GRAVES, WILLETT, and ENGELHARDT, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:

The President asks this Court to ratify an exercise of proprietary authority that would permit him to unilaterally impose a healthcare decision on one-fifth of all employees in the United States. We decline to do so. Thus, we AFFIRM the preliminary injunction issued by the district court.

No. 22-30019

## I. Background

As part of his efforts to combat the COVID-19 pandemic, President Biden issued a series of sweeping vaccination mandates. This Court has had occasion to consider at least two of them – namely, the OSHA-issued mandate which covered private employers with more than 100 employees, heard in *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021),[1] and the President's mandate covering government employees (which this Court recently heard *en banc* in *Feds for Medical Freedom v. Biden*, Case No. 22-40043). This case concerns another mandate that would, with limited exceptions, require the government to include in its contracts a clause that would require federal contractors to ensure that their entire workforce is fully vaccinated against COVID-19.

This challenge concerns four actions that together constitute the "federal contractor mandate." The first is an Executive Order issued by the President on September 9, 2021.[2] President Biden ordered that "in order to promote economy and efficiency in procurement by contracting with sources that provide adequate COVID-19 safeguards for their workplace," government contracts must include a clause specifying "that the contractor and any subcontractors … shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force [the "Task Force"] … , provided that

---

[1] The Supreme Court considered this mandate in *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.* (hereinafter "*NFIB*"), 142 S. Ct. 661 (2022) (per curiam).

[2] Ensuring Adequate COVID Safety Protocols for Federal Contractors, 86 Fed. Reg. 50985 (published Sept. 14, 2021).

the Director of the Office of Management and Budget … approves the Task Force Guidance."[3]

The second challenged action consists of guidance issued by the Task Force on September 24, 2021, which required "[c]overed contractors [to] ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation[,] … no later than December 8, 2021."[4] The Task Force guidance was not self-executing; rather, it required ratification by the Office of Management and Budget ("OMB") to take effect.

As required by the Executive Order, the OMB Director issued a short finding that the Task Force guidance "will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and sub-contractors working on or in connection with a Federal Government contract."[5] This finding was issued on September 28, 2021. Shortly after this lawsuit was filed, OMB rescinded its initial finding and issued instead a longer finding (the "OMB Determination") which reached the same conclusion with far more support.[6] This latter OMB Determination constitutes the third action herein challenged.

The fourth challenged action is a memorandum issued by members of the Federal Acquisition Regulation (FAR) Council (the "FAR Memo") in which federal agencies were urged to "act expeditiously to issue …

---

[3] Id.

[4] COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors at 5 (Sept. 24, 2021), https://bit.ly/3jTHSHJ.

[5] 86 Fed. Reg. 53691-01 (Sept. 28, 2021).

[6] *See* Determination of the Acting OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, 86 Fed. Reg. 63418-01 (Nov. 16, 2021).

deviations [to their prescribed contractual clauses] so that their contracting officers may begin to apply the clause on or before October 15[, 2021]."[7] In line with the President's Executive Order, the example clause suggested in the FAR Memo requires the signatory to "comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, … published by the Safer Federal Workforce Task Force."[8]

Together, these four actions require nearly all federal contractors, either immediately (in the case of new contracts or by consented-to changes to old contracts) or at the soonest opportunity, to consent to a contractual clause obliging them to follow guidance from the Task Force. The primary element of that guidance – at least for the moment, as the guidance is subject to amendment – is a mandate that contractors ensure that their employees become fully vaccinated against COVID-19.

The President's Executive Order purports to exercise authority given to the President under the Federal Property and Administrative Services Act of 1949, known as the "Procurement Act."[9] The Procurement Act states that its purpose "is to provide the Federal Government with an economical and efficient system" for procurement, contracting, and other related activities.[10] It also enables the President to "prescribe policies and directives that the

---

[7] Issuance of Agency Deviations to Implement Executive Order 14042 at 3 (Sept. 30, 2021), https://bit.ly/3bvdizB.

[8] *Id.* at 5.

[9] 40 U.S.C. § 101 *et seq.*

[10] 40 U.S.C. § 101.

President considers necessary to carry out this subtitle," provided that "[t]he policies must be consistent with this subtitle."[11]

The Congressionally-created FAR Council, meanwhile, "assist[s] in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government."[12] Generally speaking, the FAR Council has exclusive authority to "issue and maintain … a single Government-wide procurement regulation, to be known as the Federal Acquisition Regulation."[13] Finally, the Procurement Policy Act generally requires that "a procurement policy, regulation, procedure, or form … may not take effect until 60 days after it is published for comment" unless "urgent and compelling circumstances make compliance with the requirements impracticable."[14]

## II. Procedural History

Three states – Louisiana, Indiana, and Mississippi (the "Plaintiff States") – brought suit in the Western District of Louisiana against President Biden in his official capacity to seek invalidation of this mandate. These states brought suit in their capacities as federal contractors themselves. They sought and were granted a preliminary injunction and stay by the district court.

In evaluating the request for a preliminary injunction, the district court first found that the states had Article III standing as they faced a choice

---

[11] 40 U.S.C. § 121.

[12] 41 U.S.C. § 1302.

[13] 41 U.S.C. § 1303(a)(1).

[14] 41 U.S.C. § 1707.

between complying with the mandate and potentially losing members of their workforce or becoming ineligible to bid on or renew federal contracts.

Next, the district court reviewed the familiar four factors which govern grants of a preliminary injunction: "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v. Livingston*, 766 F.3d 450, 451 (5th Cir. 2014)).

In finding that the states' suit was likely to succeed, the district court first expressed its concern "that EO 14042 conflicts with the Tenth Amendment," as "EO 14042, although supported upon a nexus of economy and efficiency, was clearly and unequivocally motivated by public health policy first and foremost." "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the states." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (mem.) (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). Thus, the district court explained, this mandate falls afoul of the Tenth Amendment's reservation of such power to the states.

The district court also found that the elements of the mandate are procedurally invalid. First, the district court found that there were no "urgent and compelling circumstances"[15] to justify dispensing with the otherwise required notice-and-comment period. Even assuming, *arguendo*, that the notice-and-comment requirement could be overruled, the district court held that the FAR Memo "clearly and unequivocally appl[ied] beyond EO 14042's authorized scope" and was thus unlawful. And while the OMB

---

[15] 41 U.S.C. § 1707.

Determination included a shortened notice-and-comment period which arguably "adhere[d] to the text" of the statute, the district court found that since "[c]ompliance requires action by employees weeks before the effective date to obtain a fully vaccinated status," "the actions of the OMB circumvent the protections envisioned under the APA."

The district court then held that the states had shown irreparable harm in the form of "nonrecoverable compliance costs," *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 221 (1994) (Scalia, J., concurring in part and in the judgment)), such as "diversion of resources necessary to identify covered employees and manage their vaccination status." The district court also identified as irreparable harm the choice the states would have to make if an employee refused to get vaccinated: a choice between "releasing the employee and all accompanying efficiency, institutional memory, and operational know-how or foregoing federal contracts." Moreover, employees would have to undertake an irreversible decision – vaccination – in order to be compliant with this mandate. Finally, the district court identified the threat to the states' sovereign interests as potentially irreparable harm.

In evaluating the balance of harms, the district court found simply: "[w]ithout denying the existence of the pandemic or the potential risk it imposes, … EO 14042, the OMB determination[,] and the FAR Memo present a greater risk to the rights of covered employees and contractors and to the interests of the Plaintiff States to defend constitutionally reserved police powers from federal overreach." Finally, the district court found that this Court's analysis of the public interest factors in *BST Holdings* was applicable to this case as well.

Having established that an injunction was warranted, the district court set out that the injunction would only apply "to all contracts, grants, or any

other like agreement by any other name between the Plaintiff States and the national government." It then stayed the case pending appellate review.

### III. Standard of Review

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013). "Under the clearly erroneous standard, this court upholds findings by the district court that are plausible in light of the record as a whole." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017). And as this Court has often said, "it is an elementary proposition, and the supporting cases too numerous to cite, that this court may affirm the district court's judgment on any grounds supported by the record." *Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015) (quoting *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009)).

To obtain or uphold a preliminary injunction, a movant must show: "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd*, 777 F.3d at 288 (quoting *Trottie*, 766 F.3d at 451).

### IV. Discussion

**A. Validity of the Executive Order**

The first issue presented in this appeal is whether or not the Executive Order is within the bounds of the President's authority under the

No. 22-30019

Procurement Act.[16] Again, "to provide the Federal Government with an eco-nomical and efficient system,"[17] the President may "prescribe policies and directives that [he] considers necessary to carry out this subtitle," provided that "[t]he policies [are] consistent with this subtitle."[18] The Government contends that generally this "express grant of statutory authority permits the President to issue, among others, orders that improve the economy and effi-ciency of contractors' operations." The states suggest that under the Gov-ernment's interpretation of this act, "[t]here is simply no limiting principle to the government's authority." To this, the Government replies that "[p]residential authority under the Procurement Act is constrained by the statute's text, which requires that any executive order bear a close nexus to the statutory goals of establishing 'an economical and efficient system' for federal procurement and contracting." This "close nexus" test, the Govern-ment suggests, is amply demonstrated in the historical and jurisprudential record surrounding the Procurement Act.

---

[16] On appeal, neither side challenges the district court's finding that the states have Article III standing as federal contractors but likely no *parens patriae* standing as representatives of their citizens.

[17] 40 U.S.C. § 101. The Plaintiff States contend that the Government impermissibly relies upon this "prefatory purpose statement … [as] a grant of authority" in violation of Supreme Court precedent. The brief quotes *D.C. v. Heller*, 554 U.S. 570, 578 (2008) for the proposition that "apart from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause." To this, the Government retorts that a statement of purpose, "[w]herever it resides, … is 'an appropriate guide' to the 'meaning of the [statute's] operative provisions.'" *Gundy v. United States*, 139 S. Ct. 211, 2127 (2019) (quoting Antonin Scalia & Brian Garner, Reading Law: The Interpretation of Legal Texts 218 (2012)) (plurality opinion). To the extent that 40 U.S.C. § 121 authorizes the President to prescribe policies and directives concerning contracting, we agree that the statement of purpose acts as a set of guidelines within which those policies must reside.

[18] 40 U.S.C. § 121.

*1. Historical Practice*

In its relative infancy, the Procurement Act's "most prominent use … [was] a series of anti-discrimination requirements for Government contractors." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 790 (D.C. Cir. 1979) (*en banc*). However, the executive orders promulgating these requirements did not themselves cite the Procurement Act as the source of their authority. That reliance was instead a creature of case law. In evaluating a later executive action that did claim Procurement Act authority, the D.C. Circuit noted of the anti-discrimination requirements that "the early anti-discrimination orders were issued under the President's war powers and special wartime legislation, but for the period from 1953 to 1964 only the [Procurement Act] could have provided statutory support for the Executive action." *Id.* at 790-91 (footnotes omitted). None of these orders, it appears, were "tested in the courts until 1964," *id.* at 791, at which point the Third Circuit held without analysis that "we have no doubt that the applicable executive order and regulations have the force of law." *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 8 (3d Cir. 1964).[19] This Circuit was next to address this question, although it did so without the benefit of a direct challenge to the validity of the claimed authority under the statute. *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967). In *Farkas*, the Fifth Circuit noted that "[w]e would be hesitant to say that the antidiscrimination provisions of Executive Order No. 10925 are so unrelated to the establishment of 'an

---

[19] Notably, the *Farmer* court recognized without much discussion that there is "[a]n argument to the contrary" that since "Congress has … declined to enact antidiscriminatory legislation[,] [f]or the executive to attempt to reach the result by indirection, through the Government contract device, is an (invalid) attempt to legislate where Congress has refused to do so." *Id.* at 8 n.9. As neither party in *Farmer* appears to have challenged the validity of the orders themselves, the Third Circuit left that note without refutation.

economical and efficient system for … the procurement and supply' of property and services that the order should be treated as issued without statutory authority." *Id.* at 632 n.2 (quoting 40 U.S.C. § 471 [now codified as 40 U.S.C. § 101]). "Indeed," the Court continued, "appellees make no such challenge to its validity." *Id.* Both *Farmer* and *Farkas* involved an employee suing an employer alleging violations of anti-discrimination contractual terms mandated by executive order in federal contracts. *See Farmer*, 329 F.2d at 4-5; *Farkas*, 375 F.2d at 631.[20] *Farmer* was decided on jurisdictional grounds, *see Farmer*, 329 F.2d at 10,[21] while *Farkas* held that the Plaintiff had failed to allege "the essential allegations of state action" necessary to sustain his action. *Farkas*, 329 F.2d at 634. Nonetheless, both courts found (although arguably only in dicta) that the Procurement Act authorized the anti-discrimination executive orders.

The first case to tackle this issue directly is *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159 (3d Cir. 1971), which involved a challenge to an order by the Secretary of Labor purporting to implement an executive order by "requir[ing] that bidders on any federal or federally assisted construction contracts for projects in a five-county area around Philadelphia, the estimated total cost of which exceeds $500,000, shall submit an acceptable affirmative action program which includes specific goals for the utilization of minority manpower." *Id.* at 163 (footnote omitted). In finding that the order could be upheld as an exercise of the President's Procurement Act authority, the court held: "[n]o less than in the case of defense

---

[20] *Farmer* also notes that "[t]he case appears to be the first of its kind in the Federal courts." *Farmer*, 329 F.2d at 4.

[21] The court explained: "[W]e know of no announced overriding federal common law permitting a right of action by an employee against his employer for the latter's failure to comply with the nondiscrimination provision in a government contract."

procurement it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen." *Id.* at 170. However, the court also impliedly found a significant limitation on the President's authority in this area:

> While all federal procurement contracts must include an affirmative action covenant, the coverage on federally assisted contracts has been extended to construction contracts only. This … demonstrates that the Presidents were not attempting by the Executive Order program merely to impose their notions of desirable social legislation on the states wholesale. Rather, they acted in the one area in which discrimination in employment was most likely to affect the cost and the progress of projects in which the federal government had both financial and completion interests.

*Id.* at 171.

It was with this jurisprudential backdrop in mind that the D.C. Circuit made its ruling in *Kahn*. That case concerned an order by President Carter that, in effect, "den[ied] Government contracts above $5 million to companies that fail[ed] or refuse[d] to comply with … voluntary wage and price standards." 618 F.2d at 785. The court, "consider[ing] the procurement compliance program in its real-world setting," expected that "to the extent compliance with the wage and price standards is widespread a corresponding reduction (or more gentle increase) in Government expenses should take place." *Id.* at 792. The more subtle "real-world" influence on the court's decision, expressed almost in an offhanded fashion, was the idea that "the inflation problem is too serious for businessmen and workers not to understand the importance of compliance." *Id.* The court thus found "no basis for rejecting the President's conclusion that any higher costs incurred … will be more than offset by the advantages gained … in those cases where the lowest bidder is in compliance with the voluntary standards and his bid is lower than

… in the absence of standards." *Id.* at 793. Nonetheless, the court concluded, "our decision today does not write a blank check for the President to fill in at his will." *Id.* Instead, the court expressed its "wish to emphasize the importance to our ruling today of the nexus between the wage and price standards and likely savings to the Government." *Id.*

The next major case to give serious consideration to the President's authority under the Procurement Act was also heard by the D.C. Circuit.[22] In *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003), the court held that an executive order requiring contractors to "include a provision requiring contractors to post notices at all of their facilities informing employees of what are commonly known as *General Motors* and *Beck* rights" was lawfully promulgated as an exercise of Procurement Act power. *Id.* at 362. The executive order in question claimed a nexus to economy and efficiency based on the notion that "[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced."[23] While recognizing that "[t]he link may

_____

[22] Several other cases, including one in this Circuit that the Supreme Court summarily vacated, discussed procurement power in general or in particular. *See, e.g.*, *United States v. New Orleans Pub. Serv., Inc.*, 553 F.2d 459, 466–67 (5th Cir. 1977) ("First, the President has express authority over direct federal procurement practices, under [the Procurement Act]. … [M]ore recent decisions involving Executive Order 11246 have candidly acknowledged the validity of the use by the President or Congress of the procurement process to achieve social and economic objectives. *See Rossetti Contracting Co. v. Brennan*, 508 F.2d 1039, 1045 n.18 (7th Cir. 1975); *Northeast Const. Co. v. Romney*, 485 F.2d 752, 760 (D.C. Cir. 1973). Those cases stand for the proposition that equal employment goals themselves, reflecting important national policies, validate the use of the procurement power in the context of the Order.") (footnote omitted and inline citations cleaned up), *vacated*, 436 U.S. 942 (1978). But none of these contained a direct, full examination of presidential authority under the Procurement Act.

[23] Notification of Employee Rights Concerning Payment of Union Dues or Fees, 66 Fed. Reg. 11221 (Feb. 17, 2001).

seem attenuated," the D.C. Circuit held that "under *Kahn*'s lenient standards, there is enough of a nexus." *Chao*, 325 F.3d at 367.

The Supreme Court has had little occasion to review presidential authority under the Procurement Act, and even its most direct consideration is not particularly direct. In *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), the Supreme Court considered the validity of a regulation adjacent to an anti-discrimination executive order; the latter "prohibit[ed] discrimination on the basis of 'race, creed, color, or national origin' in federal employment or by Government contractors." *Id.* at 286 n.1. However, the Court held that, "[f]or purposes of this case, it is not necessary to decide whether [the executive order] as amended is authorized by the [Procurement Act]" or another statute. *Id.* at 304. Nonetheless, the Supreme Court noted in a footnote that "[l]ower courts have suggested that [the Procurement Act] was the authority for predecessors of [the executive order]." *Id.* at 304 n.34 (citing *Farmer*, 329 F.2d 3; *Farkas*, 375 F.2d 629; and *Contractors Assn.*, 442 F.2d 159). The nearest the Court came to evaluating the scope of the Procurement Act was as follows: "The Act explicitly authorizes Executive Orders 'necessary to effectuate [its] provisions.' However, nowhere in the Act is there a specific reference to employment discrimination."[24] *Id.* (citation omitted).

In sum, while there is no direct, binding authority on the scope of presidential authority under the Procurement Act, courts have generally landed

---

[24] One could (and the Plaintiff States do, "Just as the Act contains no reference to remedying employment discrimination, it never remotely refers to contractor vaccination or public health more generally") take this dicta from the Supreme Court as a narrowing instruction for interpretation of the Procurement Act. However, this interpretation is not supported by the rest of the footnote in question, let alone the rest of the opinion. *See, e.g.*, *Chrysler*, 441 U.S. at 308 ("This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to it can be binding … . What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued.").

on a "lenient" standard, *Chao*, 325 F.3d at 367, under which the President must demonstrate a "sufficiently close nexus" between the requirements of the executive order and "the values of 'economy' and 'efficiency.'" *Am. Fed.*, 618 F.2d at 792.[25]

### 2. Modern Practice

In the years between these cases and now, the Procurement Act has been utilized by multiple presidents in a manner not dissimilar to that of President Biden. Two executive orders in particular merit discussion, one of which a district court reviewed and another of which has not been squarely presented for judicial review.

The first, Executive Order 13465, was issued by President George W. Bush.[26] The Order mandated that all federal contractors "agree to use an electronic employment eligibility verification system … to verify the employment eligibility of: (i) all persons hired during the contract term … to perform employment duties within the United States; and (ii) all persons assigned by the contractor to perform work within the United States on the Federal

---

[25] *See also Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981) ("Assuming, without deciding, that the Procurement Act does provide constitutional authorization for some applications of Executive Order 11,246, we conclude that, in any event, the authorization could validly extend no farther than to those applications satisfying the nexus test used in *Contractors Association* and *Kahn*. Applying that test here, we are satisfied that it is not met.").

However, this Court does not today determine whether or not the "close nexus" test is the proper test for evaluating the lawfulness of executive orders under the Procurement Act. The Eleventh Circuit has made a compelling case that the text and structure of the Procurement Act are inconsistent with this test, *see Georgia v. President of the United States*, No. 21-14269, 2022 WL 3703822 at *8-11 (11th Cir. 2022). In any case, such a determination is not necessary for resolution of the case before us.

[26] Amending Executive Order 12989, as Amended, 73 Fed. Reg. 33285 (June 6, 2008).

contract."[27] The Chamber of Commerce of the United States of America, among others, brought suit in the District Court of Maryland to challenge the legality of the executive order and its implementing documents. *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009). Finding that "President Bush explained how requiring contractors to use E–Verify would promote efficiency and economy in procurement," the court held that the order was consistent with the Procurement Act and noted that "[t]he President and his Administration are in a better position than this Court to make such determinations." *Id.* at 738.[28]

More recently, President Barack Obama issued Executive Order 13706, by which he sought "to increase efficiency and cost savings in the work performed by parties that contract with the Federal Government by ensuring that employees on those contracts can earn up to 7 days or more of paid sick leave annually, including paid leave allowing for family care."[29] The President justified the order by stating: "[p]roviding access to paid sick leave will improve the health and performance of employees of Federal contractors and bring benefits packages at Federal contractors in line with model employers, ensuring that they remain competitive employers … . These savings and quality improvements will lead to improved economy and efficiency in

---

[27] *Id.* at 33286.

[28] It appears that the parties stipulated to dismissal before the Fourth Circuit could hear the case. *See Chamber of Com. of U.S. v. Napolitano*, No. 8-CV-3444 docket entry 60 (D. Md. 2009).

[29] Establishing Paid Sick Leave for Federal Contractors, 80 Fed. Reg. 54697 (Sep. 7, 2015).

Government procurement."[30] However, it appears that the order was never challenged in federal court, with only passing references present in the case law.[31]

### 3. Limitations

The "close nexus" test combined with appropriate deference to presidential determinations leaves the President with nearly unlimited authority to introduce requirements into federal contracts. Hypothetically, the President could mandate that all employees of federal contractors reduce their BMI below a certain number on the theory that obesity is a primary contributor to unhealthiness and absenteeism. Under the Government's theory of the case, the only practical limit on presidential authority in this sphere is the executive's ability to tie policy priorities to a notion of economy or efficiency. To an extent, this is borne out by the statutory text. The statute introduces no serious limit on the President's authority and, in fact, places discernment explicitly in the President's hands: "[t]he President may prescribe policies and directives that *the President considers necessary* to carry out this subtitle."[32]

---

[30] *Id.*

[31] *See Hurst v. Wilkie*, No. 19-CV-0540, 2021 WL 1534471, at *2 (D. N.M. Apr. 19, 2021) ("Under EO 13706, federal contractors must provide personnel with a specified minimum amount of paid sick leave, vacation days, and holidays"), *Glocoms, Inc. v. United States*, 149 Fed. Cl. 725, 734 (2020) ("Glocoms argues that Coastal's quotation is not technically acceptable, because the [terms] would violate … Executive Order 13706. … But, even if true, the Court agrees with the government that such compliance issues are matters of contract administration that fall beyond the Court's bid protest jurisdiction."), and *Ne. Illinois Reg'l Commuter Rail Corp. v. Int'l Ass'n of Sheet Metal, Air, Rail, & Transportation Workers - Transportation Div.*, 578 F. Supp. 3d 985, 993 (N.D. Ill. 2022) ("Under the circumstances, the Court cannot say that Metra's noncompliance with Executive Order 13706 amounts to evidence that it is not, or does not consider itself to be, a federal contractor.")

[32] 40 U.S.C. § 121 (emphasis added).

No. 22-30019

It bears considering, therefore, whether there are other extra-statutory limitations on the President's authority under the Procurement Act. The district court found one such limitation in the form of the Tenth Amendment. The President's authority is undoubtedly circumscribed by the bounds of the Constitution. President Biden could not, for example, require that all federal contractors be Catholic.[33] But given the Supreme Court's general admonition to avoid finding constitutional problems where unnecessary, *see Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("[i]n keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' nonconstitutional claim"), and given the existence of another potential limitation by which this case may be decided, this Court does not address the Tenth Amendment argument today.

Another theoretical limitation suggested but not explored in the case law is the notion that market forces will prevent overreach. If private corporations and individuals believe this mandate to be a bridge too far, they can choose not to contract with the federal government. After all, "no one has a right to a Government contract." *Kahn*, 618 F.2d at 794. However, this argument does not withstand serious inquiry; the federal government is no ordinary market participant subject to the same whims of free enterprise as others, if for no other reason than its aims are greater than profit.[34] To its credit, the Government does not advance this argument.

---

[33] *See* U.S. Const. amend. I.

[34] *See* U.S. Const. pmbl. ("We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.").

No. 22-30019

When considering the related vaccination mandate imposed by the Occupational Safety and Health Administration ("OSHA"), the Supreme Court suggested that another limitation may apply. The Court ruled that the OSHA mandate was "no 'everyday exercise of federal power.'" *NFIB*, 142 S. Ct. at 665 (2022) (quoting *In re MCP No. 165*, 20 F.4th at 272 (Sutton, C. J., dissenting)). More than that, the Court continued, "[i]t is instead a significant encroachment into the lives—and health—of a vast number of employees. 'We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.' There can be little doubt that OSHA's mandate qualifies as an exercise of such authority." *Id.* (quoting *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 141 S. Ct. 2485, 2489, (2021) (*per curiam*)). OSHA's mandate may have been larger in scope than the mandate at issue in this case, but not perhaps by as much as may be expected. The Department of Labor has suggested that roughly "one-fifth of the entire U.S. Labor Force" is "employed by federal contractors." [35] The guidance document issued by the Safer Federal Workforce Task Force suggests that the vaccination requirement applies to "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace. This includes employees of covered contractors who are not themselves working on or in connection with a covered contract." [36]

This so-called "Major Questions Doctrine" – that is, that "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance," *id.* – serves as a bound on Presidential authority. The Government submits that the Major Questions

---

[35] Dep't of Labor, History of Executive Order 11246, perma.cc/6ZXJ-WGR.

[36] COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors at 3-4.

Doctrine does not apply here as it applies only to interpretations of statutes that result in "enormous and transformative expansion[s] in … regulatory authority without clear congressional authorization." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324, (2014). As this federal contractors mandate is neither an "enormous and transformative expansion" nor an exercise of "regulatory authority," the Government suggests, the major questions doctrine is inapplicable. Instead, the Government would have us say that as this is an exercise of the President's "proprietary authority, as purchaser of services," it is not subject to the major questions doctrine. The Government suggests this is more akin to the vaccine mandate imposed on Medicare and Medicaid facilities than the OSHA mandate. The Supreme Court upheld the former in a *per curiam* decision that did not mention the major questions doctrine. *Biden v. Missouri*, 142 S. Ct. 647 (2022) (*per curiam*). There, the Court held that "a vaccination requirement under these circumstances is a straightforward and predictable example of the 'health and safety' regulations that Congress has authorized the Secretary to impose." *Missouri*, 142 S. Ct. at 653.

In stark contrast, this federal contractor mandate is neither a straightforward nor predictable example of procurement regulations authorized by Congress to promote "economy and efficiency." The Government notes that "large numbers of private employers—including AT&T, Bank of America, Google, Johnson & Johnson, and Microsoft—have established vaccination requirements for their workforces." At issue in this case, though, is not whether the federal government may (analogously) force its employees to get vaccinated against COVID-19,[37] but whether the federal government may place such a requirement in its contracts with third parties, including the

---

[37] That issue is being considered by our court *en banc* in *Feds for Medical Freedom v. Biden*, Case No. 22-40043.

No. 22-30019

Plaintiff States. The Government has provided no examples of such contracts in the private sector.

Nor is the Government's analogy to the mandate upheld as to employees of Medicare and Medicaid facilities apt. The decision in *Missouri* rested in part on ordinary practices: "Vaccination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella." *Missouri*, 142 S. Ct. at 653. The Supreme Court likewise emphasized "the longstanding practice of Health and Human Services in implementing the relevant statutory authorities." *Id.* at 652. Indeed, as the D.C. Circuit recognized in *Kahn*, "the President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect.'" *Kahn*, 618 F.2d at 790 (quoting *Bd. of Governors of Fed. Rsrv. Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248, (1978)). And as this Court has elsewhere noted, "where there exists a longstanding judicial construction, 'Congress is presumed to be aware of the interpretation ... and to adopt that interpretation [if] it reenacts that statute without change.'" *Silva-Trevino v. Holder*, 742 F.3d 197, 202 (5th Cir. 2014) (alterations in original) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).

At best, it is questionable, however, whether the historical record supports the Government's contention that this mandate is within the longstanding practice and construction of the President's Procurement Act authority. As the D.C. Circuit noted in the first major Procurement Act case, "the early anti-discrimination orders were issued under the President's war powers and special wartime legislation." *Kahn*, 618 F.2d at 790. It was not until the 2001 executive order at issue in *Chao* that it appears Presidents routinely and explicitly relied upon Procurement Act authority to issue social-

policy oriented procurement orders to contracting entities. *See Chao*, 325
F.3d at 367.

Even assuming, *arguendo*, that as a matter of historical practice and
judicial construction that the Procurement Act has been used to advance pol-
icy positions, this argument fails to account for the dramatic difference be-
tween this mandate and other exercises of Procurement Act authority. The
nearest analogue to this mandate is President Obama's Paid Sick Leave exec-
utive order, which sought to impose a sick leave requirement on federal con-
tractors in order to "improve the health and performance of employees of
Federal contractors and bring benefits packages at Federal contractors in line
with model employers, ensuring that they remain competitive employers in
the search for dedicated and talented employees."[38] Again, though, the Sick
Leave order was never considered by a federal court. More significantly, a
vaccine mandate is "strikingly unlike" the sick leave policy or any other Pro-
curement Act exercises for several reasons, not least of which is that "[a]
vaccination ... 'cannot be undone at the end of the workday.'" *NFIB*, 142 S.
Ct. at 665 (quoting *In re MCP*, 20 F.4th at 274) (Sutton, C. J., dissenting)).
Most significantly, unlike the non-discrimination, E-Verify, *Beck* rights, and
sick leave orders, which govern the conduct of *employers*, the vaccine mandate
purports to govern the conduct of *employees* – and more than their conduct,
purports to govern their individual healthcare decisions.[39]

---

[38] Establishing Paid Sick Leave for Federal Contractors, 80 Fed. Reg. 54697.

[39] The dissent argues that there is no real distinction between this executive order
and, for example, the one relating to E-Verify: "Neither of these necessarily govern the
conduct of employees, or ... they both [do.]" To be clear: unlike the E-Verify order, this
vaccine mandate requires employees to take an action not limited temporally or physically
to their place of employment and unrelated to any statutory scheme – that is, to get
vaccinated or lose their job. No such action is required by employees under the E-Verify
order. The E-Verify order also tracks with a statutory scheme – namely, the Illegal

No. 22-30019

To allow this mandate to remain in place would be to ratify an "enormous and transformative expansion in" the President's power under the Procurement Act. *Util. Air Regul. Grp.*, 573 U.S. at 324. Under Supreme Court precedent, this Court cannot permit such a mandate to remain in place absent a clear statement by Congress that it wishes to endow the presidency with such power.[40]

### 4. Effectively Boundless Scope

Imagine that the President had issued an alternative but similar executive order. In this order, to "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government,"[41] the President instructed executive agencies to incorporate a clause into all contracts specifying that all contractors and subcontractors "comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force."[42] This hypothetical order, however, would instruct the Task Force to issue guidance relating to the dangers of tobacco, and this Task Force would issue guidance requiring that all covered contractors

---

Immigration Reform and Immigrant Responsibility Act of 1996 and related immigration and work authorization laws. Pub. L. No. 104–208, 110 Stat. 545.

[40] The dissent takes issue with our analysis of the major questions doctrine, suggesting that it "is only invoked when there are potential anti-delegation issues to agencies" rather than the President. However, the Supreme Court has never explicitly limited the major questions doctrine to delegations to agencies rather than to the President. As Article II of the Constitution "makes a single President responsible for the actions of the Executive Branch," *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2203 (2020) (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-97 (2010)), delegations to the President and delegations to an agency should be treated the same under the major questions doctrine.

[41] 86 Fed. Reg. at 50985.

[42] *Id.*

ensure that all covered contractor employees refrain from smoking or from being in the presence of smoking. As we now know better than ever, smoking and exposure to second-hand smoke contribute to significant and lasting health issues. It is no stretch at all to say that contractual requirements that all employees of federal contractors refrain from smoking or being in the presence of smoking at all times would result in a gain to economy and efficiency in federal contracting.[43] Nor would it be much different than this mandate, which likewise makes demands of individuals inside and outside the workplace. This order could certainly pass the "close nexus" test already discussed, and yet it would undoubtedly strike reasonable minds as too great a stretch under the Procurement Act.

At oral argument, the Government dismissed such hypotheticals as outlandish and suggested that they would not be upheld in a court of law. We agree that no court would uphold them, but the Government provided no dividing line by which a court might rule out the one and uphold the other. Though the government suggests that the "close nexus" test provides such a line, respectfully, that line is no line at all. The President would have little difficulty, under the close nexus test, finding a close relationship between economy and efficiency and a requirement that all federal contractors certify that their employees take daily vitamins, live in smoke-free homes, exercise three times a week, or even, at the extremity, take birth control in order to reduce absenteeism relating to childbirth and care.[44]

---

[43] It is this element of the hypothetical order that makes it analogous to the case at hand and which the dissent misses. Smoking may be prohibited at federal facilities, but what about at the homes of federal employees? Likewise, this "contractor" mandate places demands on individuals employed by federal contractors in and out of the workplace.

[44] The Government suggested at oral argument that this last, hyperbolic hypothetical may run into un-elaborated independent constitutional issues. Whether or not this is so, the point remains that the close nexus test – the only non-constitutional limitation

No. 22-30019

The difference here, the Government suggested, is at least in part that we are facing a "once-in-a-century" pandemic. The Constitution is not abrogated in a pandemic. Nor, as the Supreme Court's COVID-related decisions make clear, are our legal principles of statutory interpretation. *See NFIB*, 142 S. Ct. at 665. And nor, for that matter, is Congress, who could have drafted vaccination-related laws or even made clear its intent regarding the President's proprietary authority in federal contracting or employing. Congress has also provided in certain laws for special and extraordinary powers to be placed in the hands of the President.[45] No such provision exists in the Procurement Act to justify this intrusive command. The pandemic, challenging as it has been for the President, the legislature, the courts, and especially the populace, does not justify such an enormous and transformative expansion of presidential authority.

As to the distinction between regulatory and non-regulatory power, on which the Government relied in its briefing to distinguish this action from the OSHA mandate, it is here a distinction without a difference. Certainly, "the Government has a much freer hand in dealing 'with citizen employees [and government contractors] than it does when it brings its sovereign power to bear on citizens at large.'" *NASA v. Nelson*, 562 U.S. 134, 148 (2011) (quoting *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 598 (2008)). And were this mandate to apply only to federal contractors on, for example, federal job sites, this distinction may carry more weight. As it is, though, the

---

on Procurement Act authority that the Government recognized – would not in itself prevent the President from issuing such an order.

[45] *See, e.g.,* 42 U.S.C. § 247d ("If the Secretary determines, after consultation with such public health officials as may be necessary, that—(1) a disease or disorder presents a public health emergency; or (2) a public health emergency, including significant outbreaks of infectious diseases or bioterrorist attacks, otherwise exists, the Secretary may take such action as may be appropriate to respond to the public health emergency").

mandate covers *any and all* employees – *full-time or part-time* – who work for a contractor at any location "at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract."[46] "This includes employees of covered contractors who are not themselves working on or in connection with a covered contract."[47] The Government seeks to paint this mandate as "the Government act[ing], not as a regulator, but as the manager of its internal affairs." *NASA*, 562 U.S. at 153. The vast scope of its mandate belies that contention. There is little internal about a mandate which encompasses even employees whose sole connection to a federal contract is a cubicle in the same building as an employee working "in connection with"[48] a federal contract – especially as the Supreme Court has called the phrase "in connection with" "essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.'" *Maracich v. Spears*, 570 U.S. 48, 59 (2013) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (internal quotation marks omitted)).

This is not an exercise in determining what type of power is being used by evaluating "practical effects" of the order, as the Government suggests. Nor are we blind to the effect of political accountability on a president's decisions. By its own terms, this mandate and its implementing documents require immense action not just from internal contract employees but also from an all-but-boundless number of employees whose employer has at least one federal contract. No matter what else is or is not regulatory, this certainly is.

---

[46] COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors at 4.

[47] *Id.*

[48] COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors at 3.

*5. Conclusion*

"When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"[49] *Util. Air Regul. Grp.*, 573 U.S. at 324 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123 (2000)). As the Government's brief makes clear, questions surrounding the vaccine and the pandemic generally are undoubtedly of "vast economic and political significance." *Id.* Congress has not spoken clearly to authorize such a dramatic shift in the exercise of the President's power under the Procurement Act. Nor are historical exercises of that power sufficient to demonstrate a long-standing understanding that the Procurement Act could be used in this way. The President's use of procurement regulations to reach through an employing contractor to force obligations on *individual employees* is truly unprecedented. As such, Executive Order 14042 is unlawful, and the Plaintiff States have consequently demonstrated a strong likelihood of success on the merits.[50]

## B. Equitable Factors

*1. Irreparable Harm*

The district court found that the Plaintiff States had carried their burden to show irreparable harm in the form of "nonrecoverable compliance costs," *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal*, 510 U.S.

---

[49] *Id.* (quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 123 (2000)).

[50] As it need not do so, the Court takes no stance today on the procedural validity of the implementing documents.

at 221), such as "diversion of resources necessary to identify covered employees and manage their vaccination status." The district court also identified as irreparable harm the choice the states would have to make if an employee refused to get vaccinated against COVID-19: a choice between "releasing the employee and all accompanying efficiency, institutional memory, and operational know-how or foregoing federal contracts." A showing of irreparable harm requires a demonstration of "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As the district court identified, "'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal*, 510 U.S. at 220–21 (alteration in original)).[51] Such harm, however, must be more than "speculative;" "there must be more than an unfounded fear on the part of the applicant." *Texas v. EPA*, 829 F.3d at 433 (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).

The Government suggests, first, that to hold compliance costs as irreparable harm "would encompass every case in which a litigant complains of a new contract requirement" and thereby impermissibly broaden the scope of irreparable harm. But not all compliance costs are "nonrecoverable"; to the extent that compliance costs are recoverable, they are not irreparable. The loss of an employee and the associated costs – monetary and otherwise

---

[51] In response to this statement, the Government cites two cases from other circuits for the proposition that "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (citing *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980)). Although this quote appears to apply only to recoverable compliance costs, we are bound regardless by *Texas v. EPA* and not *Freedom Holdings*.

– are nonrecoverable costs. Should an employee be fired and a new employee hired due to this mandate, it is undisputed that the Plaintiff States would be harmed and would have no recourse for this harm. The Government's second contention also serves as a sort of retort to their own argument: "Plaintiffs similarly failed to introduce evidence substantiating their claim that the Executive Order will cause mass disruptions to their labor forces."[52] The Government points to a study which noted that "only '1% of all adults … say they left a job because an employer required them to get vaccinated.'"[53] The district court appears to have credited the testimony of at least one Louisiana employee that she expected the State to fire her alongside as many as 96 other state employees in her department after each of them had a religious accommodation request denied. In any case, as this Circuit has previously noted, "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts.'" *Texas v. EPA*, 829 F.3d at 433–34 (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). Even if the Government is right and only one percent[54] of, for example, the state of Louisiana's employees left their job because of this mandate, Louisiana alone would lose nearly 700

---

[52] *Id.* at 48.

[53] *Id.* at 49 (quoting Kaiser Family Found., *The KFF COVID-19 Vaccine Monitor* (Oct. 28, 2021), https://perma.cc/ENL7-E7HE).

[54] To be clear, the report the Government cites only states that one percent of *all* adults left their job due to a workplace vaccine mandate. This number does not account for the figure elsewhere in the same study which noted that only 25% of all employers had a vaccine mandate when the study was published. Nor does it account for the statistic also compiled in the study that when faced with a choice between (a) getting vaccinated, (b) undergoing weekly COVID-19 testing (an option not likely available under this mandate), or (c) leaving their job, only 11% of unvaccinated employees said they would get vaccinated, while a full 37% said they would leave their job. *See* Kaiser Family Found., *The KFF COVID-19 Vaccine Monitor* (Oct. 28, 2021), https://perma.cc/ENL7-E7HE.

employees.[55] Obviously, this Court cannot accurately predict how many employees would be fired were this injunction to be lifted. Under our precedent, it is sufficient to show that even under the Government's best theory of the case, enough employees would likely leave as to constitute "more than de minimis" harm, *Enter. Int'l*, 762 F.2d at 472 (quoting *Canal Authority v. Callaway*, 489 F.2d 567, 574 (5th Cir. 1974)), at which point "'it is not so much the magnitude but the irreparability that counts,'" *Texas v. EPA*, 829 F.3d at 433–34 (quoting *Enter. Int'l*, 762 F.2d at 472).

### 2. Balance of Harms and the Public Interest

The Government summarily dismisses the district court's analysis of the balance of harms and the public interest, noting that "[d]elaying implementation of the Executive Order will lead to productivity losses in the performance of federal contracts from schedule delays as well as leave and health care costs for workers who are sick, isolating, or quarantined." As "the virus continues to pose complex and dynamic challenges to the delivery of services to the American people," the Government continued, "[h]ow to address the evolving challenges the virus poses … is a question best left to the President … not to unelected courts." In the eyes of the President, however: "The pandemic is over. If you notice, no one's wearing masks. Everybody seems to be in pretty good shape."[56] Regardless, we have noted before that "'[t]here is generally no public interest in the perpetuation of unlawful agency

---

[55] Byron P. Decoteau, Jr., *State Civil Service Annual Report: Fiscal Year 2020-2021*, Louisiana State Civil Service Agency (November 3, 2021), https://www.civilservice.louisiana.gov/files/publications/annual_reports/AnnualReport20-21.pdf (noting that "[a]t the close of Fiscal Year 2020-2021, Louisiana state government employed 69,906 employees.").

[56] *President Joe Biden: The 2022 60 Minutes Interview*, (Sep. 18, 2022), https://www.cbsnews.com/news/president-joe-biden-60-minutes-interview-transcript-2022-09-18/.

action.'" *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). And, as with the OSHA mandate, "any abstract 'harm' a stay might cause the Agency pales in comparison and importance to the harms the absence of a stay threatens to cause countless individuals and companies." *BST Holdings*, 17 F.4th at 618. The balance of harms and the public interest favors an injunction.

## V. Conclusion

We do not, and cannot, rule on the efficacy of any vaccine, the wisdom of the President's action, or even whether or not this action would, in fact, increase economy and efficiency in federal contracting. Today, we are asked, where Congress has not authorized the issuance of this mandate, whether the President may nonetheless exercise this power. We hold that he may not. Accordingly, we AFFIRM the district court's grant of an injunction.

No. 22-30019

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting:

The majority conjures up the most extreme and unlikely scenarios to deny the President his authority under the Procurement Act. But it is important to ask where the Procurement Act began. It began with anti-discrimination requirements, *See, e.g.*, Exec. Order No. 11,246, 30 Fed. Reg. 12,319, 12,319 (Sept. 24, 1965) (forbidding civilian contractors from discriminating on the basis of race, creed, color, or national origin). It is also indisputable that it allowed the President to require contractors to inform their employees that they have a right to not pay union dues. Exec. Order No. 12,800, 57 Fed. Reg. 12,985, 12,985 (Apr. 13, 1992). It allowed for a president to require federal contractors to use the E-Verify system to verify the lawful immigration status of employees. Exec. Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 6, 2008). And it allowed a requirement that federal contractors provide their employees with paid sick leave. Exec. Order No. 13,706, 80 Fed. Reg. 54,697, 54,697 (Sept. 7, 2015). All these executive orders were issued pursuant to the president's authority under the Procurement Act. And all were either ruled constitutional, or not even challenged in court. *See, e.g.*, *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159, 170 (3d Cir. 1971) (upholding anti-discrimination orders); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (same); *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (upholding union notices); *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009) (upholding the E-Verify System).[1] Because the executive order here is consistent with what is allowed under the Procurement Act, I respectfully dissent.

---

[1] *See also* Justin C. Van Orsdol, *An Administrative Solution to the Student Loan Debt Crisis*, 80 Wash. & Lee L. Rev. Online 35, 51 & n.59 (2022) (discussing unsuccessful challenges to executive orders on adopting affirmative action plans).

No. 22-30019

I.

The Procurement Act states that "[t]he President may prescribe policies and directives that the President considers necessary" to ensure the "economical and efficient administration and completion of Federal Government contracts." 40 U.S.C. § 121. The Procurement Act gives the President both "necessary flexibility and broad-ranging authority" in setting procurement policies reasonably related to the statute's aims, *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted), including policies that in the President's judgment will improve the economy and efficiency of federal contractors' operations. Acting as Chief Operating Officer of the Executive Branch, the President has the authority in making judgments about how best to promote economy and efficiency in the federal government's contracting and procurement.

The majority tries to make a distinction between this use of the Procurement Act and all the others (each upheld by federal courts). The majority argues that "[m]ost significantly, unlike the non-discrimination, E-Verify, *Beck* rights, and sick leave orders, which govern the conduct of *employers*, the vaccine mandate purports to govern the conduct of *employees* – and more than their conduct, purports to govern their individual healthcare decisions." But this is not quite true. For example, the E-Verify system mandated that federal contractors use E-Verify to electronically verify the employment eligibility of employees working under covered federal contracts. Exec. Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 6, 2008). In turn, the COVID-19 Procurement Act Order directs federal agencies to include in certain contracts a clause requiring covered contractor employees to follow COVID-19 safety protocols, which include vaccination requirements. Exec. Order No. 14,042. 86 Fed. Reg. 50,985 (Sept. 14, 2021). Neither of these necessarily govern the conduct of employees, or, taking the majority's logic, they both govern the conduct of employees. Both Executive

Orders require something of employers, namely that the employer use the E-Verify system to verify the immigration eligibility of its workers, and that the employer uses a system to verify the vaccine eligibility of its workers. Both necessarily touch the employees, namely that employees working for federal contractors must be verified under the E-Verify system or be subject to termination, and that employees working for federal contractors must be verified as being COVID-19 vaccine compliant or be subject to termination. These two executive orders are almost indistinguishable regarding how they affect federal contract workers.[2]

## II.

In *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 790 (D.C. Cir. 1979) (en banc), a case analyzing a challenge to an executive order which was issued under the Procurement Act, the District of Columbia Circuit Court held that Section 205(a)'s language "recognizes that the Government generally must have some flexibility to seek the greatest advantage in various situations." *Id.* at 788–89. The court continued, "'[e]conomy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Id.* at 789. And in *Kahn*, the court recognized that "there may be occasional instances where a low bidder will not be awarded a contract." *Id.* at 793. That was acceptable for the court because there was "no basis for rejecting the President's conclusion that any higher costs incurred in those transactions will be more than offset by the

---

[2] The majority distinguishes the contractor vaccine mandate, in part, because it is "unrelated to any statutory scheme." Setting aside the many public health statutory schemes, a plain reading of the Procurement Act makes it clear that the action does not have to be tied to any outside statutory scheme. If that were so, Congress would have mandated that requirement.

advantages gained in negotiated contracts and in those cases where the lowest bidder is in compliance with the voluntary standards and his bid is lower than it would have been in the absence of standards." *Id.* This was permitted because "it is important to consider the procurement compliance program in its real-world setting." *Id.* at 792.

Courts after *Kahn* consistently upheld the President's broad authority under the Procurement Act. In *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003), President George H.W. Bush's executive order "sought to connect its requirements to economy and efficiency as follows"

> [w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced. The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.

*Id.* at 366. The court was clearly skeptical of this reasoning; "[t]he link may seem attenuated (especially since unions already have a duty to inform employees of these rights), and indeed one can with a straight face advance an argument claiming opposite effects or no effects at all." *Id.* at 366–67. Yet the court recognized *Kahn's* "lenient standards" and found "enough of a nexus." *Id.* at 367.

The majority notes that some of "the executive orders promulgating these [anti-discrimination] requirements did not themselves cite the Procurement Act as the source of their authority." Rather, they contend, "[t]hat reliance was instead a creature of case law." But Executive Orders are not required to lay out the specific statute that the President's authority falls under. For example, Executive Order No. 11,246, 30 Fed. Reg. 12,319,

12,319 (Sept. 24, 1965) bases its authority "[u]nder and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States. . . ." No court has ever held that the President's executive order lacks certain "magic words" which transforms an otherwise legal executive order into an illegal one. Regardless, as the majority concedes, both *Farmer v. Phila. Elec. Co.*, 329 F.2d 3 (3d Cir. 1964) and *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967)—two cases dealing with anti-discriminatory executive orders—"found (although arguably in dicta) that the Procurement Act authorized the anti-discrimination executive orders." And as *Kahn* recognized, for the period from 1953 to 1964, only the Procurement Act "could have provided statutory support for the [anti-discrimination] Executive action[s]." 618 F.2d 784 at 790–91. The majority briefly discusses Executive Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 6, 2008) (E-Verify) and Executive Order No. 13,706, 80 Fed. Reg. 54,697, 54,697 (Sept. 7, 2015) (paid sick leave), and concludes that "courts have generally landed on a lenient standard, under which the President must demonstrate a sufficiently close nexus between the requirements of the executive order and the values of economy and efficiency." (internal citations and quotations omitted). I agree.

### III.

The majority seems to anchor its decision on the major question's doctrine. This reliance, however, is misplaced. The major questions doctrine provides that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA (UARG)*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Additionally, the major questions doctrine has been described as a skepticism of agency interpretations that "would bring about an enormous and transformative expansion in . . . regulatory authority without clear congressional

authorization." *Id.* The doctrine requires that an agency "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *UARG*, 573 U.S. at 324). As Judge Anderson points out in his concurrence in *Georgia v. President of the United States*,

> [w]hile I agree this is a question of major eco-
> nomic and political significance, we are not deal-
> ing with delegation to an agency. Instead, the del-
> egation is to the President who does not suffer
> from the same lack of political accountability that
> agencies may, particularly when the President
> acts on a question of economic and political sig-
> nificance. *Cf. Free Enter. Fund v. Public Co. Ac-
> counting Oversight Bd.*, 561 U.S. 477, 513–14, 130
> S. Ct. 3138, 3164, 177 L.Ed.2d 706 (2010) (hold-
> ing that the structure of an independent agency
> violated the Constitution because the President,
> "who is accountable to the people for executing
> the laws," did not have the ability to hold the in-
> dependent agency accountable).

46 F.4th 1283, 1308-17 (Anderson, J. concurring/dissenting opinion). It is important to note that the major questions doctrine is only invoked when there are potential anti-delegation issues to agencies, and that is not the situation here. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010). Furthermore, as pointed out above, this is not an "enormous and transformative expansion in" regulatory authority, but rather is a standard exercise of the federal government's *proprietary* authority. Therefore, the injunction cannot be grounded in reasoning under the major question's doctrine.

## IV.

Regardless, the majority decides that this must be the first executive order under the president's Procurement Act authority to be struck down. Even in doing so, it recognizes that analyzing the text of the statute could lend the President the power to issue the Executive Order in question: "[t]he statute introduces no serious limit on the President's authority and, in fact, places discernment explicitly in the President's hands: '[t]he President may prescribe policies and directives that *the President considers necessary* to carry out this subtitle.'" But, according to the majority, "[i]t bears considering, therefore, whether there are other extra-statutory limitations on the President's authority under the Procurement Act."

It is true that there must be limiting principles to the President's authority under the Procurement Act. But it must be fact specific to the precise issue before the court. When actions taken are in the mainstream of American businesses, that points towards permitting the executive order. Economic factors would prevent the President from handicapping the contractor workforce with extreme contractual terms. If the President attempted to insert into contracts forced abortions, BMI restrictions, or other draconian measures outside the mainstream of American companies, he or she would hear from the people or from Congress. The majority conjures up an example where the President could

> instruct the Task Force to issue guidance relating to the dangers of tobacco, and this Task Force would issue guidance requiring that all covered contractors ensure that all covered contractor employees refrain from smoking or from being in the presence of smoking. As we now know better than ever, smoking and exposure to second-hand smoke contribute to significant and lasting health issues. It is no stretch at all to say that contractual

> requirements that all employees of federal
> contractors refrain from smoking or being in the
> presence of smoking at all times would result in a
> gain to economy and efficiency in federal
> contracting.

The government can and certainly does have the authority to prohibit smoking on federal facilities. *See* 41 C.F.R. § 102-74.315.[3] It is simply another example of an Executive Order that curtails the *employees* actions. Just like requiring vaccine mandates, the reason to prohibit smoking while at a federal facility is to prevent dangerous disease from spreading, whether it be COVID or harms from secondhand smoke, which hampers the economy and efficiency of federal contractors' operations.[4]

The majority dismisses the argument that "market forces will prevent overreach." After all, "no one has a right to a Government contract." *Kahn*, 618 F.2d at 794. To the majority, "this argument does not withstand serious inquiry; the federal government is no ordinary market participant subject to the same whims of free enterprise as others, if for no other reason than its aims are greater than profit." (footnote omitted). But it deserves further inquiry. Again, no company has a right to a federal contract. If the company does not want to abide by the clauses of the government contract, the government is not forcing companies to contract with it. And there are reasons to think that the government has *greater* control in designing their contracts than private businesses. Unlike private contracts, the government

---

[3] Note, this regulation was first enacted via Executive Order 13058.

[4] The majority distinguishes the "smoking" hypothetical because it places "demands on individuals employed by federal contractors in and out of the workplace." However, getting the vaccine does not require any lasting affirmative or prohibitive activity of the employee outside the workplace like a demand that a worker quits smoking at home.

has authority to unilaterally terminate a contract for no reason at all. *See* FAR 43.103(b).

Additionally, the largest workforce in the United States—the employees of the federal government—achieved over 97% compliance with the COVID-19 vaccine requirement, with every government agency having at least a 95% compliance rate.[5] Roughly 40% of employers in the United States have some type of vaccine mandate for their employees.[6] These include American companies such as AT&T, Bank of America, Google, Johnson & Johnson, and Microsoft. The largest airline in the United States, American Airlines, achieved a 99.7% vaccination rate and fired only 232 employees out of its 67,000 U.S. based employees.[7] Some agencies also require employees *and* contractors be vaccinated for diseases such as influenza.[8] And other Department of Defense contractors are required to get

---

[5] Update on Implementation of COVID-19 Vaccination Requirement for Federal Employees, The White House (Dec. 9, 2021), https://www.whitehouse.gov/omb/briefing-room/2021/12/09/update-on-implementation-of-covid-%E2%81%A019-vaccination-requirement-for-federal-employees/.

[6] Robert Iafolla, Vaccine Mandates at Work Part of 'New Normal,' Employers Say, Bloomberg Law (May 3, 2022 at 11:01 PM), https://www.bloomberglaw.com/bloomberglawnews/daily-labor-report/X42AKRF4000000?bna_news_filter=daily-labor-report.

[7] Jemima McEvoy, United Airlines Firing 232 Employees Who Refused Covid Vaccine, CEO Says, Forbes (April 21, 2022 at 9:32 AM), https://www.forbes.com/sites/jemimamcevoy/2021/10/13/united-airlines-firing-232-employees-who-refused-covid-vaccine-ceo-says/?sh=5f1fbe8c4399).

[8] James N. Stewart, DoD Immunization Program, Office of the Under Secretary of Defense for Personnel and Readiness (July 23, 2019), https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/620502p.pdf?ver=2019-07-23-085404-617 ("For HCP working under contract to any DoD Component, seasonal influenza immunizations may be provided by the DoD medical treatment facilities, if stated in the contract agreement. Otherwise, contracting companies will provide influenza vaccines to their employees.")

vaccines for overseas assignments. *See, e.g.*, *Griffin v. Sec'y of Health & Hum. Servs.*, No. 13-280V, 2014 WL 1653427, at *2 (Fed. Cl. Apr. 4, 2014), *aff'd,* 602 F. App'x 528 (Fed. Cir. 2015). While the government does not exist to make a profit, it does favor the "economical and efficient administration and completion of Federal Government contracts." 40 U.S.C. § 121. There is an "expressed federal policy of selecting the lowest responsible bidder." *Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018) (quoting *Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187, 190 (1956)). There is no compelling reason why federal government contractors should be treated differently than private businesses in this situation.

## V.

The Procurement Act authorizes the President's action in issuing Executive Order 14042. Therefore, the States fail to establish a substantial likelihood of success on the merits. The district court abused its discretion in granting the injunction.

Even if the States showed a likelihood of success on the merits, there is no irreparable harm. A showing of irreparable harm requires a demonstration of "harm for which there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The district court identified irreparable harm as the choice the states would have to make if an employee refused to get vaccinated: a choice between "releasing the employee and all accompanying efficiency, institutional memory, and operational know-how or foregoing federal contracts." The loss of an employee is typically not a nonrecoverable cost, save for certain types of contracts where institutional knowledge might be necessary, such as large research and development contracts. More importantly, the monetary cost would be recoverable. First, this Executive

Order does not apply to any existing contracts. Any future contract modification here would be a bilateral modification under FAR 43.103(a)(1), which requires "negotiable equitable adjustments resulting from the issuance of a change order." To provide another example, in the various government shutdowns in the last decade, the federal government had to suspend countless contracts and was forced to negotiate different prices to recall contractors back after the shutdown ended.[9] And similar actions occurred when President Obama issued Executive Order 13658 to establish the minimum wage increases; the federal government simply renegotiated the contract prices. Therefore, the idea that the States show irreparable harm in the form of "nonrecoverable compliance costs" is not availing. Accordingly, there is no irreparable harm.

"[T]he irreparable harm and the public interest inquiries are intertwined, and we consider them jointly." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 623 (5th Cir. 1985). Delaying the implementation of the Executive Order will lead to widespread economic harm in the economical and efficient administration and completion of federal government contracts. Absenteeism will affect the cost and progress of all federal contracts, regardless of the type. Increased delays necessarily equal increased costs to the government because it either delays a program or delays other contractors. Absenteeism from contractors with COVID-19 causes delays or non-performance in government contracts, which will cost the government—and therefore citizens and taxpayers—unnecessary time

---

[9] David H. Carpenter, How a Government Shutdown Affects Government Contracts, Congressional Research Service (Jan. 10, 2019) https://www.google.com/url?sa=i&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact= 8&ved=0CAQQw7AJahcKEwjQx5GntKT7AhUAAAAAHQAAAAAQAg&url=https%3 A%2F%2Ffas.org%2Fsgp%2Fcrs%2Fmisc%2FLSB10243.pdf&psig=AOvVaw0bbpShAyjkp UV2qEIejsvY&ust=1668196910139790.

No. 22-30019

and money. The balance of harms weighs against the States. The district court abused its discretion in granting the injunction.

Respectfully, I dissent.